UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA

    - against -

                                                17 CR 647 (RJD)

MAKSIM ZASLAVSKIY,

      Defendant.

---

DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR SUBJECT MATTER
JURISDICTION AND VAGUENESS

DAVID PATTON
FEDERAL DEFENDER
Federal Defenders of New York
Eastern District of New York

One Pierrepont Plaza 16th Floor
Brooklyn, NY 11201

By:
Mildred M. Whalen
Len H. Kamdang
Counsel to Maksim Zaslavskiy

## PRELIMINARY STATEMENT

Pursuant to Fed. R. Crim. P. 12(b)(3)(B) and the Due Process Clause of the United States Constitution, defendant Maksim Zaslavskiy respectfully submits this Memorandum of Law in support of his motion for an Order dismissing the instant indictment because cryptocurrencies are both exempt from securities regulations as currencies and because they do not represent investment contracts – and therefore securities – within the meaning of the law. Moreover, the statutes upon which all charges are based – 15 U.S.C. §78j(b) and 78ff – *as applied* to cryptocurrencies are void for unconstitutional vagueness.

Cryptocurrencies such as the tokens Mr. Zaslavskiy attempted to create are encrypted digital currencies designed to work both as a medium of exchange and a store of value. These digital currencies operate utilizing an innovative technology called blockchain – a public and searchable electronic ledger that allows users to view the entire transactional history of respective cryptocurrencies. This emerging technology has potentially transformative implications for cybersecurity, transaction costs, and decentralized financial transactions. However, the potential societal benefits offered by these cryptocurrencies are threatened by unlawful regulation of constitutional liberties. Virtual currencies such as the ones at issue here present regulatory challenges for securities laws that were written in the 1930's – decades before the invention of the computer.

Securities laws have been crafted since the 1930s to be intentionally flexible. As cryptocurrencies have gained more mainstream adoption various American regulatory agencies – including the Securities and Exchange Commission (hereinafter "SEC"), the Commodities and Futures Trading Commission, and even the Internal Revenue Service,

have issued guidance that is at times contradictory and always non-specific. While the flexibility of securities laws generally provides enough meaningful notice for criminal enforcement of other asset classes, they fail to do so in the unique case of cryptocurrencies. The "one law fits all" approach to securities enforcement bends Due Process too far in the case of cryptocurrencies. As applied to this case, they are unconstitutionally vague.

With these concerns in mind, the best reading of the current laws make clear that cryptocurrencies are not securities. First, as currencies, these assets are statutorily exempt from the definition of securities – even under the 1933 and 1934 Securities Acts. Second, cryptocurrencies are not "investment contracts" within the meaning of the law – a key requirement should the SEC argue that cryptocurrencies are securities. Since the cryptocurrencies at issue in this case – REcoin and DRC – are not securities, they are not subject to securities law upon which all of the charges are based. Therefore the indictment charging Mr. Zaslavskiy is defective.

To date, no defendant in the United States has been convicted at trial of criminal charges relating to securities fraud of cryptocurrencies despite the launch of hundreds of new cryptocurrencies that were not registered with the SEC in the past ten years. In fact, both in the civil and criminal context, no federal court in the United States has held that cryptocurrencies are "securities" within the meaning of the law. The government's prosecution of Maksim Zaslavskiy is both unprecedented and an improper attempted criminal enforcement of SEC law. The Court should dismiss the charges in the indictment in their entirety.

# I.     BACKGROUND

Maksim Zaslavskiy is a naturalized United States citizen living in Brooklyn, NY. In 2017 Mr. Zaslavskiy founded REcoin and Diamond Reserve Club ("DRC"). Mr. Zaslavskiy owns REcoin and DRC and he serves as the president, CEO, and sole officer of both companies.

Mr. Zaslavskiy sold what are known as cryptocurrencies in July and August 2017.  Both REcoin and DRC were intended to function as virtual currencies – they were intended to be digitally traded and function as both a medium of exchange and a store of value. Although these new cryptocurrencies were not intended to have legal tender status, these currencies would have value within a financial ecosystem of adoptors who would each bring their valuable professional expertise to the virtual ecosystem to make more efficient transactions. The vision was for these adoptors to conduct their transactions using REcoin and DRC coins as currency. As the government points out, a more well-known example of cryptocurrency that functions in this manner is Ethereum. Indictment at ¶5.

REcoin was to be an innovative token ecosystem where real estate players including brokers, tenants, purchasers, developers, architects, and lawyers could purchase REcoin tokens to facilitate a variety of real estate transactions. The REcoin blockchain would allow users in the ecosystem to enter into smart contracts – electronic contracts recorded forever on the blockchain for added security and ease of service.  A "smart contract" is a computer program designed to execute the terms of a contract when certain triggering conditions are met. Blockchains record contracts and all other transactions on the ledger forever.

As an example of a potential smart contract on the REcoin blockchain – a developer and an architect could agree to enter into a smart contract where the architect would design a building for the developer for an agreed upon amount of REcoins. The terms of that smart contract, for example price, timeline, scope of design, time commitment, and parameters of conceptual design, would be recorded on the REcoin blockchain ledger. Once the terms of that contract were triggered, the digital contract would execute and implement a transfer of REcoin tokens from the developer to the architect. There would be no need for attorney fees and banking fees. The contract would automatically execute. This transaction would have added security because the terms of the contract would be forever recorded on a digital ledger.

Unlike centralized banks, power on the REcoin blockchain was intended to be decentralized. The ideal adopters of REcoin were envisioned to be players in the real estate industry. The more REcoin adopters transacted in the ecosystem, the more the ecosystem would develop expertise to facilitate future deals. Adopters of REcoin themselves would contribute their expertise to the value of the blockchain and accrue decision-making authority on the blockchain the more they used it.  This decentralized model of blockchain governance would also minimize attorney fees and other transaction costs – making transactions more efficient and secure than traditional deals. The ability to transact in this sort of secure ecosystem, without the need for centralized banking and burdensome securities regulations, is one of the central ideals of blockchain enthusiasts.

REcoin launched its initial fundraising Initial Coin Offering in August 2017. Anyone could purchase REcoin.  REcoin offered early investors a 15 percent discount on tokens. The discount decreased as certain threshold levels of tokens were sold. As an added measure of

security of REcoin token holders, the REcoin token would itself be hedged by ownership of real estate – so that if token holders in the ecosystem for some reason decided not to recognize value of the tokens, the tokens themselves would have some measure of intrinsic value.

To be clear, Maksim Zaslavskiy never intended to defraud potential adopters of their money. His was a sincere vision and he intended to create a new more efficient token economy for the benefit of society. As his project continued to progress, he soon realized that his vision was not feasible and he refunded nearly all of the money he had raised in the ICO to his adopters to make them whole.

After winding down REcoin, Mr. Zaslavskiy's turned his attention to a second cryptocurrency venture. The Diamond Reserve Club (DRC) was intended to be a virtual ecosystem where "businessmen and investors" could rely upon DRC as an "alternative financing method" to retain and perform services.  Like REcoin, DRC tokens would be hedged with real world assets as a measure of additional security – in this case diamonds instead of real estate. Although DRC began the initial stages of marketing, DRC never officially launched in an initial coin offering. Both of these ventures are subjects of the government's criminal indictment.

Without explanation, the government concludes in the indictment that "investments in the REcoin ICO and Diamond IMO were "investment contracts," and therefore "securities" as defined by Section 2(a)(1) of the Securities act and 3(a)(10) of the Exchange Act." The government's arguments are unavailing for three reasons: 1) currencies are specifically exempt by statute from being considered securities by the SEC; 2) cryptocurrencies are not "investment contracts" and therefore not securities within the meaning of the law; 3) the statutes are

unconstitutionally vague as to what constitutes an "investment contract" pursuant to the 1933 and 1934 Securities Acts.

## II.    STANDARD OF REVIEW

A motion to dismiss an indictment challenges the adequacy of an indictment on its face. Thus, the indictment must be viewed as a whole and the allegations must be accepted as true at this stage of the proceedings. *Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 96 L.Ed. 367 (1952); *United States v. Ferris,* 807 F.2d 269, 271 (1st Cir.1986). The question, then, is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *United States v. Sampson,* 371 U.S. 75, 76, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962).

## III.    ARGUMENT

### A.  CRYPTOCURRENCIES ARE A FORM OF CURRENCY EXPRESSLY EXCLUDED FROM THE DEFINITION OF "SECURITY"

Even before reaching the question of whether cryptocurrency is an "investment contract" and in doing so contemplating whether or not the definition of this term in the statute is unconstitutionally vague, the Court should dismiss the instant charges because cryptocurrencies are "currency" within the meaning of the statute and therefore exempt from the definition of securities.

Although the statute contains a lengthy list of covered assets, the definition of a "security" in the 1933 and 1934 Acts does not include the term "cryptocurrency."[1] No U.S.

---

[1] *See* 15 U.S.C. § 77b(a)(1) ("The term 'security' means any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call,

court has held that cryptocurrencies are "securities."[2] In fact, the 1934 Act expressly excludes "currency" from the definition of security. *See* 15 U.S.C. § 78c(a)(10) ("The term 'security' means . . . but shall not include currency"); *see also Procter & Gamble Co. v. Bankers Trust Co.*, 925 F. Supp. 1270, 1280 n.4 ("underlying instrumentality of the DM swap was not a security, because the value of the DM swap was based on a foreign currency, which is not a security as defined in the 1933 and 1934 Acts"). There is no legal requirement that "currency" be legal tender and recognized by the United States or any other foreign country. *See generally Sea Pines of Va. v. PLD, Ltd.*, 399 F. Supp. 708, 711-12 (M.D. Fla. 1975) (holding that a promissory note was not a security because it was merely a cash substitute and therefore within the exclusion for "currency" contained in the 1934 Act). Thus, the statute and case law are clear that if an instrument is a currency, it cannot also be a security under U.S. law.

When dealing with issues of statutory interpretation, courts look to the plain language of the words used. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995)("the

---

straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.") and 15 U.S.C. § 78c(a)(10) ("The term 'security' means any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.").

[2] One court has, however, held that an investment into a digital hedge fund comprised of cryptocurrencies was a security. *See SEC v. Shavers*, 2013 WL 4028182, (E.D. Tex. Aug. 6, 2013). Notably, *Shavers* limited its holding to whether shares of the hedge fund investment were securities, but the court did not go as far as the SEC seeks to go in this case. Thus, *Shavers* is inapposite here.

plain meaning of a statute will produce a result demonstrably at odds with the intentions of its drafters")(quotations and alterations omitted). It seems almost redundant to contend that cryptocurrencies are currencies. It is an axiomatic principle of economics that currency is anything that can serve as a:

1) store of value, which means people can save it and use it later—smoothing their purchases over time;

2) unit of account, that is, provide a common base for prices; or

3) medium of exchange, something that people can use to buy and sell from one another.

*See* International Monetary Fund "Back to Basics: What is money" available at http://www.imf.org/external/pubs/ft/fandd/2012/09/basics.htm[3]

Here, the government defines the virtual currencies REcoin and DRC using identical language. *See* Indictment. ¶ 5 (describing virtual currency as a "digital representation of value that can be digitally traded and functions as (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any jurisdiction"). Cryptocurrencies are currencies. They are not securities within the meaning of the statute.

Case law also recognizes that cryptocurrencies function as a medium of exchange. *See United States v. Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) ("Indeed, the only value for Bitcoin [a form of cryptocurrency] lies in its ability to pay for things—it is digital and has no earthly form; it cannot be put on a shelf and looked at or collected in a nice display case.").

---

[3] The plain language definition of "currency" is "[a]n item (such as a coin, government note, or banknote) that circulates ***as a medium of exchange***." Black's Law Dictionary (10th ed. 2014) (emphasis added); *see also Merriam-Webster Online, available at https://www.merriam-webster.com/dictionary/currency* (last visited January 4, 2018) (defining currency as "a medium of exchange").

Likewise, IRS guidance on virtual currencies describes them as "as a medium of exchange, a unit of account, and/or a store of value." IRS Notice 2014-21 (March 26, 2014). The IRS further notes that virtual currencies can operate like paper or coin money despite the lack of legal tender status. *Id.*

Unlike stocks, debentures, bonds, etc., which are primarily used as investments, the primary function of cryptocurrencies is the ability to purchase goods or services – in both general society and within specific token economies like REcoin or DRC. *See Ulbricht*, 31 F. Supp. 3d at 570 (ability to use cryptocurrency as payment is critical feature); IRS Notice 2014-21 (noting that "convertible virtual currencies" can substitute for currency issued as legal tender). Indeed, foreign regulators have noted this feature of cryptocurrencies and have treated them accordingly. *See generally* Miljan Mimic, *Regulatory Challenges of Alternative E-Currency*, Central European University (March 31, 2014) (available at http://www.etd.ceu.hu/2014/mimic_miljan.pdf) (noting that foreign regulators have classified cryptocurrencies differently depending on use). In the civil companion case, the SEC acknowledges that a cryptocurrency is a "medium of exchange." SEC Complaint, 17 CV 5725, dkt 1, p.7, nt 1. In doing so, it acknowledges that REcoins and DRC coins can function as a form of currency, unlike stocks or bonds or the other forms of security contained within the statutory definitions.

Cryptocurrencies like ReCoin and DRC function as more than mere investment vehicles; they are "currency." Cryptocurrencies continue to gain mainstream acceptance as a viable medium of exchange every month. Today, it is possible to purchase lunch, or a hotel room, or even a new set of living room furniture using cryptocurrencies. Major companies that accept cryptocurrencies as payment include Overstock.com, Subway, Expedia, PayPal,

and Microsoft. *See* "7 major companies that accept cryptocurrency" available at

https://www.nasdaq.com/article/7-major-companies-that-accept-cryptocurrency-cm913745.

The utility of cryptocurrency is not speculative. Adopters are using cryptocurrency as money

today. These tokens are plainly "currency" within the meaning of the statutes. Thus, ReCoin

and DRC are excluded from regulation as securities and the government's indictment should

be dismissed.

### B.  CRYPTOCURRENCIES ARE NOT SECURITIES UNDER EXISTING CASE LAW

The complaint and indictment claim that RECoin and DRC are securities, and that they

fall under the security class known as investment contracts.   Investment contracts are defined

in ¶ 6 of the complaint as "an investment of money in a common enterprise or managerial

efforts of others." In ¶ 9 of the complaint, the government claims that the investments offered

during the RECoin ICO were securities  within the meaning of the Securities and the Securities

Exchange Acts, without further explanation.  In ¶ 19, the government explains that because

the Diamond IMO "provided investors with an expectation of profits to be derived from the

purchase of diamonds, the investments . . . were securities" within the meaning of the

Securities and Securities Exchange Acts.

The indictment defines investment contracts in ¶ 9 as "an investment of money in a

common enterprise with a reasonable expectation of profits to be derived from the

entrepreneurial or managerial efforts of others." It noted that investment contracts were

defined as securities under the Securities and Securities Exchange Acts. The government then

concluded that ""nvestments in the RECoin ICO and the Diamond IMO were investment

contracts and therefore securities" under the Securities and Securities Exchange Acts.

The government's formulation of investment contracts tracks what is commonly known as the *Howey* test.  In *SEC v. W.J. Howey Co..et al.*, 328 U.S. 293 (1946), the Supreme Court looked at an offering of units in a citrus grove development to determine whether the offering fell under the regulatory authority of the Securities Act.  The Court looked at whether the offering – consisting of a land sales contract, warranty deed and service contract – constituted an "investment contract" under the Acts.  *Id.* at 297.  The Court noted that the term "investment contract" was included, but not defined under the Securities Act, so the Court looked to state "blue sky laws" for a definition.  There, the Court found that an investment contract "came to mean a contract or scheme for the placing of capital or laying out of money in a way intended to secure income or profit from its employment." *Id.* at 297-298 (internal quotations and citations omitted). The Court then defined an investment contract, for the purposes of the Securities Act, as a "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party". *Id.* at 298-99, 301.  If that test is met, the item is an investment contract and governed by the Securities Act.

All three elements of the *Howey* test must be present for an offering to constitute an investment contract: (1) an investment of money; (2) in a common enterprise; (3) with profits to be derived solely from the efforts of others.  *See SEC v. Edwards*, 540 U.S. 389, 393 (2004); *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).  The definitions of these elements have been refined over time.

A review of the items offered and the white papers detailing the offerings demonstrate that none of the prongs of the *Howey* test were met, and that the offerings do not meet a threshold test that they constitute securities.

**1)  The first prong of the *Howey* test is not met**

The first prong of the *Howey* test is not met because there is no 'investment' of money. RECoin and DRC are commodity backed crypto currencies.  Their value is supported by purchases of real estate or diamonds, the way the U.S. dollar was once backed by gold reserves.Individuals who choose to buy RECoin or DRC are simply exchanging one medium of currency for another, they are not 'investing'. Thus the first prong of the *Howey* test is not met.

**2)  The second prong of the *Howey* test is not met**

The second prong of the *Howey* test: that of a common enterprise, has been further refined to include two kinds of commonality, horizontal and strict vertical commonality.[4] Horizontal commonality is similar to the commonality found in *Howey*, where each individual investor's fortunes are tied "to the fortunes of other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak*, *supra*, at 87 (internal quotations and citations omitted); *Howey*, *supra*, at 299-300.

Strict vertical commonality requires that the fortunes of investors be tied to the fortunes of the promoter. In other words, the profit and loss of the investor and the promoter must be interdependent. When the investor loses, the promoter must lose as well, when the investor profits, the promoter must profit as well.  Where the promoter can profit, say through commissions when the investor loses, there is no strict vertical commonality.  *Marini v. Adamo*, 812 F.Supp.2d 243, 256 (E.D.N.Y. 2011)(Bianco, J.)(gathering cases); *Kaplan v. Shapiro*, 655

---

[4]While other jurisdictions recognize a third form of commonality, 'broad' vertical commonality, the Second Circuit does not.  *Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994).

F.Supp 336, 341 (S.D.N.Y. 1987)(Kram, J.)

The second prong of the *Howey* test is not met under either a horizontal commonality or a strict vertical commonality test[5].  As noted above, for horizontal commonality to exist, each individual investor's fortunes are tied to the fortunes of other investors by the pooling of assets, with the pro-rata distribution of profits.

Here, there is no pooling of assets. Each individual purchases a REcoin or DRC, and then is free to do with it as she wishes.  She can exchange it for other currency, use it to purchase items, or use it in the execution of a smart contract. Her profits and losses from these actions are her own.

Additionally, there is no pro-rata distribution of profit. If the real estate or diamonds (purchased with the proceeds of her purchase of RECoin or DRC) increase in value, she shares in no direct increase in the value of her coin. Any profit resulting from the sale of real estate or diamonds supporting the value of this commodity-based currency is ploughed back into the purchase of additional real estate or diamonds. Defendant's Exhibit  A  , p. 9, Defendant's Exhibit B, Diamond Reserve Whitepaper, pp.4, 8.  As noted in the SEC's Memorandum of Law, there is no distribution of profit based on any profit achieved from the investment of real estate or diamonds. SEC Memorandum of Law, 17 CV 5725, Dkt 1-4, p.13

There is also no strict vertical commonality in RECoin or DRC. The profits and loss of the purchaser and promoter are not interdependent.  Any profit Mr. Zaslavskiy were to make from the venture would come from transaction fees for smart contracts and other

---

[5]The government did identify which of the common enterprise theories RECoin and DRC met to achieve the second prong of the *Howey* test.  The SEC, in its memorandum of law filed with the complaint in the parallel case, 17 CV 5725, Dkt 1-4, p.19, claims  that there is horizontal commonality, via a pooling of assets and reinvestment.  As we explain, there is no horizontal commonality in these offerings.

maintenance costs.  Ex. A, pp.10, 17; ex. B, pp.6, 8.  These transaction fees are independent of

the rise or fall in the value of RECoin or DRC, or even the real estate and diamonds

supporting these crypto currencies.  As a result, Mr. Zaslavskiy would make a profit on

transaction fees despite any rise or fall in the value of RECoin or DRC.  For these reasons,

there is neither horizontal nor strict vertical commonality, and the second prong of the *Howey*

test is not met

### 3) The third prong of the *Howey* test is not met.

We anticipate that even the government would concede the third prong of the *Howey*

test, as it applies to cryptocurrency, is the most novel issue of the three. It is not met because

profit in RECoin or DRC is not derived solely from the effort of others, or under the more

expansive finding of essential managerial efforts which affect the failure or success of the

enterprise.     As noted above, RECoin and DRC are commodity-based currencies. Value

derived from the currency is based on a number of things, like its efficacy for use in smart

contracts or the ease or difficulty of mining the currencies, not the managerial efforts of

others.

Courts have expanded the third prong of the *Howey* test, that profits be derived *solely*

through the efforts of others, as well. In *Securities and Exchange Commission v. Glenn W. Turner*

*Enterprises, Inc.*, 474 F2d 476 (9thCir 1973), the 9th Circuit found adherence to a strict

interpretation of "solely" was too restrictive. Instead, it adopted "a more realistic test, whether

the efforts made by those other than the investor are the undeniably significant ones, those

essential managerial efforts which affect the failure or success of the enterprise."  *Id.* at 482.

This interpretation has been adopted by the Second Circuit. *United States v. Leonard*, 529 F.3d

83, 88 (2008); *S.E.C. v. Aqua-Sonic Products, Corp.*, 687 F.2d 577 (1982).

### a) The Government's view of DRC and RECoin fails to understand the unique nature of cryptocurrencies

In answering the critical question of whether value in RECoin or DRC will be derived solely by the work of others the Court must first consider why blockchain cryptocurrencies function as a new asset class that has never existed before. No Court has yet opined on how the third prong of the *Howey* test applies to the decentralized nature of cryptocurrencies.

What Mr. Zaslavskiy – and other second generation blockchain creators – envisioned for REcoin adopters was a role more active and engaged than a typical investor in a security.[6] RECoin and DRC were to be unlike a typical company where an investor purchases stock in a company and agrees to be passively tied to fortunes of a company. Instead REcoin and DRC were to be a new kind of decentralized token economy where adoptors with shared professional interests could work together to create an ecosystem where shared related professional transactions could be conducted securely, efficiently, and without the need for centralized banks.[7]

While anyone in the world was free to purchase RECoin, investors in RECoin were anticipated to be "tenants/buyers and sellers of real estate" and "lawyers, developers, architectural firms." Defendant's Exhibit A, Final RECoin White Paper at 6. This group of real estate professionals could transact in the RECoin ecosystem using smart contracts to "ensure

---

[6] Bitcoin – the original cryptocurrency was not specifically designed to execute smart contracts. Although improvements have been made to the blockchain to allow for some form of smart contracts, the parameters of a Bitcoin economy differ from second generation alternative coins like RECoin and DRC. *See* "Yes, Bitcoin can do Smartcontracts" https://www.nasdaq.com/article/yes-bitcoin-can-do-smart-contracts-and-particl-demonstrates-how-cm859505

[7] As blockchains, REcoin and DRC were conceived to operate similarly. Since REcoin was further developed than DRC, we discuss REcoin as an example of a blockchain token economy. The analysis would apply with equal force to DRC.

that payment terms, service fees or liens [were] paid for once the contract was executed." Defendant's Exhibit A, White Paper at 17. All adopters in the REcoin ecosystem would agree to transact in the REcoin currency.

When the REcoin white paper describes "investors" it is referring to their role as real estate professionals before becoming members within REcoin ecosystem. Holders of RECoin tokens were to be more akin to stakeholders[8] than investors. They would contribute value to the ecosystem by a) using the ecosystem to conduct transactions and b) adding their own unique expertise in the field of real estate to the token ecosystem. *See* Defendant's Exhibit A, REcoin White Paper at 5 (Participants can realize the value of the blockchain in part by "becoming active in the REcoin ecosystem and creating REcoin sidechains"). In fact, the white paper specifically contemplates that stakeholders would create their own individual tokens within the ecosystem as their needs demanded. *Id.* at 18.

Accordingly, a central feature of a blockchain ecosystem like the REcoin and DRC is that the value of the network flows from the critical efforts of all of its participants – from the efforts of the developers, to miners, and the stakeholders alike. Without the continued participation of the stakeholders, the blockchain would become valueless. This model is fundamentally at odds with the prong three of the *Howey* test. The continued efforts of REcoin purchasers was essential to the survival of the blockchain. If all of the purchasers simply relied solely upon the efforts of Mr. Zaslavsky, the blockchain would die. REcoin and DRC are not investment contracts.

---

[8] *See* Dolan, Zoe "ICOs on Our Terms and Conditions" available at https://www.coindesk.com/icos-terms-conditions/

**b) Value of DRC and REcoin would largely be controlled by market forces**

One unique feature of both DRC and REcoin was that the value of the blockchain was to be hedged by real world assets – diamonds and real estate. As with the blockchain itself, the value of these real-world assets do not run afoul of prong three of the *Howey* test. Managerial efforts of others were to affect the value of the real estate or diamonds in a very limited way. Both diamonds and real estate are largely valued outside of any one individual's control. Diamonds have a value determined in large part by the world market, on a scale created by the Gemological Institute of America in the 1940's. https://www.gia.edu/gia-about. So while DRC would have a "Vault Group" responsible for purchase, valuation, storage, and strategic purchase or sale for benefit of DRC value (ex. B at p.6), that group's work would be limited by factors affecting the world market for diamonds.

The value of real estate is also determined by a number of factors exclusive of any individual's control.  While development may be an aspect of increase in real estate value, that is only one of the considerations in REcoin real estate investment. The others are income investment, short sales, and foreclosures, all of which rise and fall based on the world market, not an individual's efforts.  Additionally, coin holders would vote on any investment decisions that could affect 5% of REcoin market value, thus decreasing the impact of managerial efforts on the value of the commodities underpinning REvoin.  Ex. A at p.7.

Given the unique design and necessity of token holder efforts to the success of block chain technology, and given the lack of impact of managerial effort on failure or success of the REcoin or DRC enterprise, the third prong of the *Howey* test is not met.

### C.  THE 1933 AND 1934 SECURITIES ACTS ARE VOID FOR VAGUENESS AS APPLIED TO THIS CASE

The Due Process Clause requires that "a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender  v. Lawson,* 461 U.S. 352, 357 (1983). This fair warning requirement protects a person's right to  "steer between lawful and unlawful conduct," *Grayned v. City of Rockford,* 408 U.S. 104, 108  (1972), by insisting that "no man shall be held criminally responsible for conduct which he could  not reasonably understand to be proscribed." *Bouie v. City of Columbia,* 378 U.S. 347, 351  (1964) (citation omitted); *United States v. Roberts*, 363 F.3d118, 122 (2d Cir. 2004).

In *Kolender*, the Supreme Court elaborated that "although the doctrine [of void for vagueness] focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.' Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows  policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender v. Lawson*, 461 U.S. 352, 357-58, 103 S. Ct. 1855, 1858, 75 L. Ed. 2d 903 (1983) (internal citations omitted).  Accordingly, this second prong requires that legislatures "establish minimal guidelines to govern  law enforcement" in order to prevent "policemen, prosecutors, and juries [from] pursu[ing] their  personal predilections." *Smith v. Goguen,* 415 U.S. 566, 574-75 (1974); *United States v. Roberts*, 363 F.3d 118, 123 (2d Cir. 2004). Vague

laws leave the line between lawful and illegal  conduct to be drawn "on an ad hoc and

subjective basis" by those who enforce the statute,  inevitably leading to disparate treatment

of similarly situated defendants based on the happenstance of the understanding adopted

by particular police officers, prosecutors, judges, and  juries. *Grayned*, 408 U.S. at 109.

As applied to cryptocurrencies, the instant indictment implicates all these concerns.

Cryptocurrencies are an asset class that have never before existed. The attempt to regulate this

new asset class using the framework conceived of in the 1930s is troubling. While it is true that

courts have applied the *Howey* test since the 1940s to determine whether specific assets are

securities – that test as applied to cryptocurrencies in unconstitutionally vague since the statute

also exempts currency from its definition of securities. There is no meaningful guidance for

would-be developers to know whether their work runs afoul of criminal securities laws. These

laws provided no meaningful guidance for how a potential defendant could navigate this

potential statutory contradiction. Due Process requires more.

1) **A person of common intelligence must necessarily guess at the meaning of and application of the Securities Acts as they apply to cryptocurrencies**

 "The vagueness doctrine bars enforcement of a statute which either forbids or

requires the doing of an act in terms so vague that men of common intelligence must

necessarily guess at its meaning and differ as to its application." *United States v. Roberts*, 363

F.3d 118, 123 (2d Cir. 2004) citing *United States v. Lanier*, 520 U.S. 259, 266 (1997). Securities

law have been crafted since the 1930s to be intentionally vague in order to maintain

flexibility. However, Congress "did not intend to provide a broad federal remedy for all

fraud." *Maine Bank v. Weaver*, 455 U.S. 551, 556 (1982).

As cryptocurrencies have gained more mainstream recognition various American regulatory agencies have issued guidance that is at times contradictory and always non-specific. While our securities laws may have been sufficient to provide meaningful notice for criminal enforcement of other asset classes, the laws and public guidance offered by the SEC have failed to do so in the case of cryptocurrencies.

The last Congressional action on this issue occurred in 1934 – nearly seventy-five years before the creation of Bitcoin, the first cryptocurrency. The 1933 and 1934 Acts set forth an identified list of covered assets that does not include cryptocurrencies. In fact, the Acts specifically exempt currency from its definition of securities. At its threshold, would-be developers of new cryptocurrencies must attempt to determine whether a potentially transformative technologically advanced asset class would shoehorn into a class of securities conceived by Congress over 80 years ago. [9]

While Congress has held hearings on the regulation of cryptocurrencies as recently as this month, it has not yet supplemented these laws with additional guidance. Without more, anticipation of what cryptocurrencies would be subject to criminal securities laws amounts to nothing more than mere guesswork.

### 2) A defendant may not be able to know *ex ante* whether a cryptocurrency is a security without a jury determination

As noted above, should the Court find the three prongs of the *Howey* test met by the

---

[9] Whether a financial instrument constitutes a "security" is a question of statutory interpretation. *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685-86 (1985). The 1933 Act and the 1934 Act contain similar, but not identical definitions of "security." *Compare* 15 U.S.C. § 77b(a)(1) *with* 15 U.S.C. § 78c(a)(10). Despite the minor differences between the statutes, courts treat them identically "in decisions dealing with the scope of the term." *Landreth*, 471 U.S. at 686 n.1; *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 847 n.12 (1975).

REcoin or DRC offerings, it would then go to the jury for a decision on whether the three

prongs of the *Howey* test are met to determine beyond a reasonable doubt – whether the

REcoin or DRC offerings are investment contracts and thus securities.

That a jury determination might be required to ultimately answer whether securities

laws apply has troubling implications. It would have been impossible for Mr. Zaslavskiy to

determine whether REcoin and DRC token were securities conclusively *ex ante*. A jury's

determination would have no precedential value. Reasonable juries could conceivably hear the

same testimony and reach different results on cryptocurrencies that are set up identically.

Assigning the task deciding the *Howey* test to the factfinder unavoidably makes the

lawfulness of any given substance subject to determination "on an ad hoc" and "case by case

basis." *Grayned,* 408 U.S. at 109; *Ashton,* 384 U.S. at 198. This risks the law meaning one

thing for one defendant, and another for someone else.

### 3) The Securities Acts as applied to cryptocurrencies promote arbitrary enforcement and inconsistent criminal prosecutions

*Kolender*'s second prong requires that legislatures "establish minimal guidelines to

govern law enforcement" in order to prevent "policemen, prosecutors, and juries [from]

pursu[ing] their personal predilections." *Smith v. Goguen,* 415 U.S. 566, 574-75 (1974); *United

States v. Roberts*, 363 F.3d 118, 123 (2d Cir. 2004). A statute may not be so broad and

unconstrained as to "encourage arbitrary and discriminatory enforcement." Vague laws

leave the line between lawful  and illegal conduct to be drawn "on an ad hoc and subjective

basis" by those who enforce the statute, inevitably leading to disparate treatment of

similarly situated defendants based on the  happenstance of the understanding adopted by

particular police officers, prosecutors, judges, and  juries. *Grayned* at 109. Upon information

and belief, there have been hundreds of fundraising ICOs in the United States in the past ten years launching new cryptocurrencies. None have been registered as securities with the SEC. The prosecution of Mr. Zaslavskiy under American securities law is arbitrary and inconsistent.

For its part, the SEC remained largely silent on the question of whether cryptocurrencies represented securities until recently. In July 2017 – the most recent guidance the SEC issued before Mr. Zaslavskiy launched REcoin – the SEC opined nebulously that cryptocurrencies *may* be securities depending on how they were set up. *See* DAO Report of Investigation, available at https://www.sec.gov/litigation/investreport/34-81207.pdf. As recently as December 11, 2017, the Chairman on the SEC reiterated the point: some cryptocurrencies appear to the SEC to be securities, some do not. As he opined "while there are cryptocurrencies that *do not* appear to be securities, simply calling something a "currency" or a currency-based product does not mean that it is not a security."  December 11, 2017 Public Statement of SEC Chairman Jay Clayton, available at https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11. (emphasis added)

As the SEC has issued more and more guidance on the securities issue, its position remains clear that its inquiry is case specific and depends on a number of factors that have not yet been identified by the agency. *See Id.* ("A key question for all ICO market participants: "Is the coin or token a security?"  As securities law practitioners know well, the answer depends on the facts."). While we recognize the need for securities laws to remain flexible, we submit that they cannot be so flexible that the SEC or the United States Attorney's Office can decide on an unprincipled case-by-case basis whether to prosecute defendants for criminal for

securities violations.

The Securities Acts as applied to cryptocurrencies bear all the markings of an unconstitutionally vague statute. *See, e.g., Ashton v. Kentucky,* 384 U.S. 195, 198 (1966) (Due Process Clause prohibits a law whose meaning can be determined only on a "case to case basis"); *Lanzetta v. New Jersey,* 306 U.S. 451, 453-55 (1939) (due process violated when critical term of criminal statute had no settled meaning in legal tradition, dictionaries, or social science); *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 91, 41 S. Ct. 298, 300, 65 L. Ed. 516 (1921) (vagueness indicated by efforts "made by administrative officers … to establish a standard of their own to be used as a basis to render the [statute] capable of execution"); *cf. Sykes v. United States,* 131 S. Ct. 2267, 2286-87 (2011) (Scalia, J., dissenting) (asking "is it seriously to be expected that the average citizen would be familiar with the sundry statistical studies" underlying the Court's interpretation of the ACCA's residual clause).

Finally, while we recognize the long line of cases applying the *Howey* test to alleged investment contracts, this line of cases is insufficient to provide notice as applied to cryptocurrencies. Cryptocurrencies plainly operate as a currency which suggests they are exempt from securities regulation. Without additional guidance or Congressional action, potential defendants are left with a conflicting statutory tension that undermines any notice the *Howey* test might provide. The problem of cryptocurrencies raises unique vagueness concerns with respect to the Securities Acts.

## CONCLUSION

The prosecution of Maksim Zaslavskiy is unprecedented. No Court has ruled that cryptocurrencies are securities within the meaning of the law. While the regulation of

alleged fraud is a laudable goal for the government, it does not follow that United States securities laws are the appropriate means to accomplish these goals.

Increased mainstream adoption makes clear that cryptocurrencies have become a viable medium of exchange. They are currency. As such, the plain language of the Securities Acts makes clear that cryptocurrencies are not securities. Moreover, the best reading of available case law makes clear that cryptocurrencies are not "investment contracts." Under both rationales, the Court should dismiss the indictment in its entirety.

Ultimately, this prosecution implicates more fundamental concerns of fairness and due process. Our current regulatory scheme provides insufficient notice for defendants like Mr. Zaslavskiy. No district court has ruled that cryptocurrencies represent "investment contracts" within the meaning of the statute. To subject him to a criminal securities cryptocurrency prosecution when hundreds of tokens have launched without incident in the past ten years would be arbitrary and unfair without real notice. Without additional Congressional action, the indictment violated Maksim Zaslavskiy's Due Process rights. Therefore, the Court should dismiss the indictment in its entirety.

Dated: February 26, 2018                    Respectfully Submitted,
Brooklyn, New York


                                            /s/_____
                                            Mildred Whalen
                                            Len H. Kamdang
                                            Counsel to Maksim Zaslavskiy
                                            Federal Defenders of New York, Inc

Copies to:

The Honorable Raymond J. Dearie (by hand delivery)

Government's Counsel of Record (via first class mail)

Defendant's Exhibit

A

# COMPANY PROFILE



## Real Estate Coin
### leadership of tomorrow

# About REcoin

REcoin is hedged by secure real estate investments in the world's most advanced economies. It will allow investors from all over the world to convert their currency and savings into stable inflation-proof token. REcoin is founded by humanitarian and entrepreneur Maksim Zaslavskiy, who financed all activities pertinent to creation of REcoin out of his own pocket.



01

# Executive summary

**REcoin provides both investors and the general public a more superior alternative to storing their wealth in low-interest bank accounts.**



REcoin is designed to accommodate a broad range of financial transactions and storing value. Its security is ensured through the use of one of the soundest and most reliable currency backings there is - real estate.

02

# The currency problem

There have been no real assets backing the world's major state-issued currencies since 1971 when the United States effectively ended the gold standard.

Since that time, none of the major currencies in the world has had a commodity backing it other than a government decree and the faith of the public in that currency's purchasing power.

"*Many economists see this as a fundamental flaw of the world's major currencies, making them susceptible to a continuously declining value and potential collapse...*"

03

# The solution: REcoin

REcoin is hedged by real estate investments in countries with developed and stable economy such as the United States, Canada, the U.K., Switzerland, Japan.

REcoin is powered by blockchain technology offering stability and a superior alternative to storing savings in the form of a primary currency.

Cryptocurrencies such as REcoin are digital currencies, which use cryptography for their security. They are difficult to counterfeit as a result. They are not susceptible to government or central bank manipulation.

Confidence in cryptocurrencies and their popularity has grown tremendously in the past decade since Bitcoin was first launched in 2009.



04

# How does REcoin work?

High liquidity is an important advantage of REcoin. There are four ways of taking that advantage:
  by doing business on token exchanges and with REcoin-friendly e-commerce organizations;
  by using smart contracts for real estate transactions calculated in REcoin;
  by becoming active in the REcoin ecosystem and creating REcoin sidechains;
  by exchanging tokens for Trust assets, whose stable earning potential is based on investing in the propitious real estate in developed countries. Those investments are supported with 83% of the annual emission of tokens and through reinvesting of 100% of the Trust's net profit.

The management of the REcoin supply and its security is guaranteed by the membership club "REcoin Group Foundation". REcoin offers its users an easy and intuitive buying and selling process, and furthermore, it is designed to be easily used as a currency alternative for a full range real estate transactions and services.



05

# Who will use REcoin?

REcoin holders are not just users; they are also investors. REcoin offers a different mode of payment for online real estate transactions. The most common REcoin users are defined below:

- Anyone in the world can purchase REcoin to convert their country's currency into stable, real estate hedged token.

- Tenants/buyers and sellers of real estate will be able to use REcoin for their real estate acquisitions and rental agreement payments.

- Licensed brokers will be able to rely on REcoin as an alternative financing method and incorporate it into their daily practices and agreements.

- Service providers such as lawyers, developers, architectural firms and other services related to the real estate industry will be able to use REcoin to purchase or sell their services.

06

# The unique advantages of REcoin

REcoin offers numerous distinct advantages compared to other currencies and real estate purchasing methods.

The unique feature of REcoin is the creation of templates for smart contracts in real estate. REcoin smart contracts is an online legal instrument that helps customers rent or purchase commercial and residential property avoiding the need for legal counsel altogether.

- REcoin simplifies and expedites real estate transactions without involving third parties.

- REcoin offers the safe financial transactions in real estate via the built-in code for smart contracts escrow.

- REcoin offers a new international real estate marketplace and facilitates connections for investors, brokers, and real estate sellers.

07

# THE RECOIN TRUST

With the purpose of decentralization of the REcoin ecosystem to the benefit of all REcoin community members, the REcoin Trust is created. The Trust's goal is going to be holding and hedging all real estate assets acquired/invested in by the REcoin community members using the REcoin ecosystem and the cyber currency REcoin as a legal tender of a transaction. The REcoin Trust is designed to ensure that all investment activities will be in the interest of REcoin holders and centered around real estate.

The Trust is led by an experienced team of brokers, attorneys, and developers and invests its proceeds into global real estate based on the soundest strategies, including:

- Investing into properties in the world's leading economies will allow devising a diverse investment portfolio generating a stable income.

- All investment income is reinvested into real estate raising the level of REcoin's security, while no individual or organization receives dividends from the Trust's activities

- Using active investment strategies such as investing in real estate with a stable income potential, short sales, foreclosures and real estate development projects will stimulate the growth of the Trust's assets.

08

# REcoin Group Foundation



To promote and support the REcoin membership tokens, and to present the REcoin token holders with unique possibilities, the REcoin Group Foundation membership club is created.

# REcoin Group Foundation goals

REcoin Group Foundation goals are:

- to support REcoin and the REcoin community around the world;

- to indefinitely prolong the lifespan and development of epy REcoin token to increase its liquidity, visibility, enhance its credibility worldwide;

-  to inform and consult members of the REcoin community;

- to propagate REcoin as a new blockchain based proprietary instrument for a variety of financial transactions, database and listings creation.

10

# REcoin Group Foundation goals

REcoin Group Foundation reserves the right to carry out all necessary actions with the aim of creating and developing the image of the REcoin token, supporting its reputation, increasing the number of members. Such actions include:

- Creation of educational programs and advisory bodies to inform the public advocating for the image, and supporting the reputation of REcoin;

- Studying and evaluating partnership proposals (participation in the REcoin ecosystem);

- Prequalifying and auditing applications for the creation of REcoin sidechains;

- Development of technological solutions improving the REcoin software as well as further enhancement of security of the blockchain;

- Development of new templates for smart contracts, databases, listings, and the expansion of their use;

- Involvement in all charitable, legal, social, and socio-economical aspects of the REcoin community life;

11

# REcoin Group Foundation membership

The membership rules, conditions, regulations, and the bylaws of the REcoin Group Foundation membership club are going to be detailed and codified as a separate document.



# REcoin Group Foundation financing and expenses

The REcoin Group Foundation is financed by 1% of the transaction commission, which REcoin holders assign voluntarily for the inclusion of the operations initiated by them into blocks on the REcoin blockchain. The funds mentioned above are used to pay the REcoin Group Foundation expenses related to its activities, including office maintenance, employee salaries, legal representation, marketing expenses, and IT infrastructure.



14

# REcoin guarantees

REcoin offers several guarantees to its users:

- REcoin's activities are based on the legal principals of the United States law.

- 100% of proceeds from REcoin sales minus maintenance costs are invested into real estate.

- In worst-case scenarios, REcoin Trust will offer an exchange of up to 70% of the REcoin token market value for the Trust's assets of comparable value as an alternative to the current liquidity.

The latest user-friendly digital token software conveniently secures the REcoin Wallet.

New technical and economic solutions will be developed for the benefit of REcoin users.

15

# Mining

The process of REcoin mining is set up so that it remains attractive for miners while ensuring the REcoin platform's earning potential for the entire community.

The miners' compensation for block completion is comprised of a share in the annual token emission (15%) and a transaction commission included in the block (92.5%, which is almost the entire sum of the transaction commission).

- In total, 100 billion REC will be issued during mining, limiting the process to 30 years. The miners' share will be 15 billion REC.

- The issue of coins for the first year will be close to 9.5% of the planned emission for 30 years, i.e. in the first year, miners will earn almost 1.5 billion REC. Then the issue of coins and the payment for mining will gradually decrease year by year: every year the reward for the block will be 1.1 times less. The figure 1.1 is confined to the most modest projections for the REC/fiat currencies rate growth. Thus, the decrease of the mining reward will be insignificant in dollar (or other) equivalent.

- For miners, the cost of closing one block at a frequency of 1 block in 21s for the first year is 963 REC, i.e. almost $1000 at the presale rate; Ethereum today boasts the same formula. In the future, this equivalent is predicted to only grow.     The cost of closing one block depends on the protocol supported by Ethereum and the block completion frequency. The determining factor is the total amount of REcoin tokens issued annually, which is embedded in the REcoin code.



# Mining

The number of new tokens created by the system at the time of the block completion is embedded in the code and is not subject to change for a year. The specific value of this quantity is the ratio of the total amount of tokens intended for emission in the current year to the total number of blocks. The total number of blocks, in turn, is determined by the frequency of their creation, prescribed in the Etherium supported protocol.

It is assumed, however, that as a result of REcoin's significant increase in popularity and its inherent convenience as an alternative financial instrument, by the end of the 30-year emission period the share of emitted coins in the calculation of the mining fee will be less than the voluntary transaction commission or close to 50REC. This will determine the stability of the system after the termination of the emission.

# REcoin smart contracts



As one of its most important features, REcoin utilizes smart contracts which are implemented from Ethereum, the most widely used secure smart-contract platform.

Smart contracts are algorithms that facilitate, automate, verify or enforce financial contracts.
They are designed to reduce the traditional costs and time associated with developing and
enforcing contracts through the use of automatically enforced contractual conditions.

In the world of real estate, smart contracts can be used to ensure that payment terms, service fees or liens are paid for once the contract is executed. Smart contracts allow for crypto currencies like REcoin to be safely used as working capital for real estate transactions.

The ability to create smart contracts in real estate is a distinctive feature of REcoin. Our software developers and legal specialists have managed to create a unique to REcoin set of smart contract templates embedded directly in the core code of the REcoin platform. This is especially useful in such legal issues-heavy environment as real estate where constantly changing rules and regulations leave very little room for error. The REcoin smart contract is an online legal instrument that helps customers rent or purchase commercial and residential property without the need for legal counsel.

17

# REcoin sidechains

The availability of REcoin sidechains will allow for the token to be creatively utilized by entrepreneurs and developers as an investment tool for the benefit of society. With approval, investors or developers can use sidechains to create their tokens within the REcoin platform.

It allows REcoin to be moved onto another platform for experimentation with the new token rules, for the creation of smart contracts, customized transaction visibility, or other innovative business projects.

Because they exist as a subset of the REcoin ecosystem, sidechain assets are interdependent with REcoin's valuation and liquidity. A commission will be created that will only select and approve REcoin sidechains for carefully planned business projects.



18

# Why should you use REcoin?

- Smart contracts is a truly revolutionary feature. It helps customers acquire real-estate property without the need to retain an attorney and pay high legal fees.

- A safer, easier, and faster way for real estate buyers and sellers throughout the world to find investments, close real estate deals and securely pay for their transactions.

- Use REcoin for less expensive and more efficient real estate transactions and services with limited third-party involvement and a lower overall cost.

- Use REcoin to get involved with the best known and the most trusted global charities.



19

# Charitable donations

Charitability and social consciousness are the REcoin's most important traits. Up to 70% of the profit from REcoin is dedicated to a range of different charities and is written into the program code to ensure that the token always distributes a portion of its earnings to the most important charities in the world.

**Charities that will be supported by REcoin include:**

- *Live Love Laugh Global* – an international non-profit organization dedicated to helping people who are living beneath the poverty line with medical care and schooling.

- *Homes for Our Troops* – a non-profit that builds and donates custom homes for severely injured 9/11 veterans to help them rebuild their lives.

- *Red Cross* – alleviating human suffering in the face of natural disasters and other emergencies. Save the Children Foundation – giving boys and girls in the United States and around the world a healthy start and protection from harm.

- *Rotary* – transforming donations into services that benefit communities throughout the world, with $3 billion being raised over the past 100 years.

- *Global Fund for Women* – a champion for women's rights throughout the world.

14

# Additional supported charities



- **World Vision** – the world's largest international children's charity dedicated to bringing hope to millions of children.

- **Doctors Without Borders** – providing quality medical care to people in war torn countries, impoverished countries, areas that have been hit by natural disasters and others.

- **Friends of Animals** – an international animal advocacy working to cultivate respect for nonhuman animals, domestic and wild.

15

# New cryptocurrency REcoin

## REcoin tokens will Be hedged by Intelligent Real Estate Investments

REcoin is founded by Maksim Zaslavskiy hedged by real estate investments in developed economies such as the United States, U.K., Switzerland, Canada, and Japan.

REcoin will be an easily accessible financial instrument through which people from all over the world can convert their holdings into a real estate hedged digital token for the potential of high returns or protect their capital from inflation.

The REcoin ecosystem will also function as a secure and efficient alternative to traditional exchange methods.



16

# New cryptocurrency REcoin

## REcoin tokens will Be hedged by Intelligent Real Estate Investments

REcoin sidechains can be used to create auto-executing smart contracts, secure and fast alternative financing methods, and other business projects intended to improve the traditional real estate business and society as a whole.

Support and promotion of the REcoin membership tokens are part of the REcoin Group Foundation membership club mission. The token holders are entitled to membership in the club, its unique opportunities and resources.

The initial sale of 10,000,000 REcoins will be at a 15% discount, with 1 REcoin (RCN) equaling $0.85 USD. This discount will become progressively lower as more REcoins are sold.

Mining will be required to build the blockchain for REcoin, with miners receiving 15% of funds emitted from the mining process, as well as 92,5% of the transaction commission.

83% of the annual issue of tokens is intended for securing tokens in the form of a real estate investment. In a negative scenario, REcoin Trust will offer an exchange of up to 70% of the REcoin token market value for the Trust's assets of comparable value as an alternative to the current liquidity.

REcoin Trust makes diversified investments using effective strategies such as investing in real estate with a stable income, short sales, foreclosures and real estate development and others. 100% of the REcoin Trust profit is reinvested into real estate.

Maksim Zaslavskiy is a humanitarian with interest in several global charities. 2% of all annual emission of REcoins will be dedicated to charity along with 6% of every transaction commission. This is equivalent to up to 70% of REcoin's remaining profit after all expenses and real estate reinvestment.

Beneficiaries of REcoin donations will include most well-known and trustworthy charities such as Live Love Laugh Global, Homes for Our Troops, World Vision, Feeding America, Doctors Without Borders and many others.

With the latest blockchain technology, REcoin like many other leading cryptocurrencies will be secure, virtually impossible to counterfeit, and will not be susceptible to manipulation from financial institutions.

# CONTACT US

contact@101recoin.com

www.101recoin.com



Defendant's Exhibit

B

# Diamond Reserve Club

Safety in Value

## Contents

About Diamond Reserve Club (DRC) ........................................................................... 3

Diamond Reserve Coin (DRC) ................................................................................... 4

DRC membership ..................................................................................................... 4

Who will use DRC? .................................................................................................. 5

How does DRC work? .............................................................................................. 5

The unique advantages of DRC ............................................................................... 6

The Diamond Reserve Club Vault Group .................................................................. 6

Mining ..................................................................................................................... 6

DRC smart contracts ............................................................................................... 7

DRC sidechains ...................................................................................................... 8

Financing ................................................................................................................ 8

Philanthropy ............................................................................................................ 8

Summary ................................................................................................................. 9

## About Diamond Reserve Club (DRC)

From time immemorial, belonging to an elite select group of individuals meant first and foremost the right of access. Looking at just about any membership-based club, we can discern one distinctive pattern: be it a craggy college fraternity or the legendary Union Club, tracing its origins to 1836 when a number of leading New Yorkers, including ex-mayor Philip Hone, invited two hundred and fifty "gentlemen of social distinction" to join, the purpose behind every such formation is, at least on some level, to separate us from them, those who are from those who wish they'd be, those in the know from those on the need to know basis.

The Diamond Reserve Club founded and self-financed by the humanitarian, philanthropist, and entrepreneur Max Zaslavsky is the answer to the question of exclusivity in the ever-widening tokenized membership pool. It only took a few years for the world to go mad for crypto and it's time to refine the offer in such a way that will separate toy-tokens from digital entities that provide DRC members with the real right of access to the most modern, most timely, most useful benefits.

The basis for the Diamond Reserve Club tokenized membership is the ownership of Diamond Reserve Coin (DRC), which is hedged by physical diamonds. The DRC will allow investors to convert their currency and savings into stable inflation-proof digital entity. By acquiring at least 1 DRC you will claim the membership in the exclusive Diamond Reserve Club (DRC) with privileges such as access to the blockchain transactional databases.  The more tokens you own, the greater access you will have to the exclusive offerings of our partners.

As you keep climbing the token ladder, you'll get access to the rest of the DRC ecosystem, unlock all platforms and gain access to exclusive listings, and be able to take full advantage of such highly sought-after digital products as smart contracts, and pay for them with your newly acquired autonomous digital financial instrument - the Diamond Reserve Coin. All in complete and utter anonymity.

Clearly stated, the goals of the Diamond Reserve Club are:

- to offer unique opportunities and benefits to Diamond Reserve Club Members;
- to indefinitely prolong the lifespan and development of the Diamond Reserve Coin to increase its liquidity, visibility, enhance its credibility worldwide;
- to propagate the DRC as a new blockchain based proprietary instrument for a variety of financial transactions, database and listings creation;

The Diamond Reserve Club reserves the right to carry out all necessary actions with the aim of creating and developing the DRC image, and supporting its reputation by carefully screening each DRC member. Such actions include:

- Hedging DRC membership tokens by physical diamonds;

- Creation and development the Diamond Reserve Club's infrastructure;
- Organization of private and club events, seminars and gatherings for DRC members;
- Pursuit of partners and service packages to the DRC Members;
- Consulting services to DRC members;
- Evaluation and admission of affiliate partnerships into the DRC ecosystem;
- Prequalification and audit of applications for the creation of DRC sidechains;
- Development of technological solutions improving the DRC software as well as further enhancement of the blockchain;
- Development of new templates for smart contracts;
- Involvement in all charitable, legal, social, and socio-economical aspects of the DRC community life;
- Promotion and support of the Diamond Reserve Club and enforcing compliance with Club' bylaws, Membership Rules and Regulations;

## Diamond Reserve Coin (DRC)

DRC is powered by blockchain technology offering stability and a superior alternative to storing savings in the form of a primary currency.  It is hedged by physical diamonds which are stored in secure locations in the United States and are fully insured for their full value.

DRC is not susceptible to government or central bank manipulation. Confidence in digital assets and their popularity has grown tremendously in the past decade since Bitcoin was first launched in 2009.

The initial sale of 10,000,000 DRCs will be at a 15% discount, with 1 Diamond Reserve Coin (DRC) equaling $0.85 USD. This discount will become progressively lower as more DRCs are sold.

83% of the annual issue of tokens is intended for securing tokens in the form of a diamond investment. In a negative scenario, DRC will offer an exchange of up to 70% of the DRC token market value for the Club's assets of comparable value as an alternative to the current liquidity.

## DRC membership

Diamond Reserve Club is based on tokenized membership and is created exclusively for the Diamond Reserve Coin (DRC) owners. The DRC will allow investors to convert their currency and savings into stable inflation-proof digital entity. As such tokens are used to determine the users' membership levels and benefits. Joining requires the ownership of just 1 DRC and will provide benefits such as access to internal members-only club publications, events and discounts.

Higher level of memberships can enable members access to custom affiliate programs, complimentary co-working space access and can also make you eligible for the exclusive right of access to the Club's most valuable partnering platform - the creative communications holding 101Lego with all of its know-how, stellar staff of professionals, client list and affiliate partners.

The full membership benefits, member rights and privileges, rules, conditions, regulations, and the bylaws of the Diamond Reserve Club membership are going to be detailed as a separate document.

## Who will use DRC?

DRC holders are businessmen and investors who hold memberships in the exclusive Diamond Reserve Club and appreciate the different mode of payment for online transactions that DRC offers. The DRC member is characterized by the following distinctions:

- He or she realizes the grand potential of using DRC to convert currency into stable, diamond hedged token.
- The Club member appreciates the convenience, safety, and security of using DRC for their payment transactions, be they direct purchases, payment plans or payment contracts.
- The member B2B merchants may rely on DRC as an alternative financing method and incorporate it into their daily practices and agreements.
- The DRC member frequently, if not exclusively, uses the member to member (M2M aka P2P) payment system for micropayments
- The members B2M (aka B2B) service providers such as lawyers, developers, consultants and other services frequently, if not exclusively, use DRC to retain/perform services.

## How does DRC work?

High liquidity is an important advantage of DRC. There are four ways of taking that advantage:

- by doing business on token exchanges and with Diamond Reserve Club-friendly e-commerce organizations;
- by using smart contracts for transactions calculated in DRC;
- through active members of the community in the Diamond Reserve Club ecosystem and the creation of DRC sidechains;
- by exchanging tokens for the DRC member services, with the profit from these services invested 100% into the DRC value.

The management of the DRC supply and its security is guaranteed by the Diamond Reserve Club. DRC offers its users an easy and intuitive buying and selling process, and furthermore, it is designed to be easily used as a currency alternative for a full range of transactions and services.

## The unique advantages of DRC

DRC offers numerous distinct advantages compared to other fiat and crypto currencies.

The unique feature of DRC is the creation of templates for smart contracts for P2P, B2P and B2B industries. DRC smart contracts is an online legal instrument that helps customers and merchants to completely avoid or minimize the need for legal counsel.

- DRC simplifies and expedites transactions without involving third parties.
- DRC offers safe financial transactions via the built-in code for smart contracts escrow.
- DRC offers a new international marketplace and facilitates connections for investors, brokers, manufacturers and retailers.

Why should you use DRC?

- Smart contracts is a truly revolutionary feature. It helps customers enter into complex contracts without the need to retain an attorney and pay high legal fees.
- A safer, easier, and faster way for buyers and sellers throughout the world to find investments, close deals and securely pay for their transactions.
- Use DRC for less expensive and more efficient transactions and services with limited third-party involvement and a lower overall cost.
- Use DRC to get involved with the best known and the most trusted global charities.

## The Diamond Reserve Club Vault Group

With the purpose of identification, purchase and sale of diamonds for the benefit of all Diamond Reserve Club members.  The Vault Group, led by industry experts, is created to ensure that:
- All diamonds are purchased at the best possible price
- All diamonds are authentic
- All diamonds are stored in secure locations
- Perform strategic sale/purchase transactions which would benefit the DRC, where 100% of the profit is reinvested back into diamonds.

## Mining

The process of DRC mining is set up so that it remains attractive for miners while ensuring the DRC platform's earning potential for all Club members and is likened to Ethereum and Bitcoin mining processes.

The miners' compensation for block completion is comprised of a share in the annual token emission (15%) and a transaction commission included in the block (85%).

- ❏ In total, 100 billion DRC will be issued, limiting the process to 30 years. The miners' share will be 15 billion DRC.

❑ The issue of tokens for the first year will be close to 9.5% of the planned emission for 30 years, i.e. in the first year, miners will earn almost 1.5 billion DRC. Then the issue of tokens and the payment for mining will gradually decrease year by year: every year the reward for the block will be 1.1 times less.

❑ For miners, the cost of closing one block at a frequency of 1 block in 21s for the first year is 963 DRC, i.e. almost $1000 at the presale rate; Ethereum today boasts the same formula. In the future, this equivalent is predicted to only grow. ** The cost of closing one block depends on the protocol supported by Ethereum and the block completion frequency. The determining factor is the total amount of tokens issued annually, which is embedded in the DRC code.

The number of new tokens created by the system at the time of the block completion is embedded in the code and is not subject to change for a year. The specific value of this quantity is the ratio of the total amount of tokens intended for emission in the current year to the total number of blocks. The total number of blocks, in turn, is determined by the frequency of their creation, prescribed in the Etherium supported protocol.

It is assumed, however, that as a result of DRC's significant increase in popularity and its inherent convenience as an alternative financial instrument, by the end of the 30-year emission period the share of emitted coins in the calculation of the mining fee will be less than the voluntary transaction commission or close to 50 DRC. This will determine the stability of the system after the termination of the emission.

## DRC smart contracts

As one of its most important features, DRC utilizes smart contracts which are implemented from Ethereum, the most widely used secure smart-contract platform.

Smart contracts are algorithms that facilitate, automate, verify or enforce financial contracts. They are designed to reduce the traditional costs and time associated with developing and enforcing contracts through the use of automatically enforced contractual conditions.

The ability to create smart contracts is a distinctive feature of DRC. Our software developers and legal specialists have managed to create a unique to DRC set of smart contract templates embedded directly in the core code of the DRC platform. This is especially useful in such legal issues-heavy environment as real estate where constantly changing rules and regulations leave very little room for error.

Some of the templates that will be created for DRC members will include:

- Rental / Lease agreements
- Mortgage purchase contracts
- Delayed payment contract (Net30, Payment on Delivery, etc.)
- Financing with/without interest (90 days no interest, 36 month, etc.)

## DRC sidechains

The availability of DRC sidechains will allow for the token to be creatively utilized by entrepreneurs and developers as an investment tool for the benefit of the Diamond Reserve Club members. With approval, investors or developers can use sidechains to create their tokens within the DRC platform.

It allows DRC to be moved onto another platform for experimentation with the new token rules, for the creation of smart contracts, customized transaction visibility, or other innovative business projects.

Because they exist as a subset of the DRC ecosystem, sidechain assets are interdependent with DRC's valuation and liquidity. A commission will be created that will only select and approve DRC sidechains for carefully planned business projects.

## Financing

The Diamond Reserve Club is financed by 7,5% of the transaction commission, which the Diamond Reserve Club members designate voluntarily for various operations with membership tokens on the DRC blockchain.

The funds are then used to pay the Diamond Reserve Club expenses related to its activities: promotion and support of DRC, organizing various events, provision of the worldwide Club's infrastructure including co-workings, sport clubs, hotels, real estate, restaurants, clubs, air travel and other modes of transportation, consulting, promotion and audit for member businesses, office management, maintenance costs, salaries, legal fees, marketing expenses, and IT infrastructure.

DRC offers several guarantees to its users:

- DRC's activities are based on the legal principals of the United States law.
- 100% of proceeds from DRC sales minus expenses are reinvested back into physical diamonds.
- In worst-case scenarios, the Diamond Reserve Club will offer its members an exchange of up to 70% of the DRC market value for the Club's assets as an alternative to the current liquidity.
- The latest user-friendly digital token software conveniently secures the DRC Wallet.
- New technical and economic solutions will be developed for the benefit of the DRC members.

## Philanthropy

Charitability and social awareness are the Diamond Reserve Club's most important traits. Maksim Zaslavskiy is a humanitarian with interest in several global charities.

Up to 50% of the profit from DRC is dedicated to a range of different charities and is written into the program code to ensure that the token always distributes a portion of its earnings to charity.

The charitable assistance is given to:

- Charitable Foundation Live Love Laugh Global, 2% annual emission

- The largest world charitable organizations, 1% of the transaction commission (0.1% per organization)

- Regional associations of charitable foundations that distribute grants in their region - 6 associations, each entitled to a share relative in size to the population of their respective regions, transaction commission share - 6%:

The charitable donations are disbursed, managed, and guaranteed by the Diamond Reserve Club, which, in turn, monitors and controls the Regional Associations' activities are going to be monitored and controlled. See the DRC website for full details on the DRC's charitable giving around the world.


## Summary

The basis for the Diamond Reserve Club tokenized membership is the ownership of Diamond Reserve Coin (DRC), which is hedged by physical diamonds. The DRC will allow members to convert their fiat currency into stable inflation-proof digital entity. The combination of a growing ecosystem, a backed token, smart contract templates, moderated smart chains sets DRC ahead of the curve.  By placing philanthropy, hardcoded into the DNA of the club, we are helping to build a community around all of us.