UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

   - against -

                                      17 CR 647 (RJD)

MAKSIM ZASLAVSKIY,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE
DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


JULIA NESTOR
ANDREY SPEKTOR
Assistant U.S. Attorneys
Eastern District of New York
  (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 2

I.   The Charges ................................................................................................................ 2
II.  REcoin ......................................................................................................................... 3
     A.  The Solicitation ................................................................................................... 3
     B.  The Defendant's Communications with the SEC ............................................... 6
III. Diamond ...................................................................................................................... 6

ARGUMENT ......................................................................................................................... 9

POINT ONE: THE RECOIN AND DIAMOND ICOS ARE SECURITIES ................................. 9
I.   Standard of Review ..................................................................................................... 9
II.  The ICOs Qualify As Investment Contracts and Are Subject to the Securities Laws ............ 10
     A.  Legal Framework for Investment Contracts ...................................................... 10
     B.  Investors in the REcoin and Diamond ICOs Invested Money ........................... 12
     C.  The ICOs Constituted a Common Enterprise .................................................... 13
     D.  Investors Expected a Profit from the REcoin and Diamond ICOs Solely from the Efforts
         of the Defendant and His Co-Conspirators ....................................................... 18
II.  REcoin and Diamond are Not Currencies ................................................................. 24

POINT TWO: THE SECURITIES ACTS ARE NOT VAGUE AS APPLIED TO THE RECOIN
AND DIAMOND ICOS ....................................................................................................... 28

CONCLUSION ..................................................................................................................... 35

TABLE OF AUTHORITIES

**Cases**

Advance Pharm., Inc. v. United States, 391 F.3d 377 (2d Cir. 2004) ........................................... 36

Boyce Motor Lines, Inc. v. United States, 342 U.S. 337 (1952) .................................................... 9

Burrus v. MacKethan, 537 F.2d 1262 (4th Cir. 1976), superseded by 545 F.2d 1388 (4th Cir. 1976)
........................................................................................................................................................ 29

C.N.S. Enter., Inc. v. G. & G. Enter., Inc., 508 F.2d 1354 (7th Cir. 1975) ............................... 29

Cont'l Mktg. Corp. v. SEC, 387 F.2d 466 (10th Cir. 1967) ........................................................ 24

Costello v. United States, 350 U.S. 359 (1956) ............................................................................ 9

Dickerson v. Napolitano, 604 F.3d 732 (2d Cir. 2010) .......................................................... 32, 37

Farrell v. Burke, 449 F.3d 470 (2d Cir. 2006) ............................................................................ 31

Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027 (2d Cir. 1974) .......... 22, 23, 24, 32

Grayned v. City of Rockford, 408 U.S. 104, 92 S. Ct. 2294 (1972)...................................... 37, 38

Hendrickson v. Buchbinder, 465 F. Supp. 1250 (S.D. Fla. 1979) ............................................... 28

In re Energy Sys. Equip. Leasing Securities Litig., 642 F. Supp. 718 (E.D.N.Y. 1986).............. 16

In re J.P. Jeanneret Assocs., Inc., 769 F. Supp. 2d 340 (S.D.N.Y. 2011)................................... 19

Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v. Daniel, 439 U.S. 551
    (1979).......................................................................................................................................... 13

Long v. Shultz, 881 F.2d 129 (5th Cir. 1989) ............................................................................... 25

Marine Bank v. Weaver, 455 U.S. 551 (1982) ....................................................................... 11, 13

Marini v. Adamo, 812 F. Supp. 2d 243 (E.D.N.Y. 2011)...................................................... 19, 38

Marini v. Adamo, 995 F. Supp. 2d 155 (E.D.N.Y. 2014).......................................................... 28

Procter & Gamble Co. v. Bankers Tr. Co., 925 F. Supp. 1270 (S.D. Ohio 1996)...................... 29

Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994)................................................... 15, 16, 18

Reves v. Ernst & Young, 494 U.S. 56 (1990)................................................................... 12, 27, 33

Rothstein v. Am. Int'l Grp., Inc., 837 F.3d 195 (2d Cir. 2016) ................................................... 28

Ruefenacht v. O'Halloran, 737 F.2d 320 (3d Cir. 1984) ............................................................. 27

SEC v. Aqua-Sonic Products Corp., 687 F.2d 577 (2d Cir. 1982) ................................... 13, 21, 26

SEC v. Brigadoon Scotch Distrib. Co., 480 F.2d 1047 (2d Cir. 1973)................................... 31, 32

SEC v. Brigadoon Scotch Distrib., Ltd., 388 F. Supp. 1288 (S.D.N.Y. 1975)........................... 25

SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344 (1943) ........................................................... 21

SEC v. Edwards, 540 U.S. 389 (2004) ............................................................................. 11, 12, 20

SEC v. Glenn W. Turner Enter., Inc., 474 F.2d 476 (9th Cir. 1973)........................................... 25

SEC v. Infinity Grp. Co., 212 F.3d 180 (3d Cir. 2000) ............................................................... 17

SEC v. Koscot Interplanetary, Inc., 497 F.2d 473 (5th Cir. 1974) ............................................. 12

SEC v. Merch. Capital, LLC, 483 F.3d 747 (11th Cir. 2007)...................................................... 25

SEC v. SG Ltd., 265 F.3d 42 (1st Cir. 2001) ................................................... 12, 16, 18, 20

SEC v. Shavers, No. 4:13-CV-416, 2013 WL 4028182 (E.D. Tex. Sept. 18, 2014)................... 14

SEC v. W.J. Howey Co., 328 U.S. 293 (1946)........................................................................ passim

Tcherepnin v. Knight, 389 U.S. 332 (1967) ........................................................................... 12, 27

Travelers Ins. Co. v. Carpenter, 411 F.3d 323 (2d Cir. 2005) .................................................... 28

United Hous. Found., Inc. v. Forman, 421 U.S. 837 (1975)................................... 12, 20, 27, 38

United States v. Alfonso, 143 F.3d 772 (2d Cir. 1998) .................................................................. 9

United States v. Bowdoin, 770 F. Supp. 2d 142 (D.D.C. 2011) .................................................. 31

United States v. Caronia, 576 F. Supp. 2d 385 (E.D.N.Y. 2008), vacated and remanded on other
    grounds by 703 F.3d 149 (2d Cir. 2012)............................................................................ 10, 22

United States v. De la Pava, 268 F.3d 157 (2d Cir. 2001)............................................................. 9

i

United States v. Dyman, 739 F.2d 762 (2d Cir. 1984) .................................................... 9

United States v. Farhane, 634 F.3d 127 (2d Cir. 2011) ............................................ 32, 35

United States v. Farris, 614 F.2d 634 (9th Cir. 1979) .................................................. 31

United States v. Finazzo, No. 10-CR-457 (RRM), 2013 WL 619571 (E.D.N.Y. Feb. 19, 2013) 21

United States v. LaSpina, 299 F.3d 165 (2d Cir. 2002) ................................................ 10

United States v. Leonard, 529 F.3d 83 (2d Cir. 2008) ........................................... passim

United States v. Litvak, 808 F.3d 160 (2d Cir. 2015) .................................................. 34

United States v. Martino, No. S1-00-CR-389, 2000 WL 1843233 (S.D.N.Y. Dec. 14, 2000) ..... 10

United States v. Persky, 520 F.2d 283 (2d Cir. 1975) ................................................... 37

United States v. Roberts, 363 F.3d 118 (2d Cir. 2004) ........................................... 33, 34

United States v. Sampson, 371 U.S. 75 (1962) ............................................................. 10

United States v. Smith, 985 F. Supp. 2d 547 (S.D.N.Y. 2014) ................................. 31, 33

United States v. Teyibo, 877 F. Supp. 846 (S.D.N.Y. 1995) ......................................... 33

United States v. Washam, 312 F.3d 926 (8th Cir. 2002) .............................................. 34

Uselton v. Comm. Lovelace Motor Freight, Inc., 940 F.2d 564 (10th Cir. 1991) ........ 14

**Statutes**

15 U.S.C. § 77b(a)(1), ................................................................................................... 14

15 U.S.C. § 78c(a)(10) ............................................................................................ 14, 28

15 U.S.C. § 78j(b) ................................................................................................... 14, 34

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in opposition to the defendant Maksim Zaslavskiy's motion to dismiss the indictment.   Like countless defendants ultimately convicted of securities fraud, the defendant offered "investment opportunities" based on false statements.   He offered tokens in an Initial Coin Offering ("ICO") for REcoin Group Foundation, LLC ("REcoin") with promises of high profits, driven by its purported high demand and the defendant's investment in real estate, all led by an "experienced team of brokers, lawyers, and developers."   After the U.S. Securities and Exchange Commission (the "SEC") contacted the defendant about his offering, he switched gears, shifting to an offering of tokens in Diamond Reserve Club ("Diamond"), which he claimed were backed by diamonds, where were "stored in secure locations in the United States and [were] fully insured."   These were all lies.   The defendant would later admit he had not taken any steps towards investing in any real estate, and there were no brokers or lawyers working with him.   As for the diamonds stored in a secure location, he had not bought any but had "talked" to a "cousin" about them.

Now facing prosecution for securities fraud, the defendant claims that his "investment opportunity" was no investment at all—it was just a sale of a currency backed by a commodity, first real estate (REcoin) and then diamonds (Diamond).   The currency, according to the defendant, are the worthless certificates sent to investors that prompted some to ask for refunds. He also claims that securities laws have not provided him with fair notice that his conduct was unlawful, despite having told his investors that he was in "full compliance" with the law.   The defendant's arguments do not hold water in light of the allegations in the indictment and controlling law.   Accordingly, his motion should be denied.

1

FACTUAL BACKGROUND

I.   The Charges

On November 21, 2017, a grand jury in the Eastern District of New York returned an indictment (the "Indictment") charging the defendant with one count of conspiracy to commit securities fraud, in violation of Title 18, U.S.C., Section 371, and two counts of substantive securities fraud, in violation of Title 15, U.S.C., Sections 78j(b) and 78ff.   The charges stem from the defendant's participation, along with others, in two fraudulent schemes to defraud investors (actual and potential) in the REcoin and Diamond ICOs by inducing them to purchase purported tokens or coins in the REcoin and Diamond ICOs through materially false and fraudulent representations and omissions.   Indictment at ¶ 10.   The schemes, as alleged in the Indictment, took place between about January 2017 and October 2017.

Prior to the grand jury's return of the Indictment, on or about September 29, 2017, the SEC filed a complaint (the "SEC Complaint") against the defendant and the related entities, REcoin and Diamond.   The SEC Complaint made similar allegations against the defendant, his co-conspirators and the related entities (REcoin and Diamond) as the Indictment.[1]

---

[1]   The SEC Complaint alleged that from about July 2017 to September 29, 2017 (the date the complaint was filed), the defendant fraudulently raised at least $300,000 from investors through a number of material misrepresentations and deceptive acts related to investments in digital "tokens" or "coins" offered first by REcoin and then by Diamond.   SEC Complaint at ¶ 2; SEC v. Maksim Zaslavskiy et. al., Civil Docket No. 17-5725 (RJD).   The SEC Complaint also alleged that these tokens were illegal offerings of securities for which no registration statement was filed and no exception to registration was applicable.   Id. at ¶ 3.

II.    REcoin

    A.    The Solicitation

As set out in the Indictment, in July 2017, the defendant and others began advertising the REcoin ICO.   The defendant and his co-conspirators made generalized solicitations for investments in REcoin using false and misleading statements posted on the internet, in press releases and on REcoin's website.   See Indictment at ¶¶ 11-24.

In press releases for REcoin, the defendant and his co-conspirators falsely advertised REcoin as a "new blockchain" cryptocurrency "backed by real estate investments in developed economies such as the United States, U.K., Switzerland, Australia, Canada and Japan." Id. at ¶ 11.   REcoin was advertised as an "easily accessible financial platform through which people from all over the world [could] convert their savings into real estate backed currency for the potential of high returns or to protect their earnings from inflation."   Id.   The defendant and his co-conspirators touted REcoin as backed by real estate investments "with some of the highest potential returns, such as short sales, foreclosures, rental properties and other related developments."   Id.

REcoin advertisements specifically stated that REcoin would be "managed, tracked and authenticated through blockchain technology," and that "[a]n international team of attorneys and programmers have been working tirelessly on creating solutions for REcoin holders to allow them to enter smart contracts in real estate rent … developing the supporting ecosystem and creating partnerships with various Internet platforms."[2]   These measures were advertised to lead to the "exponential increase of REcoin's investment potential."

---

    [2] Business Wire, REcoin Group Launches REcoin – the First Ever Cryptocurrency Backed by Real Estate (July 7, 2017, 2:00 PM), available at, https://www.businesswire.com/news/home/20170707005526/en/REcoin-Group-Launches-REcoin---Cryptocurrency-Backed.

The initial fundraising period and pre-sale of REcoin tokens started on about August 7, 2017 and was scheduled to end on October 9, 2017. Indictment at ¶ 13. REcoin purportedly provided early investors with a fifteen percent discount on tokens. Id. The REcoin website allowed investors to purchase REcoin tokens using credit cards, online fund transfer services, such as PayPal, and digital assets, such as Bitcoin and Ether. Id. at ¶ 12. The REcoin website also had a counter near the top, which as of late August and early September 2017, stated that over 2.8 million "REC," or REcoin tokens, had been purchased. Id. at ¶ 13. On August 9, 2017, two days after the launch of the REcoin ICO, the defendant and his co-conspirators issued a press release advertising the supposed success of the ICO and stating that REcoin was "proving to be a raging success," adding that since the launch of the ICO, REcoin had raised "over $1.5 million in direct REcoin token purchases," and that "another $2.3 million is the projected earnings from real estate deals that are on the table as a result of the REcoin ICO success."[3]  None of this, as the defendant would later admit, was true.

The REcoin white paper (the "REcoin White Paper"), which investors could access from the REcoin website, made many of the same false representations as the REcoin press releases and proclaimed that REcoin was a way for investors to convert "their money into a more stable and secure investment: real estate." Exhibit 1 at 5 (REcoin White Paper).[4]  REcoin investors were told that the growth of their investments would come from both the appreciation of the

---

[3] Press Release Jet, REcoin ICO is a hit from the start: the first ever crypto currency hedged by real estate is selling out in droves (August 9, 2017), available at, https://pressreleasejet.com/news/REcoin-ICO-is-a-hit-from-the-start-the-first-ever-crypto-currency-hedged-by-real-estate-is-selling-out-in-droves.html.

[4] The REcoin White Paper provided in Exhibit 1 was the version of the White Paper that was posted on REcoin's website from at least July 2017 until at least approximately August 17, 2017, well after the ICO commenced. Within days after the SEC contacted the defendant, on or about August 15, 2017, the defendant replaced the White Paper on the website with a new version similar to the one he now relies on in his motion.

underlying investments in real estate, as well as the supposed increase in demand for the tokens. Id.  The REcoin White Paper falsely stated that REcoin was led by an "experienced team of brokers, lawyers, and developers," and that REcoin "invests its proceeds into global real estate based on the soundest strategies."[5]  Id. at 8; Indictment at ¶¶ 14, 16.  The REcoin White Paper similarly falsely provided that "[t]he REcoin Purse [was] secured by the latest cryptocurrency tools . . ." and, as a result, that investors were actually purchasing digital tokens or coins.  Exhibit 1 at 9; Indictment at ¶ 14.

Individuals who wanted to invest in REcoin had to register on the REcoin website by providing an email address.  After potential investors provided their email addresses, they received periodic communications from the defendant using a REcoin email address and could contact the defendant and his co-conspirators.  Some communications with the defendant demonstrated that investors quickly began to realize the fraudulent nature of the scheme and requested their money back; some received a delayed response from the defendant, while others never heard back.

As discussed below, the defendant was eventually questioned under oath by the SEC.  During his testimony, he admitted that the value of the REcoin token was not going to increase through real estate investments, see Exhibit 2, SEC Testimony Transcript at 120-21, 123, and that no team of experienced brokers, lawyers or developers had been hired by the defendant or REcoin, id. at 129-30.   In fact, no real estate had ever been purchased or even researched by the defendant or his co-conspirators.  Id. at 61, 80-81.   The defendant also admitted that REcoin investors did not obtain anything in exchange for their purchase, received nothing in their digital accounts and that no token was ever developed.  Id. at 12, 76-78.   Furthermore, according to the

---

[5]  REcoin's website touted the defendant's supposed "extensive expertise in real estate."

defendant's SEC testimony, REcoin did not sell anywhere near the number of tokens advertised on its website.  Id. at 25.

> B.    The Defendant's Communications with the SEC

The defendant was first contacted by the SEC with respect to REcoin on August 15, 2017.   In his initial communications, he told the SEC that he was searching for a lawyer and was traveling.   Not hearing back, the SEC staff attorneys emailed the defendant again on August 29, 2017, and the defendant again wrote that he was traveling and would not return until September 9, 2017.[6]  On September 14, 2017, after they had not heard back from the defendant, the SEC staff attorneys issued a formal subpoena for him to testify.   The SEC took the defendant's testimony on September 20, 2017.

III.    Diamond

On September 6, 2017, the defendant and his co-conspirators announced that they were changing their strategy from backing their offering with real estate to backing it with diamonds and announced the Diamond launch for September 7, 2017.   Numerous press releases discussed the new Diamond "tokenized membership."   Indictment at ¶ 18.   The defendant and his co-conspirators described Diamond as "a brand new cryptocurrency designed for a broad range of financial transactions mainly focusing on operations with precious stones worldwide."   Id.   The advertisements indicated that DRC was "hedged by physical diamonds."   Id.   One press release, issued on September 6, 2017, stated that "[a]ll REcoin holdings will be seamlessly converted into Diamond at the rates favorable to REcoin investors" and that "the [Diamond]

---

[6] On September 1, 2017, the defendant incorporated DRC World Inc. in Puerto Rico.   On September 6, 2017, the defendant, using the REcoin email address, sent an email to his REcoin investors announcing Diamond.   In the email, the defendant made a number of false representations.   Press releases promoting Diamond began emerging on about September 7, 2017.

holders are now going to be able to use smart contracts not only in real estate but in every facet of commerce, in which the community is going to be engaged."[7]

Similarly, on September 11, 2017, Zaslavsky and his co-conspirators issued a press release on Reddit (the "Reddit Release") stating that purchasers of Diamond were "entitled to all opportunities and benefits they were promised at the time of joining the REcoin community." Indictment at ¶ 19.   The Reddit Release stated that the diamonds backing Diamond were "especially stored in secure locations in the United States and fully insured for their full value." Id.   In his testimony to the SEC, the defendant reiterated that other than the different hedging and duration of the Diamond project, it was almost the same as REcoin.   See Exhibit 2 at 61-62.   The Reddit Release also touted Diamond's supposed powering by blockchain technology.   Purchasers of REcoin could get a refund for their initial investment, and were offered a similar discount on Diamond tokens, as with the REcoin ICO.   Indictment at ¶ 19.

In explaining the reasons for stopping the REcoin ICO and launching Diamond, the Reddit Release stated that the REcoin ICO had been very popular because "over $1.5 million in direct REcoin token purchases [were made]," and that another $2.3 million in expected earnings were generated as a result of the REcoin pre-sale success.   Indictment at ¶19.   In the Reddit release, the defendant blamed the U.S. government for interfering in the REcoin ICO by prohibiting REcoin from maintaining the level of liquidity of its real estate holdings that it allegedly needed to keep investments safe.

In September 2017, the defendant and his associates launched the Diamond website.   Id. at 20.   The Diamond website allowed investors to purchase Diamond tokens in a

---

[7] EIN Presswire, REcoin Group rethinks hedging strategy, drops real estate in favor of physical diamonds, (September 6, 2017), available at, https://www.einpresswire.com/article/402308728/recoin-group-rethinks-hedging-strategy-drops-real-estate-in-favor-of-physical-diamonds.

way that was similar to how they had purchased REcoin tokens.   Like the REcoin website, the Diamond website contained a white paper ("Diamond White Paper"), which provided that the goals of Diamond were to "offer unique opportunities and benefits" and to "indefinitely prolong the lifespan and development of [Diamond] to increase its liquidity [and] visibility, [as well as] enhance its credibility worldwide."   Id. at 21; see also Exhibit 3 (Diamond White Paper), at 3. The Diamond White Paper claimed that Diamond would be "led by industry experts," and that a group would be formed to, among other things, ensure that "all diamonds are purchased at the best possible price" and "perform strategic sale/purchase transactions which would benefit the [Diamond token], where 100% of the profit is reinvested back into diamonds."   Exhibit 3 at 6. Diamond reserved the right to develop the club by taking actions including "development [of] the Diamond…infrastructure… ."   Exhibit 3 at 4.

Just like with REcoin, individuals who wanted to invest in Diamond had to register on its website by providing an email address at which they received periodic communications.   In these emails, the defendant and his co-conspirators attempted to induce investors to purchase Diamond tokens by stating, for example, that Diamond "forecast[s] a minimum growth of 10% to 15% per year."   Indictment at ¶ 22.   The defendant also urged investors to buy Diamond coins and stated that "negotiations with different exchanges" were ongoing so that investors could trade Diamond coins "on external exchanges and make more profit."   Id.

Contrary to statements made in press releases and on Diamond's website, the defendant admitted in his SEC testimony that he was never asked to shut down the REcoin ICO by the U.S. government, and that he instead did so on his own because it was "too risky" to invest in real estate.   Exhibit 2 at 12-13, 151.   As discussed above, the defendant admitted that the Reddit Release falsely stated that REcoin had sold over $1.5 million in REcoin tokens.   See Indictment at ¶ 23; Exhibit 2 at 25.   Furthermore, he admitted that there were no diamonds and

8

that neither he, nor anyone else working with him, had identified a storage location.  <u>See</u> Indictment at ¶ 23, Exhibit 2 at 97.   The defendant also admitted that no Diamond tokens or coins had ever been developed, and those investors who transferred funds from REcoin to Diamond were not given any coins or tokens in return.   Indictment at ¶ 23; Exhibit 2 at 55.

ARGUMENT

<u>POINT ONE: THE RECOIN AND DIAMOND ICOS ARE SECURITIES</u>

I.   <u>Standard of Review</u>

The dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."  <u>United States v. De la Pava</u>, 268 F.3d 157, 165 (2d Cir. 2001) (citations omitted); <u>see also</u> <u>United States v. Dyman</u>, 739 F.2d 762, 768 (2d Cir. 1984) (dismissal of an indictment is "the most drastic remedy, and thus is rarely used").   "An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits."  <u>Costello v. United States</u>, 350 U.S. 359, 363 (1956).

On a pre-trial motion to dismiss, the court must accept all factual allegations in the indictment as true, and must read them in the light most favorable to the government.  <u>United States v. Alfonso</u>, 143 F.3d 772, 776-77 (2d Cir. 1998); <u>Boyce Motor Lines, Inc. v. United States</u>, 342 U.S. 337, 343 n.16 (1952).   An indictment "must be read to include facts which are necessarily implied by the specific allegations made."  <u>United States v. LaSpina</u>, 299 F.3d 165, 177 (2d Cir. 2002) (internal quotations omitted).    The question for the Court is whether the allegations in the indictment are sufficient to permit the jury to find that the defendant committed securities fraud. <u>See</u> <u>United States v. Sampson</u>, 371 U.S. 75, 76 (1962); <u>see also</u> <u>United States v. Caronia</u>, 576 F. Supp. 2d 385, 391 (E.D.N.Y. 2008) (Vitaliano, J.) ("The [court considering the motion to dismiss an information] may consider additional documents that have been submitted, but cannot give any

9

weight to contrary factual assertions made by the defendant."), vacated and remanded on other grounds by 703 F.3d 149 (2d Cir. 2012); United States v. Martino, No. 00-CR-389, 2000 WL 1843233 at *1 (S.D.N.Y. Dec. 14, 2000) (same).

II.    The ICOs Qualify As Investment Contracts and Are Subject to the Securities Laws

REcoin and Diamond ICOs are "securities" because they are "investment contracts" within the meaning of the securities laws.   The defendant attempts to recast REcoin and Diamond, which he calls "cryptocurrencies," as "currencies," which are exempted from the definition of "securities."   As discussed below, however, the law requires looking beyond the name of an instrument to determine whether it constitutes a security; it requires examining the economic reality of the investments as they were advertised.   The defendant and his co-conspirators sought the investment of money in a common scheme, and promised purchasers of the tokens that they would receive a return on their investment.   Their offering was therefore a prototypical investment contract.

A.    Legal Framework for Investment Contracts

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."   15 U.S.C. § 78j(b).   In order to state a claim for securities fraud under Section 10(b), the transaction at issue must involve a "security" as defined in Section 2(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10). Although the precise wording of the two definitional sections differ, the Supreme Court has consistently held that the definitions are virtually identical and the coverage of the two Acts may be considered the same.   See Marine Bank v. Weaver, 455 U.S. 551, 555 n.3

(1982).   Both definitional sections set forth numerous different instruments that may be considered securities, including an "investment contract."

An investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived solely from the entrepreneurial or managerial efforts of others.  See SEC v. Edwards, 540 U.S. 389, 393 (2004); SEC v. W.J. Howey Co., 328 U.S. 293, 301 (1946).   The test for whether a transaction or scheme is an investment contract has come to be known as the "Howey test," which has been applied in the criminal context.   See United States v. Leonard, 529 F.3d 83, 87-91 (2d Cir. 2008).   The Howey test is designed to be "flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."   Howey, 328 U.S. at 299.   When courts analyze whether a transaction or scheme is a security, "form should be disregarded for substance and the emphasis should be on economic realit[ies]" underlying a transaction.   Tcherepnin v. Knight, 389 U.S. 332, 336 (1967); see also United Hous. Found., Inc. v. Forman, 421 U.S. 837, 847-48 (1975) (Congress "sought to define 'the term security in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.'") (quoting H.R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)).   Congress defined a security broadly to encompass practically any instrument that might be sold as an investment.   Reves v. Ernst & Young, 494 U.S. 56, 60-61 (1990). "Congress painted with a broad brush" because "[i]t recognized the virtually limitless scope of human ingenuity" in creating investment enterprises.   Id.[8]

---

[8] For example, courts have found the Howey test to be satisfied with regard to non-stock and non-debt interests in: orange groves in Howey itself; payphone leases, see Edwards, 540 U.S. at 389; licenses to sell dental products, see SEC v. Aqua-Sonic Products Corp., 687 F.2d 577, 582 (2d Cir. 1982); films, see Leonard, 529 F.3d at 87-91; and multi-level marketing, SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 478-79 (5th Cir. 1974).   Notably, Howey has been satisfied where a promotor offered "virtual shares in an enterprise existing only in cyberspace."   SEC v. SG Ltd., 265 F.3d 42, 44-59 (1st Cir. 2001).

Whether a common enterprise is an "investment contract" is a highly fact-specific determination. <u>Howey</u>, 328 U.S. at 297 ("The legal issue in this case turns [on] a determination of whether, under the circumstances" there was an investment contract); <u>Marine Bank</u>, 455 U.S. at 560 n.11 ("Each [alleged investment contract] transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole."); <u>Aqua-Sonic Products Corp.</u>, 687 F.2d at 584 (the inquiry "necessarily turn[s] on the totality of the circumstances"); <u>Leonard</u>, 529 F.3d at 87-91 (finding an investment contract "upon consideration of the totality of the circumstances").   As the Second Circuit stated in <u>Leonard</u>, a "case-by-case analysis" is especially appropriate where, as here, the investment is made in, ostensibly, a "relatively new, hybrid vehicle," 529 F.3d at 88-89—in <u>Leonard</u> it was an LLC, here a purported ICO.

B.     <u>Investors in the REcoin and Diamond ICOs Invested Money</u>

To satisfy the first prong of the <u>Howey</u> test and to determine whether an investment contract exists, the government must first show that the ICO involved an investment of money. 328 U.S. at 301.   Like the overall <u>Howey</u> test, this prong is flexible: it is ordinarily satisfied by showing that investors gave up "some tangible and definable consideration in return for an interest that had substantially the characteristics of a security."   <u>See</u> <u>Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v. Daniel</u>, 439 U.S. 551, 560 (1979).   The investment of "money" need not take the form of cash.   <u>See, e.g.</u>, <u>Uselton v. Comm. Lovelace Motor Freight, Inc.</u>, 940 F.2d 564, 574 (10th Cir. 1991) ("[I]t is well established that cash is not the only form of contribution or investment that will create an investment contract[.]").[9]

---

[9] Notably, the defendant fails to address head on the first prong of the <u>Howey</u> test.   <u>See</u> Defendant's Motion at 12.

12

Here, the first prong of the <u>Howey</u> test is satisfied because investors in the ICOs at issue clearly invested money by purchasing tokens with credit cards, online payment transfers and virtual currency in return for a financial interest in REcoin and Diamond.  Investors paid the defendant and his co-conspirators approximately $300,000 using credit cards, digital assets and through online funds transfer services in exchange for purported tokens in the REcoin ICO, which he later tried to convert to the Diamond ICO.   Indictment at ¶¶ 12, 20.   <u>See</u> <u>SEC v. Shavers</u>, No. 13-CV-416, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) (holding that an investment of Bitcoin, a digital asset, meets the first prong of <u>Howey</u>); <u>Uselton</u>, 940 F.2d at 574 ("[T]he 'investment' may take the form of 'goods and services,' or some other 'exchange of value.'") (internal citations omitted).   Investors expected that REcoin, and later Diamond, would provide investment returns.   Indictment at ¶¶ 14, 21.   Investors were paying money to participate in a venture and get returns on their investment; they were not purchasing an object of inherent value like real estate or diamonds.   <u>See, e.g.</u>, <u>Howey</u>, 328 U.S. at 299 (holding that the transaction involved an investment contract because the companies at issue were offering something more than "fee simple interests in land;" they were offering "an opportunity to contribute money to share in the profits of a large citrus fruit enterprise").   The first prong of the <u>Howey</u> test is clearly satisfied here because investors gave up some tangible and definable consideration in return for an interest that had substantially the characteristics of a security, as discussed in greater detail below.

C.     <u>The ICOs Constituted a Common Enterprise</u>

The second prong of the <u>Howey</u> test is also easily satisfied.   The REcoin and Diamond ICOs constituted a common enterprise because the investors' fortunes were pooled together so that all could share the profits and risks.   The defendant argues that the horizontal commonality component of this prong of the <u>Howey</u> test is not met because there was no pooling

of assets or pro-rata distribution of profits.   See Defendant's Motion ("Def. Mot.") at 13-14.   As set forth below, his argument, as applied to the facts in this case, is without merit.

To satisfy the second prong of the Howey test, the government must show that both ICOs constituted a "common enterprise."   328 U.S. at 298-99.   The Second Circuit has stated that a showing of "horizontal commonality" can establish a common enterprise within the meaning of Howey.   Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994). Horizontal commonality is present when "the fortunes of each investor depend upon the profitability of the enterprise as a whole."   Id.   This is usually the case when investors "pool[]" their investments in a common fund and receive profits on a pro-rata basis.   Id.

The commonality element is met here because investors' assets in both ICOs were all pooled together.   First, the defendant and his co-conspirators told investors in REcoin that their assets would be pooled together, and that all of the funds initially raised with REcoin would be invested in real estate.   Indictment at ¶ 11.   If the defendant and his co-conspirators were actually going to purchase real estate, which the government contends they never tried or intended to do, they would have necessarily had to pool investor funds to make the real estate purchases.   See In re Energy Sys. Equip. Leasing Securities Litig., 642 F. Supp. 718, 736 (E.D.N.Y. 1986) (finding horizontal commonality when investors "finance[ed] the promoters' operations through their pooled funds" by "pre-paying fees . . . prior to the actual manufacture or delivery" of the service at issue).   This is the quintessential example of a common enterprise where more than 1,000 investors purchased tokens in a venture for the very purpose of making their small investment grow in value as a result of the pooling of assets to purchase real estate in the case of REcoin and diamonds in the case of Diamond.

The defendant's contention that there was no pooling of assets because investors were free to supposedly exchange their tokens for "other currency, to purchase items, or to use the

14

tokens in the execution of smart contracts," see Def. Mot. at 13, ignores the factual allegations in the Indictment, and is otherwise meritless.   As an initial matter, both the REcoin and Diamond tokens were worthless at the time of the offering and could never have been exchanged for other currencies or used to purchase anything.   Just as significantly, the defendant appears to ignore that securities can be sold in the market for other currencies, whether for U.S. dollars or many other currencies.

The profits of each investor were also expected to be divided pro-rata.[10]  Each investor's profits from the REcoin venture depended on the number of tokens they purchased. See SG Ltd., 265 F.3d at 51 (finding horizontal commonality and recognizing that it is sufficient that "each investor was entitled to receive returns directly proportionate to his or her investment stake," "either for direct distribution or as an increase in the value of the investment"); see also SEC v. Infinity Grp. Co., 212 F.3d 180, 188-89 (3d Cir. 2000) (finding horizontal commonality where the "return on investment was to be apportioned according to the amounts committed by the investor" and was "directly proportional to the amount of that investment").   All REcoin investors shared in the risks of the venture since the real estate investments the defendant and his co-conspirators promised could prove to be worthless, thereby decreasing the value of the REcoin token.   Similarly, the REcoin tokens could fail to increase in value, which would leave investors unable to resell their tokens in the secondary market in order to profit from their investment.

As the REcoin whitepaper explained, the supposed REcoin token was "an attractive investment opportunity" because it would "grow[] in value."   Indictment at ¶ 14.   The REcoin White Paper specifically stated that REcoin holders were "investors."   See Exhibit 1 at 6.

---

[10]  The defendant suggests that horizontal commonality requires a pro-rata distribution of profits.   The Second Circuit has stated that horizontal commonality requires "pooling of assets," which is usually combined with the pro-rata distribution of profits.   Revak, 18 F.3d at 87.   However, the Circuit has not held that such a distribution is necessary.   Nonetheless, as addressed above, there was pro-rata distribution here.

Similarly, purchasers were told that the appreciation of their investments in REcoin would come from both the appreciation of the underlying investments in real estate, as well as the supposed increase in demand for the tokens.   See id. at 5.   Therefore, investors in REcoin were purportedly going to share in the profits of the common enterprise through the appreciation of the real estate in which their pooled assets were invested because if the real estate value underlying the tokens appreciated the value of the token would appreciate.

Furthermore, while no dividends were paid to investors, the defendant and his co-conspirators represented that 100% of the REcoin profits would be reinvested in the venture, thereby allowing all to share equally in the purported benefits.   See id. at 8.   The defendant's argument that the reinvestment of profits cuts against pro-rata distribution simply misses the point.   See Def. Mot. at 13.   After all, the REcoin and Diamond tokens were to increase in value based on the success of the investments in real estate and diamonds, which were to be made by the defendant and his co-conspirators.   That reinvestment of profits to increase the value of the investment is exactly what is envisioned by the Howey test as a pro-rata distribution.   See SG Ltd., 265 F.3d at 51.

Similarly, for Diamond, the defendant told investors that their assets would be pooled: the REcoin pooled assets would be converted into Diamond tokens, and then invested in actual diamonds.   Indictment at ¶¶ 19, 21.   Like REcoin, investors in Diamond were told that the appreciation in value of their investments would come from both the appreciation in underlying investments in diamonds as well as the "supposed increase in demand" for the coins.   Id.   As with REcoin, the defendant and his co-conspirators represented that profits from Diamond would be reinvested in the venture.   The defendant testified before the SEC that he and his co-conspirators planned to use 70% of the proceeds from the sales of the Diamond ICO to invest in diamonds, and the majority of the rest would be used to grow the business.   Exhibit 2 at 164.   Based on these

representations, it was reasonable for investors to believe that their investment would grow in value and that they would obtain profits pro-rata on their investment.   Finally, as with REcoin, investors shared in the risks of the venture because their Diamond tokens could prove to be completely worthless, as could the diamonds purchased by the defendant and his co-conspirators.

The Second Circuit has also said that in the absence of horizontal commonality, which the government argues is fully satisfied here, strict vertical commonality may also be sufficient.   Revak, 18 F.3d at 87-88.   Strict vertical commonality is present when the investors' fortunes in the venture are "tied" to the fortunes of the promoter.   Id. at 88.   While the Court does not need to reach this issue here, nor does the Second Circuit require it, the REcoin and Diamond ICOs also satisfy the strict vertical commonality test because investors' fortunes in both ICOs were directly tied to the defendant's profits.

Both ICOs satisfy the strict vertical commonality test based on the defendant's own characterizations of the schemes.   In both White Papers and in his testimony to the SEC, the defendant claimed that his profits from the venture would come from a "commission" he would receive when token holders "used" their tokens or sold them in a secondary market.   See Exhibit 2 at 101-02, 167-70 (the defendant stated that he received a .5 percent commission once investors used or sold their tokens); Exhibit 1 at 17 (the defendant would direct "2% of all mined REcoins" to a charity of his choosing, along with a 6% commission off of every transaction); Exhibit 3 at 9 (the defendant's "Charitable Foundation Live Love Laugh Global" would receive a "2% annual emission [sic]" and a 7.5% "transaction commission" that would be designated for "various operations with membership tokens on the [Diamond] blockchain").   Crucially for the strict vertical commonality test, the defendant's profits would be "linked" to his investors' ability to earn profits by subsequently exploiting their tokens' value.   See Marini v. Adamo, 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011).   The defendant's commission in this scheme was ultimately tied to the

17

"successful performance of the investment," therefore, satisfying the strict vertical commonality test.  See, e.g., In re J.P. Jeanneret Assocs., Inc., 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) (strict vertical commonality test satisfied where investment manager was to be paid, in part, through a performance fee equal to 20% of the profits in the investment account).

Based on the above, the REcoin and Diamond investments constituted a common enterprise.

> D.    Investors Expected a Profit from the REcoin and Diamond ICOs Solely from the
> Efforts of the Defendant and His Co-Conspirators

Investors in REcoin and Diamond expected profits, and those profits were derived from the managerial efforts of the defendant and his co-conspirators.  As alleged in the Indictment, the defendant promised investors in both REcoin and Diamond that he and others would make investments in real estate and diamonds using their expertise.  See Indictment at ¶ 11, 14, 19, 21, 22.  Investors also relied on the defendant and his accomplices to develop the REcoin and Diamond tokens, creating an infrastructure for investors to trade and use the coins as advertised.

As an initial matter, investors who purchased REcoin and Diamond tokens were investing in a common enterprise and reasonably expected to earn profits through the enterprise when they sent funds in exchange for tokens.  Howey, 328 U.S. at 298-99 ("[P]rofits" include "dividends, other periodic payments, or the increased value of the investment."); Edwards, 540 U.S. at 394; see also United Hous. Found., 421 U.S. at 852 (indicating that "profits" includes "capital appreciation resulting from the development of the initial investment").  The various promotional materials disseminated by the defendant and his co-conspirators informed investors that REcoin and Diamond were for-profit entities such that the value of the investments would be expected to increase based on the profitability of the business.  See Indictment at ¶ 14.  The

defendant and his co-conspirators similarly touted the Diamond investment as a profit-making venture with the goal of growing Diamond and ensuring that investors could trade Diamond coins "on external exchanges and make more profit."   Indictment at ¶ 22.   See also SG Ltd., 265 F.3d at 54 (discussing SEC v. C.M. Joiner Leasing Corp. and noting that in Joiner "economic inducements made by promoters in conjunction with the assignment of oil well leases transformed the financial instrument under consideration from a naked leasehold right to an investment contract") (citing 320 U.S. 344, 348 (1943)).

Furthermore, as required by the Howey test, investors' profits in both ventures depended solely on the defendant's efforts and the efforts of his cohorts.   328 U.S. at 299.   The Second Circuit does not interpret "solely" literally; instead, the test is "whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way."   Leonard, 529 F.3d at 88 (citation omitted).   To satisfy this prong, the government must show that there was a reasonable expectation of a "passive" role for investors, rather than "significant investor control."   Aqua-Sonic Products Corp., 687 F.2d at 582-85.

In his brief, the defendant advances his vision of REcoin and Diamond—a vision that has no basis in reality—and attempts to paint with a broad brush, claiming that both REcoin and Diamond have characteristics "of a blockchain ecosystem," a feature that neither investment had developed.   See Def. Mot. at 15-16.   The defendant argues that REcoin and Diamond sought out "stakeholders," not investors, and that those stakeholders were intended to be professionals who would transact on the REcoin and Diamond ecosystem, thereby contributing to its value.   Id.

However, in deciding a motion to dismiss an Indictment, the Court must look to the realities of REcoin and Diamond and what is alleged in the Indictment, not at the defendant's misleading characterizations.   See, e.g., United States v. Finazzo, No. 10-CR-457 (RRM), 2013

19

WL 619571, at *2 (E.D.N.Y. Feb. 19, 2013) (in deciding a motion to dismiss a court must consider only the allegations in the indictment and not contrary factual assertions); Caronia, 576 F. Supp. 2d at 390-91 (same).   Based on representations made by the defendant and his co-conspirators to investors in their myriad advertisements and communications, investors in REcoin and Diamond were primarily expected to be passive, not active participants.   Investors relied on the defendant and the other so-called professionals who were supposedly working with him to undertake the work necessary to establish the ecosystem, including purchasing of the underlying assets.

   As alleged in the Indictment, the defendant and his associates represented that the REcoin investment would "grow[] in value" based on the managerial efforts of others.   Indictment at ¶ 14.   Specifically, the REcoin White Paper specified that "REcoin is led by an experienced team of brokers, lawyers, and developers and invests its proceeds into global real estate based on the soundest strategies." Id.; Exhibit 1 at 8.   While, as the defendant admitted in his SEC testimony, no such team actually existed, see Exhibit 2 at 129-30, and no such investments were made, the commitments and representations made to investors show that investors were relying on the efforts of the defendant and others to grow their investment.   See Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027, 1034 (2d Cir. 1974) (finding that promoter's "commitments and representations" in the form of guaranteed services and promised results induced investors to participate in the scheme, and that the scheme as a whole constituted an investment contract).

   Likewise, the defendant represented that the value of Diamond would grow based on the expertise of the promoters, including in choosing, pricing, securing and insuring physical diamonds.   Indictment at ¶¶ 19, 21.   The Diamond White Paper reserved certain rights "to carry out all necessary actions with the aim of creating and developing the [Diamond] image, and supporting its reputation…, including "[h]edging [Diamond] membership tokens by physical diamonds" and creating and developing "the [Diamond] infrastructure." See Exhibit 3 at 3-4.

20

Based on these representations alone, it was reasonable for investors to believe that the Diamond tokens they owned would be profitable through the efforts of the defendant and his co-conspirators. See Glen-Arden Commodities, Inc., 493 F.2d at 1035 (finding this prong satisfied when investors in whiskey relied on the promoter's "utilization of their expertise in selecting the type and quality" of whiskey to be purchased).

Moreover, the defendant promised investors that he and other experienced professionals working with him would develop an infrastructure for both REcoin and Diamond, which required the development of blockchain technology to facilitate token transactions; the establishment of a system for trading tokens on a secondary market; and the provision of benefits that would enhance the value of token ownership such as the ability to transact in smart contracts.[11] In addition to relying on the defendant's efforts with regard to real estate and diamond investments, no investor or group of investors were able to develop the coins themselves or have them placed on a platform on which to trade the coins for profit.   Investors had no such expertise.   Rather, the defendant represented that he and others would use their expertise to undertake efforts to develop the coins and list them on exchanges, and the success of such efforts was among the sources of the investors' purported returns.   Indictment at ¶¶ 11, 15, 22.

With regard to REcoin, the defendant attracted investments by, for example, claiming in a press release that "an international team of attorneys and programmers have been working tirelessly on creating solutions for REcoin holders" which would "inevitably lead to the exponential increase of the REcoin's investment potential."[12]   The defendant and his co-

---

[11] The Diamond White Paper explained that Diamond, presumably through the defendant and his co-conspirators, would create and develop the Diamond infrastructure.   See Exhibit 3 at 4.

[12] See, e.g., Business Wire, REcoin Group Launches REcoin – the First Ever Cryptocurrency Backed by Real Estate (July 7, 2017, 2:00 PM), available at, https://www.businesswire.com/news/home/20170707005526/en/REcoin-Group-Launches-REcoin---Cryptocurrency-Backed.

conspirators made similar statements with respect to Diamond, advertising their efforts to propagate Diamond as a new blockchain-based proprietary instrument that would increase the value of the Diamond token as a whole.   The defendant urged investors to buy Diamond based on efforts he and his co-conspirators were undertaking in "negotiating with different exchanges, so [investors] will be able to trade [Diamond] on external exchanges and make more profit." Indictment at ¶ 22.[13]   See Cont'l Mktg. Corp. v. SEC, 387 F.2d 466, 470-71 (10th Cir. 1967) (efforts of scheme promoters to "develop" a "structure into which investors entered" was part of efforts to increase the value of investment).

The defendant argues that the managerial efforts of others were not required for either REcoin or Diamond since real estate and diamonds are largely valued by market forces, among other factors.   See Def. Mot. at 17.   This argument misses the mark.   Merely because market forces may have some degree of impact on the value of real estate and diamonds, at some point, does not eliminate the promises made to investors by the defendant that he and his "team of brokers, lawyers and developers" were working to invest the proceeds of their solicitations before market forces ever came into play.   Indictment at ¶¶ 14, 16.   Here, as in Glen-Arden, "what was being sold was an investment entrusting the promoters with both the work and expertise to make the tangible investment pay off."   493 F.2d at 1035; see also SEC v. Brigadoon Scotch Distrib., Ltd., 388 F. Supp. 1288, 1291-93 (S.D.N.Y. 1975).   Clearly investors expected that the defendant and his "team" were actually going to purchase the underlying assets and manage those assets using their expertise before market forces ever came into play.

---

[13] Investor communications indicate that, at times, the defendant personally emailed with investors to provide updates about the efforts he and others were undertaking.   Indictment at ¶ 15.

The defendant also argues that the impact of managerial efforts on the value of the tokens would have decreased since REcoin investors had limited voting rights on investment decisions that could affect five percent of the REcoin market value.[14]   See Def. Mot. at 17. Notably, other than these limited and illusory voting rights, the defendant and his co-conspirators were solely responsible for all other REcoin business decisions.[15]   And even if some limited investor voting rights are available to help make an enterprise profitable, those rights do not equate with a promoter's significant managerial efforts or control over the enterprise, as is the case here.[16]

The defendant and his co-conspirators "decided almost every significant issue" with regard to the real estate and diamond investments.   Leonard, 529 F.3d at 90.   The investors "could not reasonably be believed to be desirous or capable of undertaking" the real estate or diamond investments "on their own," and thus had to rely on the managerial expertise of the defendant and his co-conspirators.   Aqua-Sonic Products Corp., 687 F.2d at 583-84 (investors had no experience with dental supplies).   In fact, the very reason that the defendant advertised the expertise of those working with him was that investors he was seeking to entice did not have any

---

[14]   Diamond purchasers had no similar voting rights.

[15]   The voting rights have a cursory mention in the offering materials and little information is provided about how this process would work.   Furthermore, more than 1,000 investors purchased REcoin tokens, therefore, any voting rights they may have exercised would have been negligible.   See Leonard, 529 F.3d at 89-90 (while some offering materials appeared to provide for investor control, "[i]n actuality, however, the [investors] played an extremely passive role in the management and operation of the companies").

[16]   See, e.g., SEC v. Glenn W. Turner Enter., Inc., 474 F.2d 476, 482 (9th Cir. 1973) (finding that a multi-level marketing scheme was an investment contract and that investors relied on the promoter's managerial efforts, despite the fact that investors put forth the majority of the labor that made the enterprise profitable, because the promoter dictated the terms and controlled the scheme itself); Long v. Shultz, 881 F.2d 129, 137 (5th Cir. 1989) ("An investor may authorize the assumption of particular risks that would create the possibility of greater profits or losses but still depend on a third party for all of the essential managerial efforts without which the risk could not pay off.").   See also generally SEC v. Merch. Capital, LLC, 483 F.3d 747 (11th Cir. 2007) (finding an investment contract even where voting rights were provided, explaining that the voting process gave investors a limited voting right and information to make their decisions).

experience with real estate or diamonds.   Id.; accord Leonard, 529 F.3d at 89 (investors had no experience with film or entertainment).   Like the investors in Howey, who relied on the efforts of the promoters because they lacked "experience requisite" for the cultivation of oranges, investors in REcoin and Diamond, who were dispersed all over the world, necessarily lacked any expertise with real estate and diamonds.   Nor did they have the expertise necessary to build the platform that the defendant promised, complete with the ability to transact using smart contracts, as the defendant advertised.   328 U.S. at 296, 299-300.   Investors were instead attracted "by the prospects of a return on their investment" from others' expertise and management.   Id. at 300.

II.        REcoin and Diamond are Not Currencies

The defendant also invites the Court to broadly shield from the Exchange Act and the Securities Act (collectively, the "Securities Acts") any offering that an issuer labels a "cryptocurrency."   In his view, instruments carrying that name—including the worthless REcoin and Diamond certificates he sent to about 1,000 unwitting investors—necessarily constitute "currency" within the meaning of 15 U.S.C. § 78c(a)(10).   It is a position that carries broad implications, but comes with no support.

As discussed in detail above, the Securities Acts define "security" in purposefully broad terms through a long list of instruments.[17]   The definition narrowly exempts "currency or any note, draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the

---

[17]   See, e.g., Tcherepnin, 389 U.S. at 336 ("[W]e are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes. The Securities Exchange Act quite clearly falls into the category of remedial legislation."); Ruefenacht v. O'Halloran, 737 F.2d 320, 326 (3d Cir. 1984) (noting the parallels between the Securities Acts and observing that the legislative history to Section 2(1) of the Securities Act indicates that Congress cast the definition of security "'in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" (quoting H.R. Rep. No. 85, 73d Cong., 1st Sess. 11 (1933)).

maturity of which is likewise limited." 15 U.S.C. § 78c(a)(10). Looking to the list of exemptions, the defendant seizes on the term "currency" because it resembles the word "cryptocurrency"—the type of investment he purports to have sold, though he often labeled it a token or membership as well. See Def. Mot. at 8 ("It seems almost redundant to contend that cryptocurrencies are currencies.").

But by focusing on the name of the offering rather than its economic substance the defendant disregards the settled principle that, "[b]ecause securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto." United Hous. Found. Inc., 421 U.S. at 849; see also Reves, 494 U.S. at 61-62 ("In discharging our duty, we are not bound by legal formalisms, but instead take account of the economics of the transaction under investigation . . . Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called."). Indeed, REcoin and Diamond are no more a currency than are rare coins, the sale of which the Honorable Joseph F. Bianco recently held to be "securities." Marini v. Adamo, 995 F. Supp. 2d 155, 185-86 n.19 (E.D.N.Y. 2014) (holding that "there was a factual basis" for a sale of rare coins meeting the Howey test even if the parties had not stipulated that it constituted a "security").

The superficial resemblance in its label is the only similarity between REcoin/Diamond and currency. The term "currency" is not defined in the Securities Acts. In the absence of statutory definitions, the Second Circuit has routinely turned to the Black's Law Dictionary.[18] And Black's Law Dictionary defines "currency" as an "item (such as a coin,

---

[18] See, e.g., Travelers Ins. Co. v. Carpenter, 411 F.3d 323, 334 (2d Cir. 2005) ("To determine the ordinary meaning of an undefined statutory term, we turn first . . . to Black's Law Dictionary."). See also Rothstein v. Am. Int'l Grp., Inc., 837 F.3d 195, 206 (2d Cir. 2016) (referring to the Black's Law Dictionary for a securities term not defined in an agreement).

government note, or banknote) that circulates as a medium of exchange." Black's Law Dictionary (10th ed. 2014). This definition also references "legal tender," which is the "money (bills and coins) approved in a country for the payment of debts, the purchase of goods, and other exchanges for value." Id. Finally, a "medium of exchange" is "[a]nything generally accepted as payment in a transaction and recognized as a standard of value." Id.

Courts have echoed these definitions by interpreting the currency exemption as including only legal tender (which even the defendant concedes REcoin and Diamond were not) or its equivalent, like a cash substitute. See, e.g., Hendrickson v. Buchbinder, 465 F. Supp. 1250, 1252-53 (S.D. Fla. 1979) ("The plaintiffs at bar can expect nothing other than the amount of money they deposited with accrued interest at a contracted rate . . . a certificate of deposit issued in exchange for currency is not encompassed within the section because currency is not a security."); C.N.S. Enter., Inc. v. G. & G. Enter., Inc., 508 F.2d 1354, 1363 (7th Cir. 1975) ("The third note for $5,000 was an earnest money deposit subsequently redeemed. This note served for a time as a cash substitute. Since the security definition of the [Exchange] Act 'shall not include currency,' this document does not confer jurisdiction.").[19]

The defendant has not identified a single case where a court has gone beyond these contours to include instruments that could not be used as legal tender. In fact, one case he cites, Procter & Gamble Co. v. Bankers Tr. Co., 925 F. Supp. 1270 (S.D. Ohio 1996), see Def. Mot. at 7, states just the opposite. The court in Procter interpreted Ohio's Blue Sky law's definition of "security" and found that a swap agreement (an agreement to exchange cash flow over a period of

---

[19] See also Burrus v. MacKethan, 537 F.2d 1262, 1264 (4th Cir. 1976) ("In both form and substance [a certificate of deposit] is essentially an evidence of indebtedness, and only in that sense is it a promise to pay. Its fundamental character is ejusdem generis as, and not distinguishable in any significant way from, a pass-book issued by a savings bank, and it is hardly arguable that savings bank account books are securities rather than the equivalent of currency."), superseded by 545 F.2d 1388 (4th Cir. 1976).

time) tied to the value of German currency was not itself currency because it "entitled no one to any amount of German currency."   Id. at 1284.   Like the swap agreement in Procter, REcoin and Diamond did not entitle investors to any money.   In fact, the certificates the defendant's investors received were entirely illiquid, even within the defendant's "ecosystem."

Applying this definition of "currency" discloses at least two ways in which REcoin and Diamond fall short.   First, as alleged in the Indictment, neither REcoin nor Diamond had any value—no token or coin was ever developed, see Indictment at ¶¶ 16, 23, and, contrary to representations made by the defendant and his co-conspirators, neither REcoin nor Diamond were ever backed by real estate holdings or diamonds.   See id.   Instead, investors received worthless certificates that were not "generally accepted as payments" (a condition precedent to be a "medium of exchange") anywhere—in the physical or digital world.   Second, as described above, the defendant marketed his tokens as an "attractive investment opportunity" that "grows in value," not just an aspiring substitute for cash, like other digital currencies that he now touts in his brief. Compare id. at ¶ 14, with Def. Mot. at 8-9.[20]

In short, the defendant ignores the economic reality and the allegations in the Indictment, choosing to focus instead on how some other digital asset—not REcoin or Diamond tokens—could function as a medium of exchange.   The defendant talks, for example, about purchasing "lunch, or a hotel room, or even a new set of living furniture" and shopping at Overstock.com and Subway, all using cryptocurrency.   Def. Mot. at 9.   But none of these items could ever be purchased with REcoin or Diamond tokens; Overstock.com did not accept a REcoin or Diamond token as a form of payment, much less take the paper certificate that he sent to

---

[20] For purposes of the defendant's motion, the Court need not decide whether *any* cryptocurrency or other digital asset could escape the definition of "security" by fitting into the "currency" exemption.

investors.  In other words, even if some cryptocurrency—which achieves the utopian potential painted by the defendant—could be considered "currency," it is certainly not REcoin or Diamond tokens.

### POINT TWO: THE SECURITIES ACTS ARE NOT VAGUE AS APPLIED TO THE RECOIN AND DIAMOND ICOS

Finally, the defendant invites this Court to be the first to declare the Securities Acts unconstitutionally vague (either facially or as-applied).  Def. Mot. at 18.  For close to a century these laws have withstood close scrutiny, including over purported vagueness.  The Second Circuit, for example, long ago held that the term "investment contract"—which encompasses REcoin and Diamond—is not void for vagueness, "[i]n light of the many Supreme Court decisions defining and applying the term."  SEC v. Brigadoon Scotch Distrib. Co., 480 F.2d 1047, 1052 n.6 (2d Cir. 1973); see also United States v. Bowdoin, 770 F. Supp. 2d 142, 148 (D.D.C. 2011) ("The lineage of the term [investment contract] is too long and well-recognized for Mr. Bowdoin's 2011 claim of unconstitutional vagueness to stand."); United States v. Farris, 614 F.2d 634, 642 (9th Cir. 1979) ("It is too late in the day more than 32 years after the Supreme Court's decision in [Howey] to say that the term 'security' is impermissibly vague.").  The defendant nevertheless argues that this time-tested and flexible law is vague as applied to him.

"When the challenge is vagueness as-applied, there is a two-part test: a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it."  Farrell v. Burke, 449 F.3d 470, 486 (2d Cir. 2006) (Sotomayor, J.) (internal quotation marks omitted)).  "Importantly, it is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well."  United States v. Smith, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014) (collecting Supreme Court and

Second Circuit authority).    Whether by statute or judicial gloss, "a law need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." Dickerson v. Napolitano, 604 F.3d 732, 747 (2d Cir. 2010) (internal quotation marks omitted).

"[W]ith respect to the due process concern of arbitrary enforcement, a statute certainly will not be deemed unconstitutionally vague if as a general matter, it provides sufficiently clear standards to eliminate such a risk."  United States v. Farhane, 634 F.3d 127, 139 (2d Cir. 2011) (internal quotation marks omitted).   "But even in the absence of such standards, a statute will survive an as-applied vagueness challenge if the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute."   Id. at 139-40 (internal quotation marks omitted).

The Securities Acts comfortably survive what is essentially a repackaged facial attack of the intentionally broad and flexible definition of "security."   See Brigadoon Scotch Distrib. Co., 480 F.2d at 1052 n.6; accord Glen-Arden Commodities, Inc., 493 F.2d at 1029 (rejecting as "untenable" the argument that the "term 'investment contract' in the statutory definition of the term 'security' in the federal securities laws was void for vagueness").

Like many others ultimately convicted of securities fraud, the defendant enticed investors on the internet to send him money to buy an asset—a "token," "membership" or "cryptocurrency," as he called it—that he promised would earn handsome returns, annual profits of nine to 67% (for REcoin).   The defendant called his offering an "ICO," a new investment model named similarly to an initial public offerings of stock—an undisputable security[21]—or "IPOs." As discussed in detail above, see Point One, the defendant and his co-conspirators promised

---

[21]  See, e.g., Reves, 494 U.S. at 62 (identifying stocks as instruments "obviously within the class Congress intended to regulate").

REcoin and Diamond as valuable investment opportunities.   The defendant touted this "REcoin ICO" to be a "hit from the start," fraudulently claiming millions in purchases and projected earnings.   See supra note 3.   The defendant's Diamond offering was much of the same, though it promised a more modest, albeit still misleading prediction, of 10 to 15 percent growth.   Indictment at ¶ 22.

The defendant had more than sufficient notice that this conduct constituted securities fraud.   Through a rich body of case law beginning in 1946 with Howey, the definition of an "investment contract" has been outlined, explained and refined.   See Smith, 985 F. Supp. 2d at 588 (observing that judicial interpretations contribute to providing notice).   The defendant's offerings, as analyzed above, comfortably fit within that definition.   For this reason alone, the defendant fails the notice prong of the vagueness inquiry.

Moreover, the Second Circuit in United States v. Roberts, 363 F.3d 118, 123 (2d Cir. 2004), instructed courts to treat a challenge to any statute with a scienter requirement with an additional "measure of skepticism."   See, e.g., United States v. Teyibo, 877 F. Supp. 846, 861 (S.D.N.Y. 1995) (listing the elements of securities fraud under 15 U.S.C. § 78j(b) to include participation in the scheme to "defraud knowingly, willfully and with intent to defraud").   If the defendant shows that "he held an honest belief that his conduct was not improper or unlawful," then he would be entitled to a judgment of acquittal.   United States v. Litvak, 808 F.3d 160, 190 (2d Cir. 2015) (vacating conviction because the defendant was not permitted to introduce evidence regarding his intent to defraud).   A conviction, on the other hand, would necessarily mean that the government proved beyond a reasonable doubt that the defendant knowingly, willfully and intentionally committed securities fraud—a level of scienter and burden of proof that far exceed the fair notice requirement of due process.

What is more, there is evidence that the defendant was, in fact, on notice that he was subject to the securities laws.  See Roberts, 363 F.3d at 123 ("That skepticism is further buttressed by the government's proffer that the defendants actually believed what they were doing was illegal." (citing United States v. Washam, 312 F.3d 926, 930 (8th Cir. 2002) (finding "appeal" in the government's argument that "actual notice" by the defendant of the illegality of his actions defeated the argument about the statute's vagueness)).   On August 9, 2017—just two days after the planned REcoin ICO and prior to his Diamond offering—an investor asked the defendant about his compliance with securities law: "You mention that REcoin is in full compliance with US laws, can you be able to provide me with a copy of your compliance with SEC laws?"   The investor was referring to the REcoin White Paper, which stated, under a guarantees-to-investors section: "REcoin's activities are in full compliance and governed by United States law."   Exhibit 1 at 9. The defendant or his co-conspirators responded in sum and substance that the investor had nothing to worry about with respect to legal compliance.[22]   The SEC also contacted the defendant as early as August 15, 2017 requesting information about the REcoin ICO.   The defendant wrote that he planned to hire an attorney, but instead proceeded with the Diamond ICO.

After the direct inquiry from an investor about compliance with securities law and communication with the SEC, the defendant issued a misleading press release (which he would later admit in his SEC testimony was a "fuck up," Exhibit 2 at 151) to REcoin investors.   In the press release, the defendant claimed that the government interfered with the wild success of REcoin: "[i]n no uncertain terms," he wrote, falsely, the government "let us know that we're not

---

[22] Specifically the response indicated that "[t]here were [sic] just mention of SEC.   We have no compliance [sic] with US law and there would be no problems to you."   When the defendant ultimately testified before the SEC, he admitted that the statement about his compliance with the law was just his own belief; he had not, contrary to what he promised to investors, hired any lawyers.   See Exhibit 2 at 131-32.

allowed to take steps to maintain the level of liquidity of our real estate holdings. . . ."   On

September 6, 2017, the defendant announced he was "switching strategies" by offering investors

the opportunity to switch to Diamond—a continuation of the same fraud.   In short, the defendant

was on actual notice that his conduct was regulated by securities law but decided that this law can

be ignored, and that he can continue lying to his investors.

       The defendant also fails the second prong of the vagueness analysis.   It is difficult

to imagine conduct that is any closer to the "core of the [Securities Acts'] prohibition" than

deliberate lies to investors about the risk and rewards of an investment opportunity.   <u>Farhane</u>, 634

F.3d at 139.   As the defendant acknowledges, the SEC issued a report—along with other executive

statements on cryptocurrencies—[23] before the defendant's ICOs, outlining the application of

securities law to ICOs—thus adding an unusual level of transparency.   Having had fair notice, he

should not be heard complaining that his prosecution is surprising or arbitrary.   <u>Cf.</u>   <u>Advance</u>

<u>Pharm., Inc. v. United States</u>, 391 F.3d 377, 397 (2d Cir. 2004) ("[B]usinesses, which face

economic demands to plan behavior carefully, can be expected to consult relevant legislation in

advance of action.   Indeed, the regulated enterprise may have the ability to clarify the meaning of

the regulation by its own inquiry, or by resort to an administrative process.") (internal citation and

quotation marks omitted)).

---

[23] <u>See, e.g.</u>, Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, SEC Release No. 81207 (July 25, 2017), <u>available at</u> https://www.sec.gov/litigation/investreport/34-81207.pdf; Press Release, SEC, SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities (July 25, 2017), <u>available at</u> https://www.sec.gov/news/press-release/2017-131; <u>Investor Bulletin: Initial Coin Offerings, SEC</u> (July 25, 2017), <u>available at</u> https://www.investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-bulletin-initial-coin-offerings; Statement, SEC, Div. of Corporate Finance and Enf't (July 25, 2017), <u>available at</u> https://www.sec.gov/news/public-statement/corpfin-enforcement-statement-report-investigation-dao; Press Release, IRS, IRS Virtual Currency Guidance: Virtual Currency is Treated as Property for U.S. Federal Tax Purposes (Mar. 25, 2014), <u>available at</u> https://www.irs.gov/newsroom/irs-virtual-currency-guidance.

The defendant argues that his offerings were unique, that REcoin and Diamond fell into a special "asset class that have never before existed," and that the attempt to regulate this new and "potentially transformative technologically advanced asset class" with an 80-year-old law is "troubling."   Def. Mot. at 19-20.   According to him, cryptocurrency issuers are at sea in determining whether their work runs afoul of the Securities Acts.   Id.   He quotes the SEC's report but calls it "nebulous," in part because it requires looking behind the label of the security, at its substance.   See Def. Mot. at 22 (quoting the SEC Chairman's statement that "simply calling something a 'currency' or a currency-based product does not mean that it is not a security").

The defendant's position once again ignores reality and precedent.   First, his suggestion that an 80-year-old law, having withstood the test of time (just like the 229-years-old United States Constitution on which he basis his attack against the Securities Acts) is stopped in its tracks by the sheer novelty of cryptocurrency, Def. Mot. at 20, is meritless.   The defendant pays lip service to the Supreme Court's emphasis on the Securities Acts' most salient quality— "flexibility . . . capab[ility] of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."   Howey, 328 U.S. at 299.   By emphasizing elasticity in the regulation of securities, Congress and the Supreme Court predicted that issuers, like the defendant, would devise new instruments to guarantee profits—or, more accurately, repackage the same type of empty promises into financial instruments with fresh labels.   Due process in no way limits this elasticity; in fact, the Supreme Court's vagueness jurisprudence has long been marked by "flexibility and reasonable breadth" over "meticulous specificity."   Grayned v. City of Rockford, 408 U.S. 104, 110 (1972); accord Napolitano, 604 F.3d at 732.

The defendant continues to point to other digital assets and "would-be developers," Def. Mot. at 19, who, he alleges, are harmed by uncertainty of the "nebulous" laws and guidelines.

33

But the question is not whether the laws are vague as to those individuals or to all cryptocurrencies; it is about fair notice to the defendant about the legality of his particular "investment opportunity." See United States v. Persky, 520 F.2d 283, 288 (2d Cir 1975) (explaining that it is not "appropriate for [the defendant] to challenge the vagueness of [a statute] on behalf of those whose conduct would be more ambiguous but who are not before us").   That is why there is nothing "troubling," Def. Mot. at 21, about fact-finding by a jury as to whether the defendant committed securities fraud, part of which inquiry is whether REcoin and Diamond—not any other offering—is a "security."[24]

The defendant also complains the SEC has not made a global determination of whether cryptocurrencies are securities.   Def. Mot. at 22.   But that approach—looking to the substance of the offerings rather than to its labels—is, as noted above, the only one consistent with the securities law.   See, e.g., United Hous. Found. Inc., 421 U.S. at 849 ("Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto.").   It is not surprising then, that none of the cases cited by the defendant, Def. Mot. at 23, are from the securities context, an area in which courts have repeatedly emphasized the need for flexibility.   See, e.g., Howey, 328 U.S. at 299; Grayned, 408 U.S. at 110.

For these reasons, the defendant's vagueness challenge should be rejected.

---

[24] See, e.g., Marini, 812 F. Supp. 2d at 261 n.15 ("[B]ecause it is not clear based on the current record whether the transactions at issue here involved 'securities,' it consequently is unclear whether defendants' alleged conduct is 'actionable' under the securities laws.   Therefore, the Court is unable to determine [definitively] at this stage of the litigation—i.e., prior to a jury's determination on the question of whether the transactions here were investment contracts[.]").

<u>CONCLUSION</u>

For the reasons stated herein the defendant's motion to dismiss the Indictment for lack of subject matter jurisdiction and on vagueness grounds should be denied.


Dated: Brooklyn, New York
       March 19, 2018

                                    Respectfully submitted,

                                    RICHARD P. DONOGHUE
                                    United States Attorney

                                    <u>/s/ Julia Nestor</u>
                                    Julia Nestor
                                    Andrey Spektor
                                    Assistant U.S. Attorneys
                                    (718) 254-6297/6475

<u>Enclsoures</u>

  Cc:   Clerk of the Court (RJD) (By ECF)
        Mildred Whalen, Esq. (By E-mail)
        Len Kamdang, Esq. (By E-mail)