**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

     **- against -**

**MAKSIM ZASLAVSKIY,**

                **Defendant.**

**17-CR-0647 (RJD)**

---

**BRIEF OF SECURITIES AND EXCHANGE COMMISSION IN SUPPORT**
**OF THE UNITED STATES IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS INDICTMENT**

SECURITIES AND EXCHANGE
COMMISSION
200 Vesey Street, Suite 400
New York, New York 10281-1022

By:    Jorge G. Tenreiro
        Valerie A. Szczepanik

        *Attorneys for Securities and*
        *Exchange Commission*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

PROCEDURAL BACKGROUND......................................................................................... 2

INTEREST OF THE SECURITIES AND EXCHANGE COMMISSION ............................ 2

    I.  SEC's Mission ............................................................................................................ 2

    II.  SEC Enforcement Actions Involving ICOs ............................................................... 4

    III. Investor Protection Concerns Involving ICOs ........................................................... 5

    IV. Continuing Efforts to Protect Investors .................................................................... 7

FACTUAL BACKGROUND ................................................................................................ 7

ARGUMENT ......................................................................................................................... 9

    I.  Legal Background ...................................................................................................... 9

        A.  The Registration and Anti-Fraud Provisions of the Securities Laws.......................... 9

        B.  "Investment Contracts" Are "Securities".................................................................... 10

        C.  The SEC's Application of *Howey* in the DAO Report ............................................... 11

    II.  The Tokens Here Are Investment Contracts and Therefore Securities ......................... 11

        A.  Token Purchasers Invested Money ..................................................................... 11

        B.  In a Common Enterprise ...................................................................................... 12

        C.  With a Reasonable Expectation of Profits ........................................................... 13

        D.  Derived from the Managerial Efforts of Others.................................................... 14

    III. Defendant's Contrary Arguments Are Unavailing ....................................................... 15

        A.  Defendant's Attempt to Label the Investments Here as "Cryptocurrencies" Does Not Change Their Character as Securities.................................................... 15

        B.  A Pro-Rata Distribution of Profits is Not Required and, in Any Event, Is Present Here ........................................................................................................ 18

        C.  The "Voting Rights" Offered to REcoin Investors Were Illusory ............................ 19

CONCLUSION....................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972)......................................................... 3

CFTC v. McDonnell, No. 18 Civ. 361 (JBW), 2018 WL 1175156
   (E.D.N.Y. Mar. 6, 2018) ............................................................................................................ 20

Cont'l. Mktg., Corp. v. SEC, 387 F.2d 466 (10th Cir. 1967) ........................................................ 14

Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027 (2d Cir. 1974) ............................ 20

In re Barkate, Release No. 49542, 82 SEC Docket 2130, 2004 WL 762434 (Apr. 8, 2004),
   aff'd sub nom. Barkate v. SEC, 125 F. App'x 892 (9th Cir. 2005), ........................................ 12

In re Matter of Munchee Inc., Exchange Act Release No. 10445,
   2017 WL 6374434 (Dec. 11, 2017).................................................................................... 5, 11

Landreth Timber Co. v. Landreth, 471 U.S. 681 (1985) ............................................................... 16

Long v. Shultz Cattle Co., 881 F.2d 129 (5th Cir. 1989)............................................................... 17

Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994)........................................................... 12, 18

Reves v. Ernst & Young, 494 U.S. 56 (1990).................................................................................. 10

SEC v. Aaron, 605 F.2d 612 (2d Cir. 1979),
   vacated on other grounds, 446 U.S. 680 (1980).................................................................... 9

SEC v. Aqua–Sonic Prods. Corp., 687 F.2d 577 (2d Cir. 1982) .................................................. 15

SEC v. Brigadoon Scotch Distrib. Co., 480 F.2d 1047 (2d Cir. 1973)........................................ 20

SEC v. Cavanagh, 1 F. Supp. 2d 337 (S.D.N.Y. 1998),
   aff'd, 155 F.3d 129 (2d Cir. 1998) ....................................................................................... 9

SEC v. Edwards, 540 U.S. 389 (2004) .................................................................................... 10, 13

SEC v. First Jersey Sec., Inc., 101 F.3d 1450 (2d Cir. 1996) ........................................................ 3

SEC v. Glenn W. Turner Enters., Inc., 474 F.2d 476 (9th Cir. 1973) .................................... 14, 15

SEC v. Infinity Grp. Co., 212 F.3d 180 (3d Cir. 2000) ................................................................. 18

SEC v. Merch. Capital, LLC, 483 F.3d 747 (11th Cir. 2007)....................................................... 19

SEC v. Ralston Purina Co., 346 U.S. 119 (1953) .......................................................................... 9

SEC v. SG Ltd., 265 F.3d 42 (1st Cir. 2001)............................................................................ 18, 19

SEC v. Shavers, No. 13 Civ. 416 (ALM), 2014 WL 4652121 (E.D. Tex. Sept. 18, 2014).......... 11

**Page(s)**

SEC v. W.J. Howey Co., 328 U.S. 293 (1946)................................................................. passim

United Hous. Found., Inc v. Forman, 421 U.S. 837 (1975)........................................ 16

United States v. Leonard, 529 F.3d 83 (2d Cir. 2008)................................................ 10

United States v. Scully, 108 F. Supp. 3d 59 (E.D.N.Y. 2015)...................................... 7

United States v. Ulbricht, 31 F. Supp. 3d 540 (S.D.N.Y. 2014)................................. 17

Uselton v. Com. Lovelace Motor Freight, Inc., 940 F.2d 564 (10th Cir. 1991)........... 12

Williamson v. Tucker, 645 F.2d 404 (5th Cir. 1981) ................................................. 19

**Statutes**

15 U.S.C. § 77b(a) ....................................................................................... 2, 10, 16

15 U.S.C. § 77e(a)............................................................................................... 2, 9

15 U.S.C. § 77e(c)............................................................................................... 2, 9

15 U.S.C. § 77q(a) ............................................................................................ 2, 10

15 U.S.C. § 78c(a)...................................................................................... 2, 10, 16

15 U.S.C. § 78ff ...................................................................................................... 2

15 U.S.C. § 78j(b) ............................................................................................. 2, 10

15 U.S.C. § 78u(a) ................................................................................................. 4

**Other Authorities**

In re Coinflip, Inc., CFTC No. 15-29, 2015 WL 5535736 (Sept. 17, 2015) ................. 18

Investor Alert: Bitcoin and Other Virtual Cryptocurrency-Related Investments (May 7, 2014),
     https://www.investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-alert-
     bitcoin-other-virtual-currency ...................................................................... 6

Investor Alert: Public Companies Making ICO-Related Claims (Aug. 28, 2017),
     https://www.sec.gov/oiea/investor-alerts-and-bulletins/ia_icorelatedclaims ............................ 5

Investor Bulletin: Initial Coin Offerings (July 25, 2017), https://www.investor.gov/additional-
     resources/news-alerts/alerts-bulletins/investor-bulletin-initial-coin-offerings ......................... 6

IRS Virtual Currency Guidance, I.R.S. Notice 2014-21, 2014-16 I.R.B. 938,
     2014 WL 1224474 (Apr. 14, 2014)................................................................... 18

Joel Seligman, The Transformation of Wall Street (3d ed. 2003) .................................. 3

Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:
     The DAO, Release No. 81207, 2017 WL 7184670 (July 25, 2017) ................... 4, 11

**Page(s)**

SEC Chairman Jay Clayton and CFTC Chairman Christopher Giancarlo, <u>Regulators are Looking at Cryptocurrency</u>, Wall Street Journal (Jan. 24, 2018) ........................................................... 16

SEC Chairman Jay Clayton, <u>Statement on Cryptocurrencies and Initial Coin Offerings</u> (Dec. 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 .. 5

<u>SEC Suspends Trading in Three Issuers Claiming Involvement in Cryptocurrency and Blockchain Technology</u> (Feb. 16, 2018), https://www.sec.gov/news/press-release/2018-20 .... 5

<u>Spotlight on Initial Coin Offerings and Digital Assets</u>, https://www.investor.gov/additional-resources/specialized-resources/spotlight-initial-coin-offerings-digital-assets .......................... 7

<u>Statement on Potentially Unlawful Online Platforms for Trading Digital Assets</u> (Mar. 7, 2018), https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading ..................................................................................................... 6

U.S. Dep't of Treasury, Fin. Crimes Enf't Network, <u>Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies</u> (Mar. 18, 2013), <u>available at</u> https://www.fincen.gov/resources/statutes-regulations/guidance/application-fincens-regulations-persons-administering .......................... 18

## PRELIMINARY STATEMENT

The United States Department of Justice ("Government") and the Securities and Exchange Commission ("SEC" or "Commission") each have filed actions against Defendant Maksim Zaslavskiy ("Zaslavskiy" or "Defendant") for fraud in connection with his offer and sale of investments in two schemes, in which he promised investors high profits in real estate investments and later in diamonds.  Defendant sought to take advantage of investor exuberance around so-called Initial Coin Offerings ("ICOs"), using this terminology to peddle the investments.  But, as the Government and the SEC allege, Defendant simply engaged in old-fashioned fraud dressed in a new-fashioned label.

Defendant seeks now, in his motion to dismiss, to re-cast the investments at issue here as "currency" sales, exempt from the securities laws.  However, it is the substance of the transaction—not the terminology used—that determines the character of the offering.  The federal securities laws have anti-fraud and other provisions that are principles-based, broad and flexible, and are aimed at protecting investors from fraud, as well as registration provisions that mandate disclosure of critical information to investors.  These provisions provide the SEC with important tools that can be applied to securities activities involving novel technologies— regardless of how they are used.  See SEC v. W.J. Howey Co., 328 U.S. 293, 299 (1946) (definition of "security" embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.") (emphasis added).

The offerings here were securities under long-standing and clear precedent.  The SEC has a keen interest in ensuring that the federal securities laws are applied to all manner of securities offerings to provide the important market and investor protections.

1

## PROCEDURAL BACKGROUND

A grand jury sitting in this District has charged Defendant with conspiracy and substantive securities fraud counts, in contravention of Sections 10(b) and 32 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78ff.  The charges arise out of Zaslavskiy's alleged fraud in connection with general solicitations for investments in REcoin Group Foundation, LLC ("REcoin") in the form of a so-called "Initial Coin Offering" ("ICO") for interests in REcoin (the "REcoin Token"), and in Diamond Reserve Club ("Diamond" or "Diamond Tokens," together with REcoin Tokens the "Tokens").

The SEC has similarly charged Zaslavskiy, REcoin, and Diamond with violations of Section 10(b) of the Exchange Act, as well as violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), id. §§ 77e(a), 77e(c) and 77q(a), based largely on the same underlying conduct.  See Complaint, SEC v. REcoin Grp. Found., LLC, et al., No. 17 Civ. 5725 (RJD) (E.D.N.Y. Sept. 29, 2017).

Zaslavskiy has moved to dismiss the Government's charges on the basis that:  (1) the Tokens are not "securities" within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, id. § 78c(a)(1); (2) the Tokens are "currencies" exempted from the securities laws; and (3) Sections 10(b) and 32 of the Exchange Act are unconstitutionally vague as applied to "cryptocurrencies."  On February 2, 2018, the SEC sought, and was later granted, leave to file a brief in support of the Government and in opposition to Defendant's motion to dismiss.  See Letter at 1 (Feb. 2, 2018) (D.E. 18).

## INTEREST OF THE SECURITIES AND EXCHANGE COMMISSION

### I.     SEC's Mission

The SEC is the primary regulator of the U.S. securities markets.  Its mission is to protect investors, maintain fair, orderly and efficient markets, and facilitate capital formation.  Critical to

the SEC's effectiveness in promoting fair disclosures and preventing fraud in the offer and sale

of securities is the ability to enforce violations of the securities laws through civil actions.

Congress enacted the federal securities laws and created the Commission after the stock

market crash of 1929, when half of the new securities sold during the post-World War I period

turned out to be worthless.  See Joel Seligman, The Transformation of Wall Street 1—2 (3d ed.

2003).  The securities laws embrace a "fundamental purpose . . . to substitute a philosophy of full

disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business

ethics in the securities industry."  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1466 (2d Cir.

1996) (quoting Affiliated Ute Citizens v. United States, 406 U.S. 128, 151 (1972)).  The SEC

obviously has a keen interest in the interpretation and application of the securities laws and, in

particular, the definitional provisions of the Securities and Exchange Acts and how they apply to

all manner of instruments, such as those at issue in this case.

Issuers and individuals increasingly have been using distributed ledger (or blockchain)

technology in connection with raising capital for businesses and projects.  A blockchain is a

peer-to-peer database spread across a network that uses cryptography to record all transactions in

the network in theoretically unchangeable, digitally-stored data packages called blocks, linked

together in a chain.  ICOs are blockchain-enabled offerings often targeted at retail investors—in

the U.S. and globally.  ICOs promise profits through the issuance of digital assets (often called

coins, tokens, or cryptocurrencies) in exchange for fiat currency or other digital assets (often

Bitcoins).  The overall size of the ICO market has grown exponentially.  It is reported that

$3 billion has been raised so far in 2018; over $5 billion in 2017; and nearly $300 million in

2016.  See generally www.coindesk.com/ico-tracker (last visited Mar. 19, 2018).  These numbers

may understate the size of the ICO market (and the potential for investor loss) as many ICOs

3

"trade up" for some period after they are issued.  Much of this form of fund-raising appears to be unlawfully conducted through unregistered and/or fraudulent offerings of securities.

## II.     SEC Enforcement Actions Involving ICOs

In July 2017, the SEC issued a Report of Investigation pursuant to Section 21(a) of the Exchange Act, 15 U.S.C. § 78u(a), regarding an ICO for so-called "DAO Tokens."  See Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Release No. 81207, 2017 WL 7184670 (July 25, 2017) (the "Report") (Exhibit A hereto).  In the Report, the SEC considered the particular facts and circumstances presented by the offer and sale of DAO Tokens and concluded that they were securities based on long-standing legal principles, and that offers and sales of DAO Tokens were thus subject to the federal securities laws.  The Report explained that issuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption from registration applies.  The automation of certain functions through "smart contracts" or computer code or other technology, the Report concluded, does not remove conduct from the purview of the federal securities laws.  Thus, the SEC's message to issuers and others in this space has been clear: the use of distributed ledger or blockchain technology to raise capital or engage in securities transactions does not alter the need to comply with the federal securities laws.

The SEC has been actively enforcing the federal securities laws in the ICO space.  In addition to the parallel action the SEC has filed against Defendant and his entities, the SEC has brought a number of enforcement actions concerning ICOs for alleged violations of the federal securities laws.  See SEC v. AriseBank, et al., No. 18 Civ. 186 (BML) (N.D. Tex. Jan. 30, 2018) (emergency action to halt allegedly fraudulent and unregistered ICO); SEC v. PlexCorps, et al., No. 17 Civ. 7007 (CBA) (E.D.N.Y. Dec. 1, 2017) (same); In re Matter of Munchee Inc.,

4

Exchange Act Release No. 10445, 2017 WL 6374434 (Dec. 11, 2017) ("Munchee") (settled

administrative proceeding against unregistered ICO).

      The SEC has also issued more than a dozen trading suspensions to halt trading in the

stock of publicly-traded issuers who have made spurious claims relating to blockchain

technology.  See Investor Alert: Public Companies Making ICO-Related Claims (Aug. 28, 2017),

https://www.sec.gov/oiea/investor-alerts-and-bulletins/ia_icorelatedclaims (warning investors

about potential market manipulation schemes involving publicly traded companies that claim

ICO-related news) (Exhibit B); SEC Suspends Trading in Three Issuers Claiming Involvement in

Cryptocurrency and Blockchain Technology (Feb. 16, 2018), https://www.sec.gov/news/press-

release/2018-20 (SEC announces trading suspensions in issuers claiming involvement in

cryptocurrency and blockchain technology) (Exhibit C);

https://www.sec.gov/litigation/suspensions.shtml (listing all SEC trading suspensions) (last

visited Mar. 19, 2018).

### III.    Investor Protection Concerns Involving ICOs

      The SEC's Chairman has publicly expressed concerns regarding the ICO markets,

including that, as they are currently operating, there is substantially less investor protection than

in our traditional securities markets, with correspondingly greater opportunities for fraud and

manipulation.  See SEC Chairman Jay Clayton, Statement on Cryptocurrencies and Initial Coin

Offerings (Dec. 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-

12-11 (Exhibit D).  The ability of bad actors to commit age-old frauds using new technologies,

coupled with the significant amounts of capital pouring into the ICO market—particularly from

retail investors—has only heightened these concerns.

      Commission staff has noted specific risks to investors due to the fact that ICOs are

promoted online and involve the issuance and distribution of a digital asset on a blockchain.  See

Investor Bulletin: Initial Coin Offerings (July 25, 2017), https://www.investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-bulletin-initial-coin-offerings (warning investors to the risks of ICOs) (Exhibit E); Investor Alert: Bitcoin and Other Virtual Cryptocurrency-Related Investments (May 7, 2014), https://www.investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-alert-bitcoin-other-virtual-currency (warning investors to the risks of Bitcoin and other virtual currency-related investments) (Exhibit F).  Commission staff also has noted that digital assets may be trading on secondary markets over unlawful online platforms that may offer few investor protections.  Statement on Potentially Unlawful Online Platforms for Trading Digital Assets (Mar. 7, 2018), https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (Exhibit G).

Several characteristics of how ICOs are conducted pose challenges for law enforcement in investigating fraud.  For example, (1) tracing funds: traditional financial institutions (such as banks) often are not involved, making it harder to follow the flow of funds; (2) international scope: blockchain transactions and users span the globe and there may be restrictions on how the SEC can obtain and use information from foreign jurisdictions; (3) no central authority: as there is no central authority that collects blockchain user information, the SEC generally must rely on other sources, such as digital asset exchanges, for this type of information; (4) seizing or freezing digital assets: digital "wallets" (software that "stores" digital assets) may be encrypted and, unlike money held in a bank or brokerage account, may not be held by a third-party custodian; (5) anonymity: many digital assets are specifically designed to be pseudonymous or anonymous; thus, attribution of a specific digital asset to an individual or entity could be difficult or impossible, especially where additional anonymizing tools are employed; and (6) evolving technology: digital assets involve new and developing technologies.

Overall, the SEC's investor concerns in this area have been communicated through numerous public statements, investor alerts and bulletins, press releases, and filed enforcement actions.  Those communications and actions have been highlighted on the SEC's www.investor.gov website on a page entitled, "Spotlight on Initial Coin Offerings and Digital Assets."  See https://www.investor.gov/additional-resources/specialized-resources/spotlight-initial-coin-offerings-digital-assets (last visited Mar. 19, 2018).

## IV.   Continuing Efforts to Protect Investors

The SEC is acutely focused on unlawful conduct in this area.  In 2017, the SEC formed a Cyber Unit within its Division of Enforcement, to address cyber-related misconduct, including involving distributed ledger technology and ICOs.  The SEC is continuing to police the digital asset and ICO markets vigorously and to bring enforcement actions against those who conduct ICOs or other actions relating to digital assets in violation of the federal securities laws.

The SEC's ability to fulfill its mission and protect investors and the markets is critically dependent on the appropriate application of the federal securities laws to all types of instruments—including the Tokens at issue in this case.  An improper application of the definitional provisions of the Securities and Exchange Acts or an unduly narrow reading of established precedent as applied to the Tokens here could severely hinder the SEC's efforts.

## FACTUAL BACKGROUND

The Government's Memorandum in Opposition to Defendant's Motion (the "Government's Brief") comprehensively sets forth the facts relevant to the resolution of this motion.  The SEC briefly sets forth here certain facts alleged in the Indictment, which must be taken as true.  United States v. Scully, 108 F. Supp. 3d 59, 117 (E.D.N.Y. 2015).

Defendant Zaslavskiy conducted ICOs for interests in REcoin in July of 2017 and, later, in Diamond.  Indictment ¶¶ 1-3, 10.  Defendant launched a website for the REcoin ICO where he

7

identified himself as the founder and CEO, spoke of other team members associated with the enterprise, and permitted investors to purchase REcoin Tokens using fiat currency or digital assets.  Id. ¶ 12.  Defendant advertised the REcoin ICO as "an attractive investment opportunity" that "grows in value," touted the "experienced team" of professionals that led the enterprise, and explained that REcoin "invests" the proceeds from the REcoin ICO "into global real estate[,] based on the soundest strategies."  Id. ¶ 14; see also id. ¶ 11 (Defendant explained that the REcoin ICO funds would be used to buy real estate and investors could look forward to "some of the highest potential returns").  Although Defendant touted the availability of digital asset technologies to protect an investor's purchase, such as a "REcoin Purse" that was "secured by the latest cryptocurrency tools," id. ¶ 14, in reality no digital token or asset existed and none had been developed.  Id. ¶ 16.  Defendant made other misrepresentations in connection with the REcoin ICO, including regarding the amount of funds raised and the existence of a team of professionals.  Id. ¶¶ 13, 16.  More than 1,000 individuals invested in the REcoin ICO.  Id. ¶ 17.

Defendant's scheme with respect to the Diamond Tokens was substantially identical.  At some point in September 2017, Defendant began advertising Diamond Tokens by offering REcoin Token purchasers the opportunity to convert their investments into Diamond Tokens, by explaining that Diamond would use the proceeds of the Diamond ICO to invest in diamonds, and by forecasting a "minimum growth of 10% to 15% per year" for the investments.  Id. ¶¶ 18-19, 22.  As he did with respect to REcoin, Defendant detailed the growth efforts he was engaged in with respect to Diamond, including developing the Diamond "ecosystem" and identifying diamonds and their storage locations.  Id. ¶¶ 20, 23.  Defendant also touted efforts to list the Diamond Tokens on exchanges to increase profits, and otherwise made many of the same misstatements with respect to the Diamond ICO as he did with respect to REcoin.  Id. ¶¶ 22-23.

## ARGUMENT

The Government's Brief persuasively demonstrates that the Tokens are securities and that Defendant's motion should be denied.  The SEC agrees in full with the arguments in the Government's Brief—which are consistent with the SEC's long-standing legal precedent—and here highlights only certain points germane to rebut Defendant's arguments.

## I.    Legal Background

### A.    The Registration and Anti-Fraud Provisions of the Securities Laws

The Securities Act, 15 U.S.C. §§ 77a, et seq., contains registration provisions that contemplate that the offer or sale of "securities" to the public must be accompanied by the "full and fair disclosure" afforded by registration with the SEC and delivery of a statutory prospectus containing information necessary to enable potential purchasers to make an informed investment decision.[1]  See, e.g., SEC v. Cavanagh, 1 F. Supp. 2d 337, 360 (S.D.N.Y. 1998), aff'd, 155 F.3d 129 (2d Cir. 1998); SEC v. Aaron, 605 F.2d 612, 618 (2d Cir. 1979) (citing SEC v. Ralston Purina Co., 346 U.S. 119, 124 (1953)), vacated on other grounds, 446 U.S. 680 (1980).

Section 5(a) of the Securities Act provides that, unless a registration statement is in effect as to a security or an exemption for registration applies, it is unlawful for any person, directly or indirectly, to engage in the offer or sale of securities in interstate commerce.  Section 5(c) of the Securities Act provides a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed or an exemption from registration applies.   Thus, both Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of "securities" in interstate commerce absent an exemption.  15 U.S.C. §§ 77e(a), (c).

---

[1] Although not specifically at issue in this criminal action, Sections 5 and 17(a) of the Securities Act are at issue in the parallel civil case filed by the SEC.  See Complaint ¶¶ 10, 94, 97, 100, SEC v. REcoin, et al., No. 17 Civ. 5725 (RJD) (D.E. 1) (Sept. 29, 2017).

The Exchange Act, 15 U.S.C. §§ 78a, et seq., prohibits using or employing "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b) (emphasis added).  The Securities Act, 15 U.S.C. §§ 77a, et seq., similarly prohibits "in the offer or sale of any securities . . . to employ any device, scheme, or artifice to defraud, or . . . to obtain money or property by means of any untrue statement of a material fact . . . ." Id. § 77q(a).

The applicability of the foregoing provisions and the outcome of the criminal and civil actions before this Court therefore turn on the meaning of the word "securities" as it is used in the Securities and Exchange Acts.

### B.      "Investment Contracts" Are "Securities"

Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract."  See id. §§ 77b(a), 78c(a).  As the Government's Brief notes, the Supreme Court's decision in Howey holds that an "investment contract" is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.  See 328 U.S. at 301; see also SEC v. Edwards, 540 U.S. 389, 393 (2004).  Howey "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of the many types of instruments" offered in "our commercial world."  328 U.S. at 299.  Howey states the test for both the criminal and civil enforcement of the securities laws.  See, e.g., United States v. Leonard, 529 F.3d 83, 87-91 (2d Cir. 2008).  As the Supreme Court has recognized, Congress crafted "a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment."  Reves v. Ernst & Young, 494 U.S. 56, 60-61 (1990).

C.    **The SEC's Application of <u>Howey</u> in the DAO Report**

In the Report, the Commission concluded that "DAO Tokens" were investment contracts under <u>Howey</u> because, among other factors:  (1) investors in DAO Tokens purchased them using the digital asset known as Ether, which constituted an "investment of 'money,'" Report, 2017 WL 7184670, *8 (citation omitted); (2) investors had a reasonable expectation of profits because DAO promoters informed investors that the DAO was a for-profit entity "whose objective was to fund projects in exchange for a return on investment," <u>id.</u> at *9; and (3) investors expected that their profits would be derived from the entrepreneurial and managerial efforts of others given that the promoters laid out their own vision and plans for the company in promotional materials, spoke about how they would select persons to work on the projects "based on their expertise and credentials," and touted their expertise in blockchain technologies, whereas the limited voting rights and wide dispersion of investors "did not provide [investors] with meaningful control over the enterprise."  <u>Id.</u> at *9-11; <u>see also</u> <u>Munchee</u>, 2017 WL 6374434, *4 (settled order).

II.    **The Tokens Here Are Investment Contracts and Therefore Securities**

The charges in the Indictment make clear that the Tokens easily satisfy each prong of <u>Howey</u>:  they constitute an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial and managerial efforts of others.

A.    **Token Purchasers Invested Money**

Individuals invested in REcoin and Diamond "through its website using their credit cards, virtual currency or through online funds transfer services."  Indictment ¶¶ 12, 20.  Such investment is the type of contribution of value that can create an investment contract under <u>Howey</u>.  <u>See</u> <u>SEC v. Shavers</u>, No. 13 Civ. 416 (ALM), 2014 WL 4652121, *1 (E.D. Tex. Sept. 18, 2014) (holding that an investment of Bitcoin meets the first prong of <u>Howey</u>).

Defendant's insistence that people who chose to buy a Token were "simply exchanging one medium of currency for another," Def. Br. at 12, essentially concedes that the first prong of Howey is satisfied.  The first prong of Howey contemplates that the "'investment' may take the form of 'goods and services,' or some other 'exchange of value.'"  Uselton v. Com. Lovelace Motor Freight, Inc., 940 F.2d 564, 574 (10th Cir. 1991) (citation omitted) (emphasis added).  Accordingly, an investment occurred here regardless of how Defendant now seeks to relabel it.

### B.    In a Common Enterprise[2]

Defendant told investors in the REcoin Tokens that their assets would be pooled and invested into real estate selected by Defendant and his "experienced team" so that "people from all over the world'" could share in "real estate investments 'with some of the highest potential returns."  Indictment ¶¶ 11, 14.  After offering a "conversion of REcoin Tokens into Diamond [T]okens," id. ¶ 19, Defendant made similar representations with respect to the Diamond Tokens, namely, that investor funds would be used to purchase diamonds selected by Defendant and his "experienced team," and that the company "forecast a minimum growth of 10% to 15% per year."  Id. ¶¶ 14, 21, 22.  The second prong of Howey is therefore met because the "fortunes of each investor depend upon the profitability of the enterprise as a whole" and there was a "tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of

---

[2] The Commission does not require commonality per se or view a "common enterprise" as a distinct element of the term "investment contract."  In its opinion in In re Barkate, the Commission stated that a "common enterprise" is not a distinct requirement for an "investment contract" under Howey.  Release No. 49542, 82 SEC Docket 2130, 2004 WL 762434, *3 n.13 (Apr. 8, 2004), aff'd sub nom. Barkate v. SEC, 125 F. App'x 892 (9th Cir. 2005).  The Second Circuit has stated that a showing of "horizontal commonality" can establish a common enterprise.  See generally Revak v. SEC Realty Corp., 18 F.3d 81, 87-88 (2d Cir. 1994).  Broadly defined, horizontal commonality is the pooling of investor assets in the common enterprise, such that the fortunes of investors are tied to each other, whereas vertical commonality focuses on the relationship between the promoter and the investor.  In any event, as explained further herein, the Indictment shows the existence of commonality in this case.

assets, usually combined with the pro-rata distribution of profits."  Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994); see also infra p. 18-19 (discussing pro-rata distribution of profits).[3]

Defendant's contrary argument, that there is no commonality because each individual can dispose of a Token on his or her own, is misguided.  The second prong of Howey focuses on whether an individual's fortunes with respect to the investment are tied together to others', as they were undisputedly linked here.  An individual's ability to exchange or dispose of an investment contract on his or her own—which exists with respect to many forms of investments that are straight-forward examples of investment contracts (see, e.g., Edwards, 540 U.S. at 391-92 (purchaser of payphone lease investment contract had option to sell back lease to promoter))—is not germane to and does not alter this analysis.

### C.    With a Reasonable Expectation of Profits

The various promotional materials disseminated by Defendant informed investors that REcoin and Diamond were for-profit entities such that the value of the investments would be expected to increase based on the profitability of the business.  Specifically, as the REcoin whitepaper stated, the supposed REcoin Token was "an attractive investment opportunity" because it would "grow[] in value."  Indictment ¶ 14.  Similarly, the Diamond Token was forecasted for a "minimum growth of 10% to 15% per year" and Defendant informed investors that he was looking to list the Diamond Token "on external exchanges [to] make more profit." Id. ¶ 22.  Accordingly, investors in the Tokens had a reasonable expectation of an increase in the

---

[3] The investments here also satisfy the strict vertical commonality test because investors' fortunes in the Tokens were tied to Defendant's profits.  See Revak, 18 F.3d at 87 (in the absence of horizontal commonality, strict vertical commonality may also be sufficient).  Defendant claimed that he would earn a "commission" when the Token holders used or sold their Tokens. See Def. Br. at Ex. A (REcoin whitepaper) (D.E. 22-50); id. at Ex. B (Diamond whitepaper) (D.E. 22-58).

value of their purchase, a type of profit specifically recognized as satisfying <u>Howey</u>.  <u>Edwards</u>, 540 U.S. at 394 (explaining that expected profits can include "dividends, other periodic payments, or <u>the increased value of the investment</u>.") (emphasis added).

### D.   Derived from the Managerial Efforts of Others

Defendant represented that the REcoin investment would grow in value based on his managerial efforts both in selecting the assets that would back the investments and in developing the supposed environment in which the Tokens could be used.  Defendant stated that "REcoin is led by an experienced team of brokers, lawyers, and developers and invests its proceeds into global real estate based on the soundest strategies."  Indictment ¶ 14.  He also stated that the value of the Diamond Tokens would grow based on his development of the Diamond "ecosystem."  <u>Id.</u> ¶¶ 19-21.  Defendant likewise explained that his success of his efforts to list Diamond Tokens on exchanges was among the sources of the investors' returns.  <u>Id.</u> ¶¶ 22.  This suffices to meet <u>Howey's</u> last prong, in which the essential inquiry is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  <u>SEC v. Glenn W. Turner Enters., Inc.</u>, 474 F.2d 476, 482 (9th Cir. 1973); <u>see also</u> <u>Cont'l Mktg., Corp. v. SEC</u>, 387 F.2d 466, 470-71 (10th Cir. 1967) (promoters' efforts to "develop" a "structure into which investors entered" was part of efforts to increase the value of the investment).

Seeking to minimize the central role Defendant held himself out as playing in these ventures, Defendant argues that "adoptors [sic] with shared professional interests would work together to create an ecosystem" that would lead to an increase in the venture's value.  Def. Br. at 15.  However, Defendant cannot minimize the importance of the supposed investment expertise of him and his team.  Given Defendant's statement that "people from all over the world" were free to purchase the Tokens, Indictment ¶ 11, the investors in these Tokens "could

14

not reasonably be believed to be desirous or capable of undertaking" these projects "on their

own," and thus had to rely on the Defendant's managerial expertise.  SEC v. Aqua–Sonic Prods.

Corp., 687 F.2d 577, 583-84 (2d Cir. 1982); see also Leonard, 529 F.3d at 88 (investors need not

literally rely "solely" on the efforts of others).  Even if an investor's efforts help to make an

enterprise profitable, those efforts do not negate a promoter's significant managerial efforts.  See,

e.g., Glenn W. Turner, 474 F.2d at 482 (finding that a multi-level marketing scheme was an

investment contract and that investors relied on the promoter's managerial efforts, despite the

fact that investors put forth the majority of the labor that made the enterprise profitable, because

the promoter dictated the terms and controlled the scheme).

## III.    Defendant's Contrary Arguments Are Unavailing

Defendant does not squarely address most of the foregoing factual contentions or their

interaction with Howey.  Rather, Defendant argues that:  (1) the Tokens were "to be" or were

"intended to be" "currency" as that term is used in the Exchange Act, and therefore exempt from

the securities laws; (2) because there was no pro-rata distribution of profits, there was no

commonality; and (3) because the REcoin investors (but not the Diamond investors) were

offered voting rights, whatever profit would not be derived from the managerial effort of others.

Defendant's arguments mischaracterize the facts and misstate the law.

### A.    Defendant's Attempt to Label the Investments Here as "Cryptocurrencies" Does Not Change Their Character as Securities

Defendant dubs the investments at issue here "cryptocurrencies" or "virtual currencies"

and urges the Court to issue a broad ruling that such assets—as a class—are statutorily exempt

from the definition of securities under the Securities and Exchange Acts.  Def. Br. at 6-10.

Defendant argues that "cryptocurrencies" or "virtual currencies" are "currency" within the

meaning of the Exchange Act, 15 U.S.C. § 78c(a)(10), and are therefore exempt from the definition of "security," simply because he now has decided to call them "cryptocurrencies."[4]

First, the appropriate focus is on the economics of the offering, not its label.  See, e.g., United Hous. Found., Inc v. Forman, 421 U.S. 837, 849 (1975).  What Defendant promised purchasers at the time of the offer and sale were returns on an investment.  But, even if Defendant is to be believed that his intent at the time was eventually to issue tokens to be used as "cryptocurrencies" in a blockchain-based ecosystem, building such an ecosystem would have required Defendant's efforts before any cryptocurrency could be issued by it or used within it. See Indictment ¶¶ 11, 14, 16, 20, 22-23.  Defendant's supposed plan that the Tokens would, one day, be useful in that ecosystem that he had not built does not alter the nature of Defendant's promise to investors.  Defendant offered and sold the investment opportunity to profit from his development of that ecosystem.  Defendant's fund-raising effort to obtain capital—even assuming an intention to build that ecosystem—bears all the hallmarks of a securities offering.

Second, Defendant's effort to evade the application of the securities laws by labeling the Tokens "cryptocurrencies" should be rejected as contrary to the broad and principles-based analysis that decades of law dictate.  The economic realities demonstrate that the investments offered and sold are securities, as detailed above.  See, e.g., Forman, 421 U.S. at 849 ("Congress intended the application of these [securities] statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto."); see also SEC Chairman Jay Clayton and CFTC Chairman Christopher Giancarlo, Regulators are Looking at Cryptocurrency, Wall Street Journal (Jan. 24, 2018) ("[S]ome products that are labeled cryptocurrencies have characteristics

---

[4] The definition of "security" under the Exchange Act expressly excludes "currency."  15 U.S.C. § 78c(a)(10) (Section 3(a)(10) of the Exchange Act).  The Securities Act's definition of "security" does not exclude "currency" (see id. § 77b(a)(1)), but courts have treated the two definitions as the same.  See Landreth Timber Co. v. Landreth, 471 U.S. 681, 686 n.1 (1985).

that make them securities.  The offer, sale and trading of such products must be carried out in compliance with securities law.  The SEC will vigorously pursue those who seek to evade the registration, disclosure and antifraud requirements of our securities laws.").  Indeed, one is hard-pressed to imagine what would be left of the securities laws if simply labelling an investment contract a "currency" could make it so.  See, e.g., Long v. Shultz Cattle Co., 881 F.2d 129, 136 (5th Cir. 1989) (examining "the economic realities of [the promoter]'s program" and rejecting the promoter's attempts to "avoid the securities laws by simply attaching the label 'consulting agreement' to a package of services which [was] clearly . . . an investment contract").

Defendant advances a number of strawman arguments concerning digital assets unlike those at issue here.  For example, Defendant relies on United States v. Ulbricht, 31 F. Supp. 3d 540, 569-70 (S.D.N.Y. 2014), where the district court determined that Bitcoin is a type of "fund" or "monetary instrument" under a money laundering statute, 18 U.S.C. § 1956(c)(4).  But Bitcoin is a completely different asset than the investment at issue here.  Defendant's Tokens were not even created at the time of the offer and sale, and could not be used to buy anything.  Thus, the Ulbricht court's decision that Bitcoin is a "fund" or "monetary instrument" says nothing about whether the Tokens Defendant offered and sold are securities.

Finally, because the question whether an investment constitutes a "security" within the meaning of the Securities and Exchange Acts is highly fact-specific, the Court need not resolve broader questions about whether all (or which) digital assets are within the purview of the Acts.  Nor must the Court broadly decide whether an entire category of "cryptocurrency" is a "currency" for purposes of the exclusion set forth in Section 3(a)(10) of the Exchange Act.[5]

---

[5] The Treasury Department's Financial Crimes Enforcement Network has noted:  "In contrast to real currency, 'virtual' currency is a medium of exchange that operates like a currency in some environments, but does not have all the attributes of real currency.  In particular, virtual currency

When one looks past labels, as the Supreme Court has instructed, what was offered in this case

was plainly not a currency of any nature.

> **B.**    **A Pro-Rata Distribution of Profits is Not Required and, in Any Event, Is Present Here**

Defendant is also incorrect to suggest that horizontal commonality requires a pro-rata

distribution of profit.  See Def. Br. at 13.  The Second Circuit has explained that horizontal

commonality requires "pooling of assets," which is "usually" combined with such distribution—

but not that such a distribution is necessary.  Revak, 18 F.3d at 87.

Other courts that have applied horizontal commonality recognize that it is sufficient that

"each investor was entitled to receive returns directly proportionate to his or her investment

stake," "either for direct distribution or as an increase in the value of the investment."  SEC v.

SG Ltd., 265 F.3d 42, 46-47, 51 (1st Cir. 2001) (finding horizontal commonality); accord SEC v.

Infinity Grp. Co., 212 F.3d 180, 188 (3d Cir. 2000) (finding horizontal commonality where the

"return on investment was to be apportioned according to the amounts committed by the

investor" and was "directly proportional to the amount of that investment").

Here, investors would have reasonably expected profits (from real estate, diamonds,

and/or tokens) that were directly proportional to their investment, as well as a pro rata

distribution of profits.  The REcoin whitepaper states that the profits from the REcoin enterprise

---

does not have legal tender status in any jurisdiction."  Guidance: Application of FinCEN's
Regulations to Persons Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013)
(discussing 31 C.F.R. § 1010.100(m)), available at https://www.fincen.gov/resources/statutes-
regulations/guidance/application-fincens-regulations-persons-administering (last visited Mar. 19,
2018).  The CFTC has concluded that Bitcoin is a virtual currency that is a commodity, "distinct
from 'real' currencies, which are the coin and paper money of the United States or another
country that are designated as legal tender, circulate, and are customarily used and accepted as a
medium of exchange in the country of issuance."  In re Coinflip, Inc., CFTC No. 15-29, 2015
WL 5535736, *1 n.2 (Sept. 17, 2015).  The IRS has concluded that "virtual currency is not
treated as currency" for purposes of federal tax laws.  IRS Virtual Currency Guidance, I.R.S.
Notice 2014-21, 2014-16 I.R.B. 938, 2014 WL 1224474 (Apr. 14, 2014).

would be reinvested into that enterprise—an allegation that Defendant acknowledges in his papers and does not dispute.  See Def. Br. at 13 n.5 & 32 (REcoin whitepaper).  That reinvestment of profits is nothing more than a pro-rata distribution in kind to the investors in the enterprise (in other words, a proportionate return "as an increase in the value of the investment," SG Ltd., 265 F.3d at 47), such that the commonality prong is satisfied.

> ### C.     The "Voting Rights" Offered to REcoin Investors Were Illusory

Defendant argues that because the REcoin Tokens gave investors voting rights, investors retained control of the enterprise such that the last Howey prong is not met.  See Def. Br. at 17. Here, however, these voting rights were illusory both because there is no detail in the offering materials about how the voting process would work, see id. at 27-51 (REcoin whitepaper), and because, given the large number of REcoin investors (more than 1,000, see Indictment ¶ 17), their ability to exercise any real control would be minimal.  See Williamson v. Tucker, 645 F.2d 404, 423 (5th Cir. 1981) ("[O]ne would not expect partnership interests sold to large numbers of the general public to provide any real partnership control; at some point there would be so many [limited] partners that a partnership vote would be more like a corporate vote, each partner's role having been diluted to the level or a single shareholder in a corporation."); see also SEC v. Merch. Capital, LLC, 483 F.3d 747, 754-66 (11th Cir. 2007) (finding an investment contract even where voting rights were provided to purported general partners, noting that the voting process provided limited information for investors to make informed decisions, and the purported general partners lacked control over the information in the ballots).  And, of course, many types of securities come with voting rights, such as common shares in a public company.[6]

---

[6]  The SEC agrees with the Government's treatment of Defendant's vagueness argument.  To the extent Defendant argues that the term "investment contract" is void for vagueness, the Second Circuit has rejected that argument.  See SEC v. Brigadoon Scotch Distrib. Co., 480 F.2d 1047,

## CONCLUSION

In its role as the primary regulator of the national securities markets, the SEC has a paramount interest in the application of the federal securities laws to capital raises—whatever the terminology or technology used. The investments Defendant offered and sold fall squarely within the ambit of the federal securities laws. For the foregoing reasons, as well as those advanced in the Government's Brief, Defendant's motion should be denied.

Dated: March 19, 2018
      New York, N.Y.

SECURITIES AND EXCHANGE COMMISSION

By: _____

      Jorge G. Tenreiro
      Valerie A. Szczepanik

200 Vesey Street, Suite 400
New York, N.Y. 10281
Tel: 212-336-9145 (Tenreiro)

*Attorneys for Securities and Exchange Commission*

---

1052 n.6 (2d Cir. 1973) ("In light of the many Supreme Court decisions defining and applying the term we find such a position untenable."); accord Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027, 1029 (2d Cir. 1974) (following Brigadoon Scotch). Moreover, the SEC has communicated its interests in regulating ICOs in numerous public statements. See supra pp. 4-7; see also CFTC v. McDonnell, No. 18 Civ. 361 (JBW), 2018 WL 1175156, *5, *7, *12 (E.D.N.Y. Mar. 6, 2018) (noting the SEC's regulation of digital assets as "securities").

20