# Exhibit D

Public Statement

# Statement on Cryptocurrencies and Initial Coin Offerings

## SEC Chairman Jay Clayton

**Dec. 11, 2017**

The world's social media platforms and financial markets are abuzz about cryptocurrencies and "initial coin offerings" (*ICOs*). There are tales of fortunes made and dreamed to be made. We are hearing the familiar refrain, "this time is different."

The cryptocurrency and ICO markets have grown rapidly. These markets are local, national and international and include an ever-broadening range of products and participants. They also present investors and other market participants with many questions, some new and some old (but in a new form), including, to list just a few:

- Is the product legal? Is it subject to regulation, including rules designed to protect investors? Does the product comply with those rules?
- Is the offering legal? Are those offering the product licensed to do so?
- Are the trading markets fair? Can prices on those markets be manipulated? Can I sell when I want to?
- Are there substantial risks of theft or loss, including from hacking?

The answers to these and other important questions often require an in-depth analysis, and the answers will differ depending on many factors. This statement provides my general views on the cryptocurrency and ICO markets[1] and is directed principally to two groups:

- "Main Street" investors, and
- Market professionals – including, for example, broker-dealers, investment advisers, exchanges, lawyers and accountants – whose actions impact Main Street investors.

<u>Considerations for Main Street Investors</u>

**A number of concerns have been raised regarding the cryptocurrency and ICO markets, including that, as they are currently operating, there is substantially less investor protection than in our traditional securities markets, with correspondingly greater opportunities for fraud and manipulation.**

Investors should understand that to date no initial coin offerings have been registered with the SEC. The SEC also has not to date approved for listing and trading any exchange-traded products (such as

ETFs) holding cryptocurrencies or other assets related to cryptocurrencies.[2]  **If any person today tells you otherwise, be especially wary.**

We have issued investor alerts, bulletins and statements on initial coin offerings and cryptocurrency-related investments, including with respect to the marketing of certain offerings and investments by celebrities and others.[3]  Please take a moment to read them.  **If you choose to invest in these products, please ask questions and demand clear answers.**  A list of sample questions that may be helpful is attached.

As with any other type of potential investment, if a promoter guarantees returns, if an opportunity sounds too good to be true, or if you are pressured to act quickly, please exercise extreme caution and be aware of the risk that your investment may be lost.

**Please also recognize that these markets span national borders and that significant trading may occur on systems and platforms outside the United States.  Your invested funds may quickly travel overseas without your knowledge.  As a result, risks can be amplified, including the risk that market regulators, such as the SEC, may not be able to effectively pursue bad actors or recover funds.**

To learn more about these markets and their regulation, please read the "Additional Discussion of Cryptocurrencies, ICOs and Securities Regulation" section below.

**Considerations for Market Professionals**

I believe that initial coin offerings – whether they represent offerings of securities or not – can be effective ways for entrepreneurs and others to raise funding, including for innovative projects.  However, any such activity that involves an offering of securities must be accompanied by the important disclosures, processes and other investor protections that our securities laws require.  A change in the structure of a securities offering does not change the fundamental point that when a security is being offered, our securities laws must be followed.[4]  Said another way, replacing a traditional corporate interest recorded in a central ledger with an enterprise interest recorded through a blockchain entry on a distributed ledger may change the form of the transaction, but it does not change the substance.

I urge market professionals, including securities lawyers, accountants and consultants, to read closely the investigative report we released earlier this year (the "*21(a) Report*")[5] and review our subsequent enforcement actions.[6]  In the 21(a) Report, the Commission applied longstanding securities law principles to demonstrate that a particular token constituted an investment contract and therefore was a security under our federal securities laws.  Specifically, we concluded that the token offering represented an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

Following the issuance of the 21(a) Report, certain market professionals have attempted to highlight utility characteristics of their proposed initial coin offerings in an effort to claim that their proposed tokens or coins are not securities.  Many of these assertions appear to elevate form over substance.  Merely calling a token a "utility" token or structuring it to provide some utility does not prevent the token from being a security.  Tokens and offerings that incorporate features and marketing efforts that emphasize the potential for profits based on the entrepreneurial or managerial efforts of others continue to contain the hallmarks of a security under U.S. law.  **On this and other points where the application of expertise and judgment is expected, I believe that gatekeepers and others,**

**including securities lawyers, accountants and consultants, need to focus on their responsibilities.** I urge you to be guided by the principal motivation for our registration, offering process and disclosure requirements: investor protection and, in particular, the protection of our Main Street investors.

I also caution market participants against promoting or touting the offer and sale of coins without first determining whether the securities laws apply to those actions. **Selling securities generally requires a license, and experience shows that excessive touting in thinly traded and volatile markets can be an indicator of "scalping," "pump and dump" and other manipulations and frauds.** Similarly, I also caution those who operate systems and platforms that effect or facilitate transactions in these products that they may be operating unregistered exchanges or broker-dealers that are in violation of the Securities Exchange Act of 1934.

On cryptocurrencies, I want to emphasize two points. First, while there are cryptocurrencies that do not appear to be securities, simply calling something a "currency" or a currency-based product does not mean that it is not a security. Before launching a cryptocurrency or a product with its value tied to one or more cryptocurrencies, its promoters must either (1) be able to demonstrate that the currency or product is not a security or (2) comply with applicable registration and other requirements under our securities laws. Second, brokers, dealers and other market participants that allow for payments in cryptocurrencies, allow customers to purchase cryptocurrencies on margin, or otherwise use cryptocurrencies to facilitate securities transactions should exercise particular caution, including ensuring that their cryptocurrency activities are not undermining their anti-money laundering and know-your-customer obligations.[7] **As I have stated previously, these market participants should treat payments and other transactions made in cryptocurrency as if cash were being handed from one party to the other.**

**Additional Discussion of Cryptocurrencies, ICOs and Securities Regulation**

*Cryptocurrencies.* Speaking broadly, cryptocurrencies purport to be items of inherent value (similar, for instance, to cash or gold) that are designed to enable purchases, sales and other financial transactions. They are intended to provide many of the same functions as long-established currencies such as the U.S. dollar, euro or Japanese yen but do not have the backing of a government or other body. Although the design and maintenance of cryptocurrencies differ, proponents of cryptocurrencies highlight various potential benefits and features of them, including (1) the ability to make transfers without an intermediary and without geographic limitation, (2) finality of settlement, (3) lower transaction costs compared to other forms of payment and (4) the ability to publicly verify transactions. Other often-touted features of cryptocurrencies include personal anonymity and the absence of government regulation or oversight. Critics of cryptocurrencies note that these features may facilitate illicit trading and financial transactions, and that some of the purported beneficial features may not prove to be available in practice.

It has been asserted that cryptocurrencies are not securities and that the offer and sale of cryptocurrencies are beyond the SEC's jurisdiction. Whether that assertion proves correct with respect to any digital asset that is labeled as a cryptocurrency will depend on the characteristics and use of that particular asset. In any event, it is clear that, just as the SEC has a sharp focus on how U.S. dollar, euro and Japanese yen transactions affect our securities markets, we have the same interests and responsibilities with respect to cryptocurrencies. This extends, for example, to securities firms and other market participants that allow payments to be made in cryptocurrencies, set up structures to invest in or hold cryptocurrencies, or extend credit to customers to purchase or hold cryptocurrencies.

*Initial Coin Offerings.*  Coinciding with the substantial growth in cryptocurrencies, companies and individuals increasingly have been using initial coin offerings to raise capital for their businesses and projects.  Typically these offerings involve the opportunity for individual investors to exchange currency such as U.S. dollars or cryptocurrencies in return for a digital asset labeled as a coin or token.

These offerings can take many different forms, and the rights and interests a coin is purported to provide the holder can vary widely.  A key question for all ICO market participants: "Is the coin or token a security?"  As securities law practitioners know well, the answer depends on the facts.  For example, a token that represents a participation interest in a book-of-the-month club may not implicate our securities laws, and may well be an efficient way for the club's operators to fund the future acquisition of books and facilitate the distribution of those books to token holders.  In contrast, many token offerings appear to have gone beyond this construct and are more analogous to interests in a yet-to-be-built publishing house with the authors, books and distribution networks all to come.  It is especially troubling when the promoters of these offerings emphasize the secondary market trading potential of these tokens.  Prospective purchasers are being sold on the potential for tokens to increase in value – with the ability to lock in those increases by reselling the tokens on a secondary market – or to otherwise profit from the tokens based on the efforts of others.  These are key hallmarks of a security and a securities offering.

By and large, the structures of initial coin offerings that I have seen promoted involve the offer and sale of securities and directly implicate the securities registration requirements and other investor protection provisions of our federal securities laws.  Generally speaking, these laws provide that investors deserve to know what they are investing in and the relevant risks involved.

I have asked the SEC's Division of Enforcement to continue to police this area vigorously and recommend enforcement actions against those that conduct initial coin offerings in violation of the federal securities laws.

### Conclusion

We at the SEC are committed to promoting capital formation.  The technology on which cryptocurrencies and ICOs are based may prove to be disruptive, transformative and efficiency enhancing.  I am confident that developments in fintech will help facilitate capital formation and provide promising investment opportunities for institutional and Main Street investors alike.

I encourage Main Street investors to be open to these opportunities, but to ask good questions, demand clear answers and apply good common sense when doing so.  When advising clients, designing products and engaging in transactions, market participants and their advisers should thoughtfully consider our laws, regulations and guidance, as well as our principles-based securities law framework, which has served us well in the face of new developments for more than 80 years.  I also encourage market participants and their advisers to engage with the SEC staff to aid in their analysis under the securities laws.  Staff providing assistance on these matters remain available at FinTech@sec.gov .

### Sample Questions for Investors Considering a Cryptocurrency or ICO Investment Opportunity[8]

- Who exactly am I contracting with?

- Who is issuing and sponsoring the product, what are their backgrounds, and have they provided a full and complete description of the product? Do they have a clear written business plan that I understand?
- Who is promoting or marketing the product, what are their backgrounds, and are they licensed to sell the product? Have they been paid to promote the product?
- Where is the enterprise located?

- Where is my money going and what will it be used for? Is my money going to be used to "cash out" others?
- What specific rights come with my investment?
- Are there financial statements? If so, are they audited, and by whom?
- Is there trading data? If so, is there some way to verify it?
- How, when, and at what cost can I sell my investment? For example, do I have a right to give the token or coin back to the company or to receive a refund? Can I resell the coin or token, and if so, are there any limitations on my ability to resell?
- If a digital wallet is involved, what happens if I lose the key? Will I still have access to my investment?
- If a blockchain is used, is the blockchain open and public? Has the code been published, and has there been an independent cybersecurity audit?
- Has the offering been structured to comply with the securities laws and, if not, what implications will that have for the stability of the enterprise and the value of my investment?
- What legal protections may or may not be available in the event of fraud, a hack, malware, or a downturn in business prospects? Who will be responsible for refunding my investment if something goes wrong?
- If I do have legal rights, can I effectively enforce them and will there be adequate funds to compensate me if my rights are violated?

---

[1] This statement is my own and does not reflect the views of any other Commissioner or the Commission. This statement is not, and should not be taken as, a definitive discussion of applicable law, all the relevant risks with respect to these products, or a statement of my position on any particular product. Additionally, this statement is not a comment on any particular submission, in the form of a proposed rule change or otherwise, pending before the Commission.

[2] The CFTC has designated bitcoin as a commodity. Fraud and manipulation involving bitcoin traded in interstate commerce are appropriately within the purview of the CFTC, as is the regulation of commodity futures tied directly to bitcoin. That said, products linked to the value of underlying digital assets, including bitcoin and other cryptocurrencies, may be structured as securities products subject to registration under the Securities Act of 1933 or the Investment Company Act of 1940.

[3] Statement on Potentially Unlawful Promotion of Initial Coin Offerings and Other Investments by Celebrities and Others (Nov. 1, 2017), *available at* https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos; Investor Alert: Public Companies Making ICO-Related Claims (Aug. 28, 2017), *available at* https://www.sec.gov/oiea/investor-alerts-and-bulletins/ia_icorelatedclaims*;* Investor Bulletin: Initial Coin Offerings (July 25, 2017), *available at*

Case 1:17-cr-00647-RJD-RER   Document 25-4   Filed 03/19/18   Page 7 of 7 PageID #: 294

https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_coinofferings; Investor Alert: Bitcoin and Other Virtual Currency-Related Investments (May 7, 2014), *available at* https://www.investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-alert-bitcoin-other-virtual-currency; Investor Alert: Ponzi Schemes Using Virtual Currencies (July 23, 2013), *available at* https://www.sec.gov/investor/alerts/ia_virtualcurrencies.pdf.

[4] It is possible to conduct an ICO without triggering the SEC's registration requirements. For example, just as with a Regulation D exempt offering to raise capital for the manufacturing of a physical product, an initial coin offering that is a security can be structured so that it qualifies for an applicable exemption from the registration requirements.

[5] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (July 25, 2017), *available at* https://www.sec.gov/litigation/investreport/34-81207.pdf.

[6] Press Release, Company Halts ICO After SEC Raises Registration Concerns (Dec. 11, 2017), *available at* https://www.sec.gov/news/press-release/2017-227; Press Release, SEC Emergency Action Halts ICO Scam (Dec. 4, 2017), *available at* https://www.sec.gov/news/press-release/2017-219; Press Release, SEC Exposes Two Initial Coin Offerings Purportedly Backed by Real Estate and Diamonds (Sept. 29, 2017), *available at* https://www.sec.gov/news/press-release/2017-185-0.

[7] I am particularly concerned about market participants who extend to customers credit in U.S. dollars – a relatively stable asset – to enable the purchase of cryptocurrencies, which, in recent experience, have proven to be a more volatile asset.

[8] This is not intended to represent an exhaustive list. Please also see the SEC investor bulletins, alerts and statements referenced in note 3 of this statement.