UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

THE UNITED STATES OF AMERICA

     -- against --

                                        17 CR 647 (RJD)

MAKSIM ZASLAVSKIY,

     Defendant.

---

DEFENDANT'S REPLY BRIEF IN SUPPORT OF HIS MOTION TO DISMISS

                                        DAVID PATTON
FEDERAL DEFENDER
Federal Defenders of New York
Eastern District of New York
One Pierrepont Plaza 16th Floor
Brooklyn, NY 11201

By:
Mildred M. Whalen
Len H. Kamdang
Counsel to Maksim Zaslavskiy

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.....................................................................................................1

I.   CRYPTOCURRENCIES ARE CURRENCY WITHIN THE MEANING OF THE
     STATUTE......................................................................................................................2

II.  EVEN UNDER THE *HOWEY* TEST, RECOIN AND DRC ARE NOT "INVESTMENT
     CONTRACTS" AND THEREFORE NOT SECURITIES
     ……………………………………………………………..…………………….………..6

     A.  NEITHER HORIZONTAL NOR VERTICAL COMMONALITY EXISTS
         …………………………………………………………………………………...6

     B.  PROFITS FROM RECOIN AND DRC WERE NOT TO BE DERIVED *SOLELY*
         FROM THE MANAGERIAL EFFORTS OF MR. ZASLAVSKIY AND HIS
         TEAM…………………………………………………………………………..10

III. THE SECURITIES ACTS ARE VAGUE AS APPLIED TO THE RECOIN AND
     DIAMOND RESERVE CLUB INITIAL COIN OFFERINGS…………………………14

     A.  A PERSON OF NORMAL INTELLIGENCE WOULD NOT BE ABLE TO
         DETERMINE WHETHER CRYPTOCURRENCIES ARE SECURITIES………...15

     B.  REGULATION OF CRYPTOCURRENCIES IS NOT WITHIN THE CORE OF THE
         SECURITIES ACTS………………………………………………………...18


     CONCLUSION…………………………………….....……………………………… 19

## PRELIMINARY STATEMENT

As the Supreme Court has explained:

The definition of "security" in the Securities Exchange Act of 1934 is quite broad. The Act was adopted to restore investors' confidence in the financial markets, and the term "security" was meant to include "the many types of instruments that in our commercial world fall within the ordinary concept of a security." H.R.Rep.No.85, 73d Cong., 1st Sess., 11 (1933)…The broad statutory definition is preceded, however, by the statement that the terms mentioned are not to be considered securities if "the context otherwise requires …." Moreover, we are satisfied that Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud.

*Marine Bank v. Weaver*, 455 U.S. 551, 555–56, 102 S. Ct. 1220, 1223, 71 L. Ed. 2d 409 (1982)

Regulation of fraud is an important and laudable goal. However, when there is a broad consensus to regulate, criminal pursuit of fraud can be fraught with risks. In its zeal to prosecute what it perceives to be fraudulent conduct, the government advances a vision of nearly limitless regulatory jurisdiction by the SEC. This approach encourages this Court to venture down a dangerous path: where constitutional protections for the accused are ignored; where innovation in America is stymied; and where the rule of law is undermined.

Instead of litigating Mr. Zaslavskiy's motion on the merits, the government has opted instead to endorse an outcome determinative analysis. It invites the Court to ignore what is clear – that the government's indictment is defective. Because the Court must assume that the allegations in the indictment are true at this stage, the Court must assume Mr. Zaslavskiy made false statements in his efforts to seek investors in his venture. Since the Court must assume Mr. Zaslavskiy committed fraud, it should view the government's indictment as free of defect – even if such a view is contrary to law. This approach invites courts to grant regulatory agencies carte blanche to regulate industries whether it has the legal authority to

1

do so or not.

If Mr. Zaslavskiy prevails in this motion, the government would not be left toothless in its efforts to prosecute any false statements made in Mr. Zaslavskiy's efforts to seek investors.  The government has a broad range of charges in its toolbox, and the fraud allegations could be addressed by other, different criminal charges. Mr. Zaslavskiy will continue to defend himself against those allegations when the time comes. In the meantime, we ask the Court to follow the law today. Mr. Zaslavskiy's motion should be granted it its entirety. The indictment is defective and should be dismissed.

# I.   CRYPTOCURRENCIES ARE CURRENCY WITHIN THE MEANING OF THE STATUTE

There is no dispute that "currency" is exempted from the statutory definition of securities. Govt. Opposition at 24. As the government observes, Courts have routinely looked to Black's Law Dictionary in the absence of statutory definitions. Black's Law dictionary defines currency as "an item (such as a coin, government note, or banknote) that circulates as a medium of exchange." Govt. Opposition at 25-6. Additionally, as the government concedes, "a medium of exchange" is "***[a]nything*** generally accepted as payment in a transaction and recognized as a standard of value." *Id.* (emphasis added). Since there is no dispute about these definitions, all that remains for the Court is to determine whether REcoin and DRC fit these definitions as cryptocurrencies. Cryptocurencies are clearly currency. Accordingly, they are not securities.

It is disingenuous to for the government to suggest that Mr. Zaslavskiy is attempting to "recast[] REcoin and Diamond, which he calls 'cryptocurrencies,' as 'currencies,' which are exempted from the definition of 'securities.'" Gov. Opp at 10. The REcoin whitepaper –

2

under the heading "THE CURRENCY PROBLEM" – began by presenting REcoin as an alternative to fiat currency. Government's Exhibit 1 at 3. The white paper elaborated that REcoin was to be "a new cryptocurrency powered by blockchain technology offering stability and a superior alternative to storing savings *in the form a major currency.*" *Id.* at 4 (emphasis added).

The government's own indictment makes clear that Mr. Zaslavskiy marketed and intended for these coins to function as cryptocurrencies or virtual currencies from its inception. Indictment at ¶11 ("Defendant advertised REcoin as "a new blockchain" virtual currency founded by Zaslavskiy."); *Id.* at ¶18 (Defendant advertised DRC as "a brand new cryptocurrency designed for a broad range of financial transactions…"). The government cannot insulate the SEC from the currency exception by pretending this case does not involve the regulation of cryptocurrencies. This is a cryptocurrency prosecution.

The government concedes "virtual currency" is "a digital representation of value that could be digitally traded and functioned as a) medium of exchange; and/or b) a unit of account and/or c) a store of value, but did not have legal tender status." *Id.* at ¶2. In addition to the Black's Law dictionary definition and the government's own indictment, the concept of cryptocurrencies as a medium of exchange also finds fresh support in case law. In holding that cryptocurrencies are commodities, the Honorable Jack B. Weinstein recently observed that "[v]irtual currencies are generally defined as 'digital assets used as a medium of exchange.'" Defendant's Exhibit A, *CFTC v. McDonell et al*, March 6, 2018, Memorandum and Order, 18-CV-361, Docket Number 29 at 5. In light of this broad consensus, there should be no dispute that cryptocurrencies function as a medium of exchange.

The government acknowledges there is no language in the statute requiring that

3

"currency" be recognized as legal tender by any centralized government. It also acknowledges the dictionary does not define "currency" as needing to be legal tender. In fact, in acknowledging that a "medium of exchange" is "anything" accepted as payment, in makes clear that currency need not be legal tender. Nevertheless, it asks the Court to create a new requirement that currency be legal tender for the purposes of the Securities Acts.[1]

The government cites no cases for this bold proposition. Instead it asks the Court to make an inference that this illusory requirement exists because the statutory currency definition has never been applied to an asset class like cryptocurrency. That no Court has ruled that a non-legal tender medium of exchange is currency is indicative solely of the fact that a federal court is being asked to resolve this issue for the first time. There is no basis to hold that assets must be legal tender to be considered as currencies under the statute.

Additionally, the government advances an expansive view of "money" when it supports its prosecutorial prerogatives. As it argues in a separate part of its opposition, "[t]he investment of 'money' need not take the form of cash." Government's Opposition at 12 (citing *Uselton v. Comm. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991) for the proposition that "it is well established that cash is not the only form of contribution or investment that will create an investment contract."). In doing so, it asks the Court to endorse an unworkable distinction between a broad definition of money when it considers its *Howey* analysis but a restrictive definition of currency within the same statutory analysis of the currency exception. Such definitional gymnastics run afoul of the Second Circuit's command to look to the plain language of words when conducting statutory analysis. *Tomka*

---

[1] The government acknowledges that "currency" need not be legal tender when it acknowledges that courts have held recognized cash substitutes to be "currency."

4

*v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995).

Next, the government attempts to bolster its argument by relying upon its fraud allegations. Even accepting the allegations in the indictment as true, the government's fraud allegations do not cure the defects underlying this prosecution. As the government rightly points out, the Court should look to "the economic reality of the investments *as they were advertised*." Govt. Opp at 10 (emphasis added). There is no question that REcoin was extensively marketed as a new form of currency.

The government's pleadings make clear that purchasers of REcoin and DRC tokens intended to purchase a new type of cryptocurrency. The indictment explains that "REcoin was specifically advertised as a virtual currency that, unlike other such currencies, was backed by real estate investments …" Indictment ¶11. In attempting to recast Mr. Zaslavskiy's venture as real estate investment venture, it asks to the Court to ignore what it has already pleaded: this is a prosecution of an initial coin offering of new cryptocurrencies.

Accordingly, that cryptocurrencies are regularly used to purchase "lunch, or a hotel room, or even a new set of living room furniture" is relevant. Govt. Opp. at 27. It was relevant, not only, because mainstream vendors were accepting REcoin, but because those economic realities contributed to understanding of why investors were attracted to REcoin in the first place. In fact, marketing REcoin as a new part of the cryptocurrency space along the likes of more widely accepted coins was a central part of its marketing. *See* Government's Exhibit 1 at 5 (Visualizing a depiction of REcoin within a connected universe that includes established cryptocurrencies like Bitcoin, Litecoin, Monero, Dash, Ripple and Stellar Lumens). It was contemplated in the marketing that REcoin would someday be accepted in mainstream society as payment.

More importantly, the government's own exhibits make clear that Mr. Zaslavskiy advertised REcoin as a new token ecosystem. As the white paper explained "anyone in the world can purchase REcoin to convert their country's currency into stable, real estate hedged token." *See* Government's Exhibit 1 at page 6. In no uncertain terms, REcoin was marketed as a token ecosystem where adopters could use REcoin tokens as a medium of exchange to engage in real estate transactions. The question before the Court today is not whether those representations were fraudulent, but instead, whether the subject matter of this type of enterprise is something the SEC has jurisdiction to regulate. The plain answer is no. Cryptocurrencies are currencies within the meaning of the statute. Regulatory authority of cryptocurrencies lies in the hands of other agencies.

## II.    EVEN UNDER THE *HOWEY* TEST, RECOIN AND DRC ARE NOT "INVESTMENT CONTRACTS" AND THEREFORE NOT SECURITIES

We will not restate the arguments we set forth in our opposition demonstrating that REcoin and DRC were not securities even under a *Howey* analysis. However, we respond to the government's argument with respect to prongs two and three of the *Howey* test: 1) that commonality exists between investors and the management team and; 2) that investors expected profits from the REcoin and Diamond ICOs to be derived solely from the entrepreneurial or managerial efforts of others.

### A.  Neither Horizontal nor Vertical Commonality Exists

First we address the government's arguments on the second prong of the *Howey* test, commonality. In its argument on the second prong, the government ignores the stated purpose of the investment.  As the government correctly notes, the test for horizontal commonality has been held to be the pooling of assets with a *pro rata* distribution of profits; the strict vertical

commonality test has required the profit and loss of the investor and promoter to be interdependent.

With respect to horizontal commonality, however, even accepting the government's argument that the investors' assets were pooled[2], there would be no *pro-rata* distribution of profits based on the value of coin among investors.  There was to be no payment of dividends; were the value of the real estate or diamond hedges to increase in value, any profit would be put back into the hedge.  If an investor decided to liquidate her REcoin or Diamond (DRC), she would receive the market value of that coin on the exchange she used; were she to rely on the real estate or diamond hedge and have REcoin or Diamond buy back her coin, her coin would only have an intrinsic value of 70% of the *coin's* market value, not the market value of the real estate.

The government argues that "[i]nvestors in REcoin were purportedly going to share in the profits of the common enterprise through the appreciation of the real estate in which their pooled assets were invested because if the real estate value underlying the tokens appreciated the value of the token would appreciate." Govt Opp at 15-16. However, "capital appreciation resulting from the development of the initial investment," has been held to be profit where the investor is attracted *solely* by the profit on his investment. *United Housing Foundation Inc., v, Forman*, 421 US 837, 852 (1975)(emphasis added). Although the real estate or diamond hedges underlying REcoin or Diamond might appreciate in value, resulting in the appreciation of the coin, investors were not investing in a real estate or diamond trust if they purchased REcoin or Diamond. The true purpose of the investment in REcoin or Diamond would be to use the

---

[2] "[H]orizontal commonality requires more than pooling alone; it also requires that investors share in the profits and risks of the enterprise." *S.E.C. v. SG Ltd*, 265 F.3d 42, 50 (2d Cir. 2001).

coin in transactions, not to hold it to see the value of its hedge increase. Govt. Ex 1 at 13. This is especially so when that hedge would only have a guaranteed value to the investor of 70% of the coin's fair market value as noted above.  Unless the coin was used in smart contracts, other transactions, or mined, the investor would see little increase in the value of her investment.  As the Supreme Court has noted, "when a purchaser is motivated by a desire to use or consume the item purchased – 'to occupy the land or develop it themselves,' as the *Howey* Court put it – the securities laws do not apply."  *Forman* at 852-853.

The government argues that because the real estate or diamond hedges could prove to be worthless, the value of the coin would decrease.  This ignores the reality of cryptocurrency, where the value of the coin is based on its utility as a medium of exchange, not the value of any hedge.  As noted *infra*, the value of Bitcoin, a cryptocurrency without hedge, has increased greatly in value.  Its value has hit highs and lows, but it has maintained an increase in value based on its utility as a medium of exchange.  Here, Mr. Zaslavskiy sought to increase the stability of his coin through hedge, as compared to the rollercoaster changes in value of Bitcoin and other currencies. However, that desire to increase stability should not be seen as removing the proposed REcoin or Diamond from the realm of commodity based currency into the realm of securities.

The cases cited by the government in support of its argument about *pro rata* distribution of profit are cases dealing with so-called pyramid or Ponzi schemes, and are inapplicable here. In *SG Ltd*, *supr*a, the promoters relied on a new influx of investors to pay dividends or support existing investors who wished to cash out of their investment. Without such a new influx of participants, the scheme in *SG Ltd* would fail. As a result, the Court found a sharing of proportional profit and risk consistent with horizontal commonality. *SG Ltd*, *supra*, at p. 52.

But REcoin and Diamond were different from the scheme in *SG Ltd.*, there was no need for an influx of new investors to make the coin succeed; existing users could use the coin for their blockchain transactions and contracts, reduce their costs and transaction fees, and the coin would be a success. REcoin and Diamond were not marketed as vehicles for dividend distribution and none were promised. The only promise was a hedge of 70% of the market value of the coin based on the purchase of real estate, in an effort to achieve stability, which other coins and currency lack. Government's Exhibit 1 at 3.

The same is true for *S.E.C. v. Infinity Group Co.*, 212 F. 3d 180, 184-85 (3d Cir. 2000), another case cited by the government as standing for horizontal commonality being based on proportional investment. Govt Opp at 15.   While in that case investors were guaranteed a rate of return on investment, at varying rates based on the amount of their investment, the Court found horizontal commonality based on the fact that the investment was made *solely* on the guarantee of return.  *Infinity Group* at 187.  For these reasons, horizontal commonality is not found in the REcoin and Diamond offerings.

Strict vertical commonality does not exist in the REcoin or Diamond offerings, either. The government itself notes that Mr. Zaslavskiy would profit from a commission on transactions in REcoin or Diamond.  His commission was not based on the overall profitability of any transaction, but based on a percentage of the transaction, no matter the profitability of the transaction.  If the coin was sold at a loss, the seller would suffer the complete extent of the loss, while Mr. Zaslavskiy would still make a profit based on the size of the transaction.  The size of the transaction determined Mr. Zaslavskiy's commission, not the profitability of the transaction.  This ability to profit, no matter what, is the test for strict vertical commonality or the lack thereof.

The cases cited by the government found strict verticality based on a percentage commission, but only when the percentage was based on the profit of the investment, not a percentage of a transaction.  E.g., *In re J.P. Jeanneret, Associates*, Inc., 769 F. Supp.2d 340 (S.D.N.Y. 2011)(McMahon, J.) (the promoter received a percentage of the value of the asset at the close of the quarter, and a performance fee of 20% of the profit in the quarter). In that case the Court found that since the performance fee was based solely on the profitability of the investment, the promoters' interests were inextricably tied to those of the investor. "Unlike a stockbroker who collects a fee for every consummated transaction, JPJA's financial compensation was linked to the fortunes of the investors in the direct class." *Id* at 360. The Court went on to find that this linkage of compensation met the strict verticality requirement. As noted above, Mr. Zaslavskiy interests were more like those of a stock broker, receiving a commission on every transaction.

### B. Profits from REcoin and DRC were not to be derived *solely* from the managerial efforts of Mr. Zaslavskiy and his team

The government's argument about both the REcoin and DRC projects dramatically overstates the function of both real estate and diamond purchases in the project (and are contrary to their pleadings). Its discussion of these projects are either misleading or reflect a lack of understanding of what was being marketed to potential adopters and why they would invest in this technology.

As an initial matter, there is no dispute that some value in the REcoin and DRC projects were to be derived from the managerial efforts of the REcoin and DRC team. There is no dispute that the managerial team was marketed as being responsible for setting up the

infrastructure of the REcoin and DRC blockchains, as well as selecting real estate and diamond targets to hedge the blockchain in the event of a collapse. But prong three of the *Howey* test requires more: that profits from the projects would be derived *solely* from the managerial or entrepreneurial efforts of others. Absent from the government's analysis is any meaningful discussion of blockchain technology or even how these two coins were marketed as cryptocurrencies. Purchasers of the REcoin token were envisioned to play an integral role in the survival of the project.

At the heart of the government's argument is a misunderstanding of these two cryptocurrency projects: "After all, the REcoin and Diamond tokens were to increase in value based on the success of the investments in real estate and diamonds." Govt. Opp. at 16. The government's understanding of REcoin and DRC ignores both the economic and technical realities of why adopters would invest in a cryptocurrency. The suggestion that investors were enticed to purchase REcoin because they believed that profits would be derived from real estate or diamond fluctuation misses the point. Real estate and diamond purchases were merely intended to be a hedge on potential losses. If the blockchain failed to achieve mass adoption, the investment would not be worthless because the coin would still have some backing by a real world commodity. The purchase of real estate and diamonds were intended to mitigate potential losses, not to be a significant driver of profit. What ultimately attracted potential adopters to the REcoin was the tantalizing economic and technological potential of the blockchain token itself.

As Judge Weinstein observed, "the price of Bitcoin and other virtual currencies, has risen, and then fallen, at extreme rates." Exhibit A at 7. In 2010, the initial price of one Bitcoin was less than 1 cent. On December 16, 2017, the price of a Bitcoin exceeded

$19,500.[3]  On February 6, 2018, when Judge Weinstein checked the price of Bitcoin, it was

valued at $7,196.92. *Id.* A little more than one month later, as of the date of this filing, the

price of Bitcoin is now $8,180.29 – an increase in value of over 13% in less than two months.

This volatility is consistent throughout the cryptocurrency market. A year ago, the total

market cap of all cryptocurrencies was just under $24 billion dollars. Today, the total market

cap of all cryptocurrencies stands in excess of $347 billion dollars. Defendant's Exhibit B,

Market capitalization chart for all cryptocurrencies. An economic reality the government

ignores is that no real estate or diamond investment boasts this growth potential or volatility.

Investors in the REcoin project were not enticed by the possibility that the price of real estate

would rise. Investments in coins like REcoin were motivated by fear of missing out on the

next big cryptocurrency. They were not investing in land appreciation, they were investing in

the future of the coin.

If not from the market fluctuations of the real estate market, how then did potential

adopters of REcoin expect value to be derived? In answering this critical question, the

government invites the Court to rely upon its fraud allegations instead of considering the

motion on its merits. This government's approach is contrary to law. The Court should

examine how REcoin and DRC were marketed to understand why blockchain

cryptocurrencies like REcoin attracted potential adopters.

The government in its brief suggests Mr. Zaslavskiy has somehow recast his project as a

new cryptocurrency in an effort to create a defect. Again, the government's assertion is

disingenuous. Mr. Zaslavskiy's vision of REcoin is laid out in his white paper: a white paper

---

[3] *See* https://coinmarketcap.com/currencies/bitcoin/

the government included as an exhibit in its opposition brief. What Mr. Zaslavskiy – and other second generation blockchain creators – envisioned for REcoin adopters was a role more active and engaged than a typical investor in a security. REcoin and DRC were to be unlike a typical company where an investor purchases stock in a company and agrees to be passively tied to fortunes of a company. Instead REcoin and DRC were to be a new kind of decentralized token economy where adopters with shared professional interests could work together to create an ecosystem where shared related professional transactions could be conducted securely, efficiently, and without the need for centralized banks.

Mr. Zaslavskiy's explanation of his project is not speculative, it was laid out in his marketing. Understanding the type of token economy of REcoin we laid out in our opposition is critical to the Court's adjudication of this motion. Without engaging in the technological implications and understanding what REcoin was advertised to be, it is impossible to meaningfully consider how value was to be derived.

Additionally, the government ignores the decentralized nature of blockchain technology. As the indictment accurately explains, "[a] 'blockchain' was a type of distributed ledger, or peer-to-peer database spread across a network, that recorded all transactions in the network in a theoretically unchangeable, digitally-recorded data packages called blocks… this system relied upon cryptographic techniques for secure recording of transactions." Indictment at ¶6. The idea that the viability of a blockchain would rely solely upon the efforts of central management is antithetic to the concept of blockchain technology itself. When the government explains that blockchain is a type of "distributed ledger," it concedes that the entire enterprise would be decentralized and stored across computers all over the world. That the blockchain would be stored upon a worldwide network of computers is a central feature of

13

blockchain technology – since there is no single centralized location of the ledger, it makes the database unassailable. There is no single point of attack. This is why the government concedes that the network is "theoretically unchangeable." Indictment ¶6.

This critical feature of blockchain has significant implications for the Court's *Howey* analysis. A decentralized network necessarily relies upon the efforts of its adopters: not only to use the token ecosystem, but also to host the distributed ledger and become an integral part of the network as well. Decentralization – a fundamental aspect of blockchain cryptocurrencies – distributes the responsibilities for profits across all of its participants.

Accordingly, a central feature of a blockchain ecosystem like the REcoin and DRC is that the value of the network flows from the critical efforts of all of its participants – from the efforts of the developers, to miners, and the stakeholders alike. Without the continued active participation of all of its participants, the blockchain would become valueless. This model is fundamentally at odds with the prong three of the *Howey* test. The continued efforts of REcoin purchasers was essential to the survival of the blockchain. If all of the purchasers simply relied solely upon the efforts of Mr. Zaslavsky, the blockchain would die. REcoin and DRC are not investment contracts.

## III.   THE SECURITIES ACTS ARE VAGUE AS APPLIED TO THE RECOIN AND DIAMOND RESERVE CLUB INITIAL COIN OFFERINGS

- *"Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities."* -Commodity Futures Trading Commission, September 17, 2015

- *"[V]irtual currency exchangers and administrators are money transmitters and must comply with a BSA and its implementing regulations."* - Department of Treasury, Financial Crime Enforcement Network (FinCEN), February 13, 2018.

- *"I believe every ICO I've seen is a security."* – Jay Clayton – Chairman, Securities and Exchange Commission, February 5, 2018.

The current landscape with respect to cryptocurrencies is a regulatory maze marked by conflicting statements, ambiguity, and enforcement actions contrary to law. Any regulatory agency that wishes to enter this space defines this new asset class in a way that confers itself jurisdiction. For the CFTC – the regulatory agency tasked with regulating commodities – cryptocurrencies are a commodity. For the FinCEN, cryptocurrencies are something akin to money – and thus subject to its money transmitting requirements. Courts should carefully consider these threshold jurisdictional questions in light of this regulatory maze.

There is no dispute the Securities Acts have withstood judicial scrutiny and vagueness challenges for close to a century. No court has ever had to consider an "as-applied" vagueness challenge in the case of cryptocurrencies. Cryptocurrencies are an asset class that are unlike any that have existed before.

### A. A person of normal intelligence would not be able to determine whether cryptocurrencies are securities

Since filing our motion to dismiss, the Honorable Jack B. Weinstein published a detailed Memorandum and Order in a civil commodities case holding that cryptocurrencies are commodities – and thus subject to regulation by the CFTC. He ruled that "virtual currencies are "goods" exchanged in a market for a uniform quality and value. They fall well within the common definition of 'commodity'…" Exhibit A at 24. While Judge Weinstein did not directly address the securities issue before this Court, his opinion illustrates the challenge for a person of normal intelligence: guidance in this space is so unclear that one could be in a courtroom on the 10th Floor of the Eastern District of New York where cryptocurrencies are considered a medium of exchange (and therefore a commodity) and

then walk fifteen feet across the hall to another courtroom where cryptocurrencies are considered a security.

The government and the SEC ask the Court to consider the myriad of statements the agency has promulgated regarding their view that certain ICOs are securities. Setting aside the fact that many of the notices the SEC provided in its amicus brief postdate the charged conduct in this offense, its guidance remains inadequate to provide notice.

As an initial matter, the SEC has a formal rulemaking process where it seeks public comment and provides notice of enforcement prerogatives. 17 C.F.R. §200.67.[4] It has declined to engage in that rulemaking process with respect to cryptocurrencies. Instead of providing formal notice, the public has been left to read regulatory tealeaves consisting of conflicting public statements and enforcement orders.

The government's overstates the level of guidance set forth in the SECs DAO memorandum. While the government characterizes the DAO memorandum as "outlining the application of securities laws to ICOs – thus adding an unusual level of transparency" the reality of what the memorandum set forth was much more nebulous. As the SEC Chairman summarized "A key question for all ICO market participants: 'Is the coin or token a security?' As securities law practitioners know well, the answer depends on the facts." December 11, 2017 Public Statement of SEC Chairman Jay Clayton, available at https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11. This is not transparency. An already established rulemaking process that provides opportunity for public comment would have provided transparency.

---

[4] *See* SEC Website "Rulemaking: How it Works" available at https://www.sec.gov/fast-answers/answersrulemakinghtm.html

16

Reliance upon the SEC's public statements is further complicated because the SECs view of cryptocurrencies as commodities appears to have shifted in contradictory ways. In December 2017, the SEC Chairman stated that "there are cryptocurrencies that *do not* appear to be securities …" (consistent with the SEC guidance available to Mr. Zaslavskiy at the time of the charged conduct). *Id.* Two months later, on February 5, 2018, the Chairman advanced a different view: "I believe every ICO I've seen is a security."[5] While this expansive approach is consistent with a vision of limitless SEC regulatory authority the government implies in its opposition, it remains inconsistent with the fact specific case-by-case approach the government knows to be the law.

Additionally, these SECs policy statements must be viewed within the regulatory landscape of cryptocurrencies in general. Upon information and belief, every American regulatory agency that has considered its jurisdiction of cryptocurrencies has concluded it has the authority to regulate cryptocurrencies.[6] Agency promulgated guidance papers and published statement are of limited value in the midst of the regulatory agency goldrush – especially when those SEC policy statements are inconsistent with previous agency statements issued just months earlier. All of this regulatory uncertainty makes it impossible for someone in Mr. Zaslavskiy's position to know what is prohibited conduct and what is not.

---

[5] https://www.coindesk.com/sec-chief-clayton-every-ico-ive-seen-security/

[6] In fact on March 18, 2018, the Office of Foreign Assets Control, another agency within the Department of Treasury defined cryptocurrencies in part as a medium of exchange, recognizing its own power to regulate them as well.  *See* https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_compliance.aspx#vc_faqs

**B.  Regulation of Cryptocurrencies is not within the core of the Securities Acts**

As we have conceded and the government emphasizes, the Securities Acts were crafted in a ways intended to be flexible. However the government advances its argument, though, it articulates a vision of the statutes that grants the SEC nearly limitless scope and jurisdiction. *See*  Govt. Opp. at 11 (citing *Reves v. Ernst and Young*, 494 U.S. 56, 60-61 (1990) ("Congress painted with a broad brush because it recognized the virtually limitless scope of human ingenuity in creating investment enterprises")).

Similarly the government overstates the SECs reach when it argues that the core of the Securities Acts are regulating "deliberate lies to investors about the risk and rewards of an investment opportunity." Govt. Opp. at 32. The core of the Securities Acts is the regulation of securities, not all investments. It is not uncommon for speculators to invest in non-security currencies such the dollar or the yen. It is not uncommon for speculators to invest in commodities such as gold or silver. The government's view of the seemingly limitless scope of the Securities Acts is unsupported by the law. Congress "did not intend to provide a broad federal remedy for all fraud." *Maine Bank v. Weaver*, 455 U.S. 551, 556 (1982).

No person of ordinary intelligence could reasonably be expected to be able to navigate this labyrinth of conflicting regulatory statements, emerging judicial opinions, and vague statutory authority. This Court should not accept the government's invitation to interpret the Securities Acts to provide limitless regulatory authority of the SEC. The Supreme Court has made clear it is up to Congress to "establish minimal guidelines to govern law enforcement" in order to prevent "policemen, prosecutors, and juries [from] pursu[ing] their personal predilections." *Smith v. Goguen,* 415 U.S. 566, 574-75 (1974); *United States v. Roberts*,

18

363 F.3d 118, 123 (2d Cir. 2004). The SEC itself has acknowledged that specificity is particularly important in the context of a criminal prosecution. *See S.E.C. v. Gemstar-TV Guide Int'l, Inc.*, 401 F.3d 1031, 1048 (9th Cir. 2005) ("As the SEC points out, statutes that regulate businesses do not require the same precision as statutes addressing constitutional and criminal issues."). As applied to this case, the Securities Acts are unconstitutionally vague.

## CONCLUSION

This criminal prosecution of Maksim Zaslavskiy represents an overreach of the regulatory authority of federal securities laws. If unprincipled, even well intentioned regulation threatens constitutional protections of due process and the rule of law. For the reasons set forth in this reply brief, our motion to dismiss, and any others that may appear to the Court, we respectfully submit the Court should grant Mr. Zaslavskiy's motion in its entirety.

Dated: March 26, 2018                    Respectfully Submitted,
Brooklyn, New York

                                         /s/_____
                                         Mildred Whalen
                                         Len H. Kamdang
                                         Counsel to Maksim Zaslavskiy
                                         Federal Defenders of New York, Inc.

Copies to:

Chambers of the Honorable Raymond J. Dearie (by hand)

Julia Nestor and Andrey Spektor, Assistant United States Attorneys (by e-mail and first class mail)

Andrew Calamari, Jorge Tenreiro, Valerie Szczepanik (via first class mail)
Civil Plaintiff's Counsel of Record
Securities and Exchange Commission
New York Regional Office
200 Vesey Street
Room 400
New York, NY 10281

Jason Nagi, Richard Levin, William Mateja (via first class mail)
Civil Defendant's Counsel of Record
Polsinelli PC
600 Third Avenue
42nd Floor
New York, NY 10016

Maksim Zaslavskiy (via first class mail)

# DEFENDANT'S EXHIBIT

# A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

– against –

PATRICK K. MCDONNELL,
and CABBAGETECH, CORP. d/b/a COIN
DROP MARKETS,

Defendants.

**MEMORANDUM & ORDER**

18-CV-361

**Parties**

Commodity Futures Trading Commission

**Appearances**

David William Oakland
Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, NY 10005
Email: doakland@cftc.gov

Kenneth B. Tomer
Commodity Futures Trading Commission
140 Broadway
19th Floor
New York, NY 10005
Email: ktomer@cftc.gov

Gates Salyers Hurand
Commodity Futures Trading Commission
140 Broadway, 19th Floor
Ny, NY 10005
646-746-9700
Fax: 646-746-3903
Email: ghurand@cftc.gov

Patrick McDonnell
CabbageTech Corp.,
d/b/a/ Coin Drop Markets

Pro se

JACK B. WEINSTEIN, Senior United States District Judge:

## Table of Contents

I.    Introduction ................................................................................................. 3
  A.  Commodity Futures Trading Commission ("CFTC") Standing ................. 3
  B.  Injunctive Relief ........................................................................................ 4
II.   Facts ............................................................................................................ 4
III.  Background of Bitcoin and Virtual Currencies .......................................... 5
  A.  Description of Virtual Currencies .............................................................. 5
  B.  Expansion and Value ................................................................................. 6
  C.  Fraud and Crime ........................................................................................ 8
  D.  Regulation and Oversight of Virtual Currency .......................................... 9
    1.  Potential Virtual Currency Regulation ................................................ 10
    2.  Oversight by CFTC ............................................................................. 12
    3.  Concurrent Oversight from Other Agencies ....................................... 14
IV.   Law ............................................................................................................ 14
  A.  Jurisdiction .............................................................................................. 15
  B.  Standing ................................................................................................... 15
    1.  Enforcement Power of CFTC .............................................................. 15
      a.  Virtual Currencies are Commodities ........................................... 17
      b.  Commodity Exchange Act's Definition of "Commodity" ........... 18
      c.  CFTC's Interpretation of "Commodity" ..................................... 19
      d.  Derivative Contracts and Futures ................................................ 20
      e.  Regulation of Spot Market Fraud ................................................ 21
    2.  Concurrent Jurisdiction ....................................................................... 23
  C.  Preliminary Injunction Standard ............................................................. 23
V.    Application of Law .................................................................................... 24
  A.  CFTC Standing ........................................................................................ 24
    1.  Virtual Currencies as Commodities ................................................... 24
    2.  CFTC Jurisdiction Over Virtual Currency Fraud ............................... 25
  B.  Prima Facie Showing of Fraud Committed by Defendants ...................... 26
  C.  Preliminary Injunction ............................................................................ 26
  D.  Appropriate Research by Court ............................................................... 27
VI.   Conclusion ................................................................................................ 28
VII.  Appendix A Preliminary Injunction .......................................................... 28
VIII. Appendix B CFTC Primer ......................................................................... 40
IX.   Appendix C Congressional Testimony of CFTC Chairman ...................... 60

I.   Introduction

The Commodity Futures Trading Commission ("CFTC") sues Patrick McDonnell and his company Coin Drop Markets.  CFTC alleges defendants "operated a deceptive and fraudulent virtual currency scheme . . . for purported virtual currency trading advice" and "for virtual currency purchases and trading . . . and simply misappropriated [investor] funds."  *See* CFTC Complaint, ECF No. 1, Jan. 18, 2018, at 1 ("CFTC Compl.").

CFTC seeks injunctive relief, monetary penalties, and restitution of funds received in violation of the Commodity Exchange Act ("CEA").  *Id.* at 11.

Until Congress clarifies the matter, the CFTC has concurrent authority, along with other state and federal administrative agencies, and civil and criminal courts, over dealings in virtual currency.  An important nationally and internationally traded commodity, virtual currency is tendered for payment for debts, although, unlike United States currency, it is not legal tender that must be accepted.  Title 31 U.S.C. § 5103 ("United States coins and currency . . . are legal tender for all debts . . .").

A.   Commodity Futures Trading Commission ("CFTC") Standing

The primary issue raised at the outset of this litigation is whether CFTC has standing to sue defendants on the theory that they have violated the CEA.  Title 7 U.S.C. § 1.  Presented are two questions that determine the plaintiff's standing: (1) whether virtual currency may be regulated by the CFTC as a commodity; and (2) whether the amendments to the CEA under the Dodd-Frank Act permit the CFTC to exercise its jurisdiction over fraud that does not directly involve the sale of futures or derivative contracts.

Both questions are answered in the affirmative.  A "commodity" encompasses virtual currency both in economic function and in the language of the statute.  Title 7 U.S.C. § 1(a)(9)

3

(The CEA defines "commodity" as agricultural products and "all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in.").

CFTC's broad authority extends to fraud or manipulation in derivatives markets and underlying spot markets. *See* Title 7 U.S.C. § 9(1). CFTC may exercise its enforcement power over fraud related to virtual currencies sold in interstate commerce. *See* Title 17 C.F.R. § 180.1.

### B. Injunctive Relief

After hearing testimony from an Investigator in the Division of Enforcement for the CFTC, the court finds the plaintiff has made a preliminary prima facie showing that the defendants committed fraud by misappropriation of investors' funds and misrepresentation through false trading advice and promised future profits.

A preliminary injunction is granted in favor of the CFTC. The court finds a reasonable likelihood that without an injunction the defendants will continue to violate the CEA. An order outlining the terms of relief is issued and attached. *See* Appendix A, Order of Preliminary Injunction and Other Relief ("App. A, Prelim. Injunction").

### II. Facts

Patrick McDonnell and his company CabbageTech, Corp., doing business as Coin Drop Markets ("defendants"), offered fraudulent trading and investment services related to virtual currency, *see* Description of "Virtual Currencies" *infra* Part III, in the spring and summer of 2017. Christopher Giglio Declaration, ECF No. 21, Feb. 26, 2018, Ex. 2 ("Giglio Decl.") ¶¶ 13,14.

Customers from the United States and abroad paid defendants for "membership" in virtual currency trading groups purported to provide exit prices and profits of up to "300%" per

week. *Id.* ¶¶ 17-20.  Defendants advertised their services through "at least two websites,

www.coindropmarkets.com and www.coindrops.club," as well as on the social media platform

Twitter. *Id.* ¶¶ 15-17.

"Investors" transferred virtual currency to the defendants for "day" trading.  *Id.* ¶ 21

("McDonnell claimed that he could generate profits of 2 to 300% each day for [an] Investor . . .

and that $1,000 in Litecoin [a type of virtual currency] should be earning $200 to $250 per day

through trading.").

After receiving membership payment or virtual currency investments, defendants deleted

their "social media accounts" and "websites and ceased communicating with . . . customers

around July, 2017." *Id.* ¶ 26.  Defendants provided minimal, if any, virtual currency trading

advice and never achieved the promised return on investment.  *Id.* ¶ 27.  When customers asked

for a return of their membership fee, or virtual currency investment, the defendants refused and

misappropriated the funds.  *Id.* ¶¶ 27-32.

III.    Background of Bitcoin and Virtual Currencies

A.  Description of Virtual Currencies

Virtual currencies are generally defined as "digital assets used as a medium of exchange."

Skadden's Insights, *Bitcoins and Blockchain: The CFTC Takes Notice of Virtual Currencies*,

Jan., 2016.  They are stored electronically in "digital wallets," and exchanged over the internet

through a direct peer-to-peer system.  *Id.*  They are often described as "cryptocurrencies"

because they use "cryptographic protocols to secure transactions . . . recorded on publicly

available decentralized ledgers," called "blockchains."  Brief of CFTC In Support of Preliminary

Injunction and Other Relief, ECF No. 21, Feb. 26, 2018, at 4 ("CFTC Brief").

The "blockchain" serves as a digital signature to verify the exchange. *See* Appendix B, *A CFTC Primer on Virtual Currencies*, Oct. 17, 2017, at 5 ("App. B, *CFTC Primer*"). "The public nature of the decentralized ledger allows people to recognize the transfer of virtual currency from one user to another without requiring any central intermediary in which both users need to trust." CFTC Brief, at 4. Some experts believe blockchain technology underlying virtual currencies will serve to "enhance [future] economic efficiency" and have a "broad and lasting impact on global financial markets in payments, banking, securities settlement, title recording, cyber security and trade reporting and analysis." Appendix C, United States Senate Banking Committee, *Hearing on Virtual Currency,* Feb. 6, 2018 (written testimony of Christopher Giancarlo, Chairman, CFTC) ("App. C, CFTC Chair, Congressional Testimony"). Virtual currencies are not backed by any government, fiat currency, or commodity. Robert J. Anello, *New-Wave Legal Challenges for Bitcoin and Other CryptoCurrencies*, Law Journal Newsletters, Nov. 2017.

They have some characteristics of government paper currency, commodities, and securities. Allison Nathan, *Interview with Eric Posner*, Goldman Sachs Global Investment Research, Mar. 11, 2014 ("It is a lot like gold, in fact. The difference [] is that it is digital rather than a heavy, unwieldy object. That means that it could serve the same purposes as gold in terms of a currency, but much more efficiently because it does not have any mass and can be sent easily from place to place."); *cf. Power of the Executive to Change the Gold Value of the Dollar*, Columbia Law Review, Vol. 48, No. 3 (Apr. 1948) ("[T]he United States is committed to a policy of international cooperation, and in particular, to a program of international stability of [currency] exchange rates . . .").

B. Expansion and Value

6

The price of Bitcoin, and other virtual currencies, has risen, and then fallen, at extreme

rates.  Olga Kharif, *All you Need to Know About Bitcoin's Rise, From $0.01 to $15,000*,

Bloomberg Businessweek, Dec. 1, 2017 ("The initial price of bitcoin, set in 2010, was less than 1

cent. Now it's crossed $16,000. Once seen as the province of nerds, libertarians and drug dealers,

bitcoin today is drawing millions of dollars from hedge funds.").

As their value has increased, online exchanges have become more accessible allowing

more members of the public to trade and invest in virtual currencies.

> While there are many Bitcoin exchanges around the world, Coinbase has been the
> dominant place that ordinary Americans go to buy and sell virtual currency. No
> company had made it simpler to sign up, link a bank account or debit card, and
> begin buying Bitcoin.

> The number of people with Coinbase accounts has gone from 5.5 million in
> January [2017] to 13.3 million at the end of November, according to data from the
> Altana Digital Currency Fund. In late November, Coinbase was sometimes
> getting 100,000 new customers a day — leaving the company with more
> customers than Charles Schwab and E-Trade.

Nathaniel Popper, *Coinbase: The Heart of the Bitcoin Frenzy*, N.Y. Times, Dec. 6, 2017; Ian

Parker, *A Bitcoin A.T.M. Comes To A New York Deli*, New Yorker, Sept. 18, 2017 ("A

Coinsource A.T.M. accepts dollars and in return adds the bitcoin equivalent (less Coinsource's

seven per cent) to a customer's digital wallet.").

According to coinmarketcap.com (viewed Feb. 6, 2018, at approximately 9:10 a.m. EST),

there were over 1500 virtual currencies.  Bitcoin had the largest market capitalization, valued at

$121,264,863,386.  *Id.*  A single Bitcoin was valued at $7,196.92.  *Id.*  The cheapest virtual

currency, Strong Hands, was valued at $0.000001.  *Id.*

The combined market capitalization of all virtual currencies as of January 6, 2018, was

roughly $795 billion; by Feb. 6, 2018, the total value had dropped to $329 billion.  Coin Market

Cap, https://coinmarketcap.com/charts/ (last visited Feb. 6, 2018); Arjun Kharpal, *Over $60*

*Billion Wiped off Value of Cryptocurrencies as Bitcoin Drops Below $8,000 again*, CNBC, Feb.

5, 2018 ("It was not only bitcoin that fell either. Other major virtual currencies, including

ethereum and ripple, fell sharply in the last 24 hours.").

### C. Fraud and Crime

The rise in users and value of virtual currencies has been accompanied by increased fraud

and criminal activity.  Edgar G. Sánchez, *Crypto-Currencies: The 21st Century's Money*

*Laundering and Tax Havens*, 28 U. Fla. J.L. & Pub. Pol'y 167, 169 (2017) ("[T]he newest

growing concern with Bitcoin, and crypto-currencies in general, are their ability to wash money

and conceal taxable income.").

Silk Road, an online drug market that allowed for purchase through Bitcoin, was one of

the earliest and most audacious examples of crime enabled by virtual currencies.

> The largest case involving Bitcoin and illegal activity was the Silk Road case,
> which included billions of dollars in black market drug sales, two federal
> agents caught (and convicted for) stealing, and murder-for-hire attempts. While the U.S.
> government claimed a victory in curbing illegal activity facilitated with Bitcoin
> by shutting down the Silk Road's massive black market for drugs, Bitcoin is still
> available, and other online black markets have tripled the industry since Silk
> Road's closure.

Christopher Burks, *Bitcoin: Breaking Bad or Breaking Barriers?*, 18 N.C.J.L. & Tech. On. 244,

251–52 (2017) (internal citations omitted); *see also* U.S. Attorney's Office EDNY, *Long Island*

*Woman Indicted for Bank Fraud and Money Laundering to Support Terrorists*, Dec. 14, 2017

(The defendant allegedly "laundered and transferred the funds [using virtual currencies] out of

the country to support the Islamic State . . .").

Virtual currency exchanges have been victims of hacking and theft.  Reuters Staff, *The*

*Coincheck Hack and the Issue With Crypto Assets on Centralized Exchanges*, Jan. 29, 2018

("Hackers have stolen roughly 58 billion yen ($532.6 million) from Tokyo-based cryptocurrency

8

exchange Coincheck Inc, raising questions about security and regulatory protection in the emerging market of digital assets."); Alex Hern, *A History of Bitcoin Hacks*, The Guardian, Mar. 18, 2014 ("25,000 bitcoins were stolen from their wallet after hackers compromised the Windows computer they were using. Even at the time, that sum was worth more than $500,000; it would now be worth a little less than £10m.").

These and other criminal acts have led some to call for increased governmental oversight and regulation of virtual currency.

> Having delved into the prevalence of money laundering and tax evasion both globally and in the United States, and the rise of crypto-currencies and their use in disguising real money, the question remains as to what steps can be taken to legitimize crypto-currencies, or at the very least, put an end to their use for illegal purposes.

Sánchez, *supra* at 188.

D.  Regulation and Oversight of Virtual Currency

Congress has yet to authorize a system to regulate virtual currency.  T. Gorman, *Blockchain, Virtual Currencies and the Regulators*, Dorsey & Whitney LLP, Jan. 11, 2018 ("As the CFTC recently admitted, U.S. law does not provide for 'direct comprehensive U.S. regulation of virtual currencies. To the contrary a multi-regulatory approach is being used.'").

The CFTC, and other agencies, claim concurrent regulatory power over virtual currency in certain settings, but concede their jurisdiction is incomplete.  *See* App. C, CFTC Chair, Congressional Testimony ("[C]urrent law does not provide any U.S. Federal regulator with such regulatory oversight authority over spot virtual currency platforms [not involving fraud] operating in the United States or abroad."); *cf.* Doris Kearns Goodwin, *The Bully Pulpit*, (2013) at 443 ("Roosevelt . . . continued to regard the judicial system as an ineffective arena for controlling giant corporations . . . Regulation, he believed, promised a far better remedy. 'The

design should be to prevent the abuses incident to the creation of unhealthy and improper

combinations [] instead of waiting until they are in existence and then attempting to destroy them

by civil or criminal proceedings.'"); *cf. Balleisen, Bennear, Kraweic, and Weiner, Policy Shock,*

(2017) at 543-44 ("[T]ypes of regulatory responses to a crisis may vary along many dimensions.

These responses may be robust or cosmetic. They may be structural (reorganizing government or

instrumental (changing policy tools).").

### 1.   Potential Virtual Currency Regulation

Until Congress acts to regulate virtual currency the following alternatives appear to be

available:

1.   No regulation. *See, e.g.,* Nikolei M. Kaplanov, *Nerdy Money: Bitcoin, the Private*

*Digital Currency, and the Case Against Its Regulation,* 25 Loy. Consumer L. Rev. 111,

113 (2012) ("This Comment will show that the federal government has no legal basis to

prohibit bitcoin users from engaging in traditional consumer purchases and transfers. This

Comment further argues that the federal government should refrain from passing any

laws or regulations limiting the use of bitcoins . . . applying any sort of regulation to

bitcoin use, [] would be ineffective and contrary to the interest of the United States

consumers.").

2.   Partial regulation through criminal law prosecutions of Ponzi-like schemes by the

Department of Justice, or state criminal agencies, or civil substantive suits based on

allegations of fraud. *See, e.g., United States v. Faiella,* 39 F. Supp. 3d 544, 545

(S.D.N.Y. 2014) ("Defendants in this case are charged in connection with their operation

of an underground market in the virtual currency 'Bitcoin' via the website 'Silk Road.'");

*United States v. Lord,* No. CR 15-00240-01/02, 2017 WL 1424806, at *2 (W.D. La. Apr.

20, 2017) ("Counts 2-14 charged Defendants with various other crimes associated with operating their bitcoin exchange business.").

3.      Regulation by the Commodity Futures Trading Commission ("CFTC").  *See infra* Part III.D.2.

4.      Regulation by the Securities and Exchange Commission ("SEC") as securities. *See, e.g., SEC v. Plexcorps,* 17-CV-7007 (E.D.N.Y. Filed Dec. 1, 2017) SEC Compl., ECF No. 1 ("This is an emergency action to stop Lacroix, a recidivist securities law violator in Canada, and his partner Paradis-Royer, from further misappropriating investor funds illegally raised through the fraudulent and unregistered offer and sale of securities called 'PlexCoin' or 'PlexCoin Tokens' in a purported 'Initial Coin Offering.'"); *see also* Jon Hill, *Accused Fraudster Says Cryptocurrencies Aren't Securities*, Feb. 27, 2018 ("According to the government, those blockchain based tokens were securities . . .").

5.      Regulation by the Treasury Department's Financial Enforcement Network ("FinCEN").  *See, e.g.,* FinCEN, *Treasury's First Action Against a Foreign-Located Money Services Business*, U.S. Department of the Treasury, Jul. 27, 2017 ("The Financial Crimes Enforcement Network (FinCEN), working in coordination with the U.S. Attorney's Office for the Northern District of California, assessed a $110,003,314 civil money penalty today against BTC-e [a virtual currency exchange] for willfully violating U.S. anti-money laundering laws.").

6.      Regulation by the Internal Revenue Service ("IRS").  *See, e.g., United States v. Coinbase, Inc.*, No. 17-CV-01431-JSC, 2017 WL 3035164, at *1 (N.D. Cal. July 18, 2017) ("In March 2014, the IRS issued Notice 2014-21, which describes how the IRS applies U.S. tax principles to transactions involving virtual currency. (Case No.

3:16-cv-06658-JSC, Dkt. No. 2-4 at 3 ¶ 6.) In Notice 2014-21, the IRS stated its

position: virtual currencies that can be converted into traditional currency are property for

tax purposes, and a taxpayer can have a gain or loss on the sale or exchange of

a virtual currency, depending on the taxpayer's cost to purchase the virtual currency.").

7.   Regulation by private exchanges. *See, e.g.,* Asian Review, *Japan Tries Light*

*Touch in Bringing Cryptocurrencies out of Regulatory Limbo*, NIKKEI, Sept. 30, 2017

("[T]here is a growing need for exchange operators to self-police to protect investors

from taking on too much risk and other dangers.").

8.   State regulations. *See, e.g.,* Press Release, *DFS Grants Virtual Currency License*

*to Coinbase, Inc.,* N.Y. Department of Financial Services, Jan. 17, 2017 ("DFS has

approved six firms for virtual currency charters or licenses, while denying those

applications that did not meet DFS's standards. In addition to bitFlyer USA, DFS has

granted licenses to Coinbase Inc., XRP II and Circle Internet Financial, and charters to

Gemini Trust Company and itBit Trust Company.").

9.   A combination of any of the above.

2.   Oversight by CFTC

The CFTC is one of the federal administrative bodies currently exercising partial

supervision of virtual currencies.  Christopher Giancarlo, *Chairman Giancarlo Statement on*

*Virtual Currencies*, CFTC, Jan. 4, 2018 ("One thing is certain: ignoring virtual currency trading

will not make it go away. Nor is it a responsible regulatory strategy. The CFTC has an important

role to play.").

Administrative and civil action has been utilized by the CFTC to expand its control:

On September 17, 2015, the [CFTC] issued an [administrative] order (the Coinflip
Order) filing and simultaneously settling charges against Coinflip, Inc. (Coinflip)

> and its chief executive officer. In the Coinflip Order, the CFTC took the view for
> the first time that bitcoin and other virtual currencies are commodities subject to
> the Commodity Exchange Act (CEA) and CFTC regulations.

Conrad Bahlke, *Recent Developments in the Regulatory Treatment of Bitcoin,* 28 No. 1 Intell.

Prop. & Tech. L.J. 6 (2016) (internal citations omitted); *see also* Reuters, *U.S. CFTC Sues Three*

*Virtual Currency Operators for Fraud*, N.Y. Times, Jan. 19, 2018 ("The U.S. derivatives

watchdog said on Friday that it has filed charges against three separate virtual currency operators

alleging the defendants had defrauded customers and broken other commodity trading rules, in a

further sign regulators globally are cracking down on the emerging asset class."); *CFTC Charges*

*Randall Crater, Mark Gillespie and My Big Coin Pay Inc. with Fraud and Misappropriation in*

*Ongoing Virtual Currency Scam*, Jan. 24, 2018 ("The [CFTC] today announced the filing of a

federal court enforcement action under seal on January 16, 2018, charging commodity fraud and

misappropriation related to the ongoing solicitation of customers for a virtual currency known

as My Big Coin . . .").

   Legitimization and regulation of virtual currencies has followed from the CFTC's

allowance of futures trading on certified exchanges. Akin Oyedele, *Bitcoin Futures Trading gets*

*Green Light from [U.S.] Regulators*, Business Insider, Dec. 1, 2017 ("In a statement, the CFTC

said the Chicago Mercantile Exchange and the CBOE Futures Exchange self-certified new

contracts for bitcoin futures products. The Cantor Exchange self-certified a new contract for

bitcoin binary options. The futures contracts will make it possible to bet on bitcoin prices without

buying the cryptocurrency."). Two futures exchanges, Chicago Mercantile Exchange and the

CBOE Futures Exchange, as of February 23, 2018, exceeded "$150 million in daily trading

volume." CFTC Brief, at 6. The CFTC has "actively policed" futures exchanges for "violating

core principles" such as "failing to enforce its prohibitions against unlawful wash trading and

prearranged trades." *Id.; see In Re TeraExchange LLC,* CFTC No.15-33, 2015 WL 5658082

(Sept. 24, 2015).

3.   Concurrent Oversight from Other Agencies

The SEC, IRS, DOJ, Treasury Department, and state agencies have increased their

regulatory action in the field of virtual currencies without displacing CFTC's concurrent

authority.  Most current regulatory action takes the form of pursuing criminal and fraudulent

conduct after it occurs.

> A new division of the Securities and Exchange Commission dedicated to so-
> called "initial coin offerings" (ICOs) filed its first charges on Friday,
> targeting a scam that reportedly raised $15 million from thousands of
> investors by promising a 13-fold profit in less than a month.
>
> In a criminal complaint filed in Brooklyn federal court, the new SEC division,
> known as the Cyber Unit, describes how Dominic Lacroix sold digital tokens
> known as "PlexCoins" as part of a purported plan "to increase access to
> cryptocurrency services" across the world.

Jeff John Roberts, *The SEC's New Cyber Unit Just Filed Its First Charges Over an ICO*

*Scam,* Dec. 4, 2017; Robert J. Anello, *New-Wave Legal Challenges for Bitcoin and Other*

*CryptoCurrencies,* Law Journal Newsletters, Nov. 2017 ("Over the last few months the SEC

has demonstrated that it intends to pursue enforcement of securities law on certain

cryptocurrency transactions, especially increasingly popular [Initial Coin Offerings], in

response to concerns about fraud and manipulation."); Tara Siegel Bernard, *When Trading*

*in Bitcoin, Keep the Tax Man in Mind,* N.Y. Times, Jan. 18, 2018 ("In late 2016, the I.R.S.

made it clear that it was searching for cryptocurrency tax evaders: The agency sent a broad

request to Coinbase, the largest Bitcoin exchange in the United States, requesting records for all

customers who bought digital currency from the company from 2013 to 2015.").

IV.   Law

A. Jurisdiction

District courts have jurisdiction over any action in which the United States is a plaintiff. U.S. Const. Art. III § 2 ("The judicial Power shall extend to all Cases . . . [or] Controversies to which the United States shall be a Party."); 28 U.S.C. § 1345 ("Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.").

Under 28 U.S.C. § 1331 district courts also "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." *See U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 110 F.3d 861, 864 (2d Cir. 1997) ("[T]he subject matter jurisdiction provisions of Title 28 having broadest application are those granting the district courts power to entertain cases based on federal questions.").

B. Standing

Pursuant to Title 7 U.S.C. § 13a-1(a) the CFTC may seek injunctive or other relief when it believes that a person or entity is in violation of the CEA.  ("[T]he Commission may bring an action in the proper district court of the United States . . . to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder, and said courts shall have jurisdiction to entertain such actions."); *see also U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 241 (S.D.N.Y. 2012) ("The Commission may [] bring claims alleging violations of the CEA.").  Relief may be sought in the "district wherein the defendant is found or is an inhabitant or transacts business or in the district where the act or practice occurred, is occurring, or is about to occur." Title 7 U.S.C. § 13a-1(e).

1. Enforcement Power of CFTC

Exclusive jurisdiction over "accounts, agreements . . . and *transactions involving swaps or contracts of sale of a commodity for future delivery*" has been granted to the CFTC.  Title 7 U.S.C. § 2 (emphasis added).  Any commodity traded as a future must be traded on a commodity exchange approved by the CFTC.  Title 7 U.S.C. § 6.

The CEA and its "remedial statutes" are to be "construed liberally" to allow for broad market protection.  *R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n,* 205 F.3d 165, 173 (5th Cir. 2000) ("In 1974, Congress gave the Commission even greater enforcement powers, in part because of the fear that unscrupulous individuals were encouraging amateurs to trade in the commodities markets through fraudulent advertising. Remedial statutes are to be construed liberally, and in an era of increasing individual participation in commodities markets, the need for such protection has not lessened.").

The court generally defers to an agency's interpretation of a statute "that the agency is responsible for administering."  *Sierra Club, Inc. v. Leavitt,* 488 F.3d 904, 911–12 (11th Cir. 2007) (citing *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837 (1984)); *Commodity Futures Trading Comm'n v. Am. Precious Metals, LLC*, 845 F. Supp. 2d 1279, 1282–83 (S.D. Fla. 2011) ("*Chevron* applies to the instant case because the CFTC is construing a jurisdictional provision of the CEA—a statute it is responsible for administering.") (emphasis in original).

Full deference is dependent on whether the agency's interpretation followed a formal rulemaking process.  *Commodity Futures Trading Comm'n v. Sterling Trading Grp., Inc.*, 605 F. Supp. 2d 1245, 1265–66 (S.D. Fla. 2009) (citing *TVA v. Whitman*, 336 F.3d 1236, 1250 (11th Cir. 2003)) ("*Chevron* deference is confined to those instances in which the agency renders its interpretation in the course of a rulemaking proceeding or adjudication. [E]ven if an agency's interpretation of its own statute is advanced in the course of litigation rather than through a

rulemaking or agency adjudication, courts will still pay some deference to the agency's

interpretation.").

a.   Virtual Currencies are Commodities

Black's Law Dictionary defines a commodity as "an article of trade or commerce."

Bryan Garner, *Black's Law Dictionary*, (10th ed. 2014).  Merriam Webster defines it as "[a]n

economic good . . . [or] an article of commerce . . ."  Merriam Webster, https://www.merriam-

webster.com/ dictionary/commodity (last visited Feb. 5, 2018).

Commentators have argued that based on common usage, virtual currency should be

interpreted as a commodity.

> It would make sense for regulators to treat Bitcoin as a commodity. Commodities
> are generally defined as "goods sold in the market with a quality and value
> uniform throughout the world." This categorization would be appropriate because
> it realistically reflects the economic behavior of Bitcoin users and squares with
> traditional economic conceptions of exchange.

Mitchell Prentis, *Digital Metal: Regulating Bitcoin As A Commodity*, 66 Case W. Res. L. Rev.

609, 626 (2015).

Some propose that because virtual currencies provide a "store of value" they

function as commodities:

> A commodity is any item that "accommodates" our physical wants and needs.
> And one of these physical wants is the need for a store of value. Throughout
> history humans have used different commodities as a store of value – even cocoa
> beans – but, more persistently, gold. In contrast, a security is any instrument that
> is "secured" against something else. As a currency is usually secured by a
> commodity or a government's ability to tax and defend, it is considered to be a
> security. By these definitions, bitcoin with a lower case "b," is a commodity, and
> not a currency, while Bitcoin with a capital "B" is the technology, or network,
> that bitcoin moves across. The analogy would be Shale technology versus shale
> oil.

Jeff Currie, *Bullion Bests bitcoin, Not Bitcoin*, Goldman Sachs Global Investment Research,

Mar. 11, 2014.

Others argue virtual currencies are commodities because they serve as a type of monetary

exchange:

> Bitcoin should primarily be considered a commodity because it serves the
> function of money in its community of users. Users exchange Bitcoins to obtain
> property that they desire. In his seminal work, *Man, Economy, and State,* Murray
> Rothbard argues that all monetary exchanges are actually indirect commodity
> exchanges. Rothbard supports his proposition by tracing the development of
> money and exchange. Before the widespread adoption of a common form of
> money, people had to engage in bartering, or "direct exchange," in order to
> complete transactions . . .
>
> Furthermore, while Bitcoin acts as a money commodity in its community of users,
> from a pricing standpoint, it is valued like other commodities. The price of
> traditional commodities, like gold, silver, and agricultural products, vary in
> accordance with their demand and scarcity. When more people want a commodity
> that has a fixed supply, the price rises.
>
> Similarly, the price of Bitcoin fluctuates according to the same fixed supply
> model. Bitcoins are scarce because the algorithm controlling how many Bitcoins
> are released into the market through mining [] is designed to taper the supply of
> bitcoins, until no more are created. Bitcoins are considered rare because there is a
> fixed supply of them, leading users to be willing to pay increasing prices to
> control them. The value of a Bitcoin is ultimately driven by supply and demand—
> a coin is worth whatever someone is willing to pay for it.

Prentis, at 628–29 (internal citations omitted).

        b.   Commodity Exchange Act's Definition of "Commodity"

CEA defines "commodities" as "wheat, cotton, rice, corn, oats, barley, rye, flaxseed,

grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops,

fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and

oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock

products, and frozen concentrated orange juice, *and all other goods and articles . . . and all*

*services, rights, and interests . . . in which contracts for future delivery are presently or in the*

*future dealt in.*"  Title 7 U.S.C. § 1(a)(9) (emphasis added).

18

The original grant of power to the CEA was designed to control trading in agricultural commodities. Other goods, as well as services, rights and interests, are now covered by the statute. *See, e.g., United States v. Brooks*, 681 F.3d 678, 694 (5th Cir. 2012) ("Natural gas is plainly a 'good' or 'article.' The questions thus turns on whether it is a good 'in which contracts for future delivery are presently or in the future dealt with.'").

The CEA covers intangible commodities. *See, e.g., In re Barclays PLC*, CFTC No. 15-25 (May 20, 2015) (regulating fixed interest rate benchmarks as commodities); *cf. Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 395–96 (E.D.N.Y. 2017) (quoting *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)) ("That the meteoric rise of virtual reality through the Internet and its impact on communal and commercial affairs could not have been anticipated by Congress does not mean the law's application to the Internet and website is ambiguous; 'the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.'").

### c. CFTC's Interpretation of "Commodity"

After an administrative proceeding in 2015, the CFTC issued an order finding, for the first time, that virtual currencies can be classified as commodities. *In the Matter of: Coinflip, Inc.,* CFTC Docket No. 15-29 ("Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities.").

Multiple statements defining virtual currency as a commodity have been issued by the CFTC. *See* App. B, *CFTC Primer*, at 11 ("The definition of 'commodity' in the CEA is broad . . . It can mean physical commodity, such as an agricultural product . . . It can mean currency or interest rate."); *CFTC Launches Virtual Currency Resource Web Page*, Press Release, Dec. 15, 2017 ("Bitcoin and other virtual currencies have been determined to be commodities under the

Commodity Exchange Act (CEA). The [CFTC] primarily regulates commodity derivatives contracts that are based on underlying commodities. While its regulatory oversight authority over commodity cash markets is limited, the CFTC maintains general anti-fraud and manipulation enforcement authority over virtual currency cash markets as a commodity in interstate commerce.").

d.   Derivative Contracts and Futures

Regulatory authority over commodities traded as futures and derivatives has been granted to CFTC. *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 372 (D.C. Cir. 2013) ("The Commodity Exchange Act (CEA), Title 7, United States Code, Chapter 1, establishes and defines the jurisdiction of the Commodity Futures Trading Commission. Under this Act, the Commission has regulatory jurisdiction over a wide variety of markets in futures and derivatives, that is, contracts deriving their value from underlying assets.").

Title 7 U.S.C. § 9(1) of the CEA makes it unlawful for any person to:

use or employ, in connection with any swap, *or a contract of sale of any commodity in interstate commerce*, or for future delivery on or subject to the rules of any registered entity, *any manipulative or deceptive device or contrivance*, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010 . . . (emphasis added).

17 C.F.R. § 180.1 further defines the regulatory power of the CFTC:

(a) It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit . . .

Liability, under the CEA, for commodity fraud, is shown by: "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." *Commodity Futures Trading Comm'n, v. Commodity Inv. Grp., Inc.,* No. 05 CIV 5741(HB), 2006 WL 353466, at *1 (S.D.N.Y. Feb. 11, 2006) (quoting *CFTC v. R.J. Fitzgerald & Co., Inc.,* 310 F.3d 1321, 1328 (11th Cir. 2002)).

### e.   Regulation of Spot Market Fraud

The CFTC has recently expanded its enforcement to fraud related to spot markets underlying the (already regulated) derivative markets. *See, e.g.,* App. B, *CFTC Primer* (finding the CFTC has jurisdiction "if there is fraud or manipulation involving a virtual currency traded in interstate commerce"); *CFTC v. Gelfman Blueprint, Inc.,* Case No. 17-7181 (S.D.N.Y. Filed Sept. 21, 2017) (suit brought by the CFTC alleging a Bitcoin Ponzi scheme, not involving future contracts).

In *Gelfman*, as in the instant case, the CFTC relied on the broad statutory authority in Section 9(1) of the CEA, and regulatory authority under 17 C.F.R. § 180.1. Specifically, the language in § 180.1 prohibiting "any person, directly or indirectly, in connection with any . . . contract of sale of any commodity in interstate commerce" from using a "manipulative device, scheme, or artifice to defraud," or making "any untrue or misleading statement of a material fact."

The portion of the statute delegating oversight authority over "*contract of sale of any commodity in interstate commerce*" allows CFTC to enforce its mandate in cases not directly involving future trades. 17 C.F.R. § 180.1 (emphasis added); *see* Gary DeWaal, *CFTC Files Charges Alleging Bitcoin Ponzi Scheme Not Involving Derivatives*, Sept. 24, 2017 ("The CFTC brought its current action [*Gelfman*] under a relatively new provision of law (enacted as part of

21

the Dodd-Frank Wall Street Reform and Consumer Protection Act) and Commission regulation

that prohibits any person from using a manipulative or deceptive device or contrivance in

connection with any 'contract for sale of any commodity in interstate commerce' – not solely in

connection with swaps or a commodity for future delivery.").

Where a futures market exists for a good, service, right, or interest, it may be regulated by

CFTC, as a commodity, without regard to whether the dispute involves futures contracts. *See,*

*e.g., Brooks,* 681 F.3d at 694-95 ("[F]utures contracts for natural gas are traded on NYMEX, and

those futures are derivative of natural gas traded at Henry Hub. Nonetheless, the record shows

that natural gas may be moved from any location to Henry Hub through the national pipeline

system. Thus, it would be peculiar that natural gas at another hub is not a commodity, but

suddenly becomes a commodity solely on the basis that it passes through Henry Hub, and ceases

to be a commodity once it moves onto some other locale. While the price of that commodity may

fluctuate with its location, and the forces of supply and demand at that location, the actual nature

of the 'good' does not change.").

CFTC does not have regulatory authority over simple quick cash or spot transactions that

do not involve fraud or manipulation.  Title 7 U.S.C. § 2(c)(2)(C)(i)(II)(bb)(AA) (The CFTC

does not have jurisdiction over "spot" transactions that "[result] in actual delivery within 2

days.").  This boundary has been recognized by the CFTC.  It has not attempted to regulate spot

trades, unless there is evidence of manipulation or fraud. *See* App. C, CFTC Chair,

Congressional Testimony ("[T]he CFTC does not have authority to conduct regulatory oversight

over spot virtual currency platforms or other cash commodities, including imposing registration

requirements, surveillance and monitoring, transaction reporting, compliance with personnel

conduct standards, customer education, capital adequacy, trading system safeguards, cyber

security examinations or other requirements.").

2.   Concurrent Jurisdiction

Federal agencies may have concurrent or overlapping jurisdiction over a particular issue

or area. *See, e.g.,* Todd S. Aagaard, *Regulatory Overlap, Overlapping Legal Fields, and

Statutory Discontinuities*, 29 Va. Envtl. L.J. 237, 240 (2011)) ("[T]he Environmental Protection

Agency (EPA) and the Occupational Safety and Health Administration (OSHA) manage

overlapping statutory authorities. Both the EPA and OSHA regulate certain risks in the

workplace arising from exposures to hazardous and toxic substances.").

> Agencies often cooperate to enforce their overlapping powers.

> [Agencies] have explored joint rulemaking, such as the Environmental Protection
> Agency (EPA) and the Department of Transportation (DOT) collaboration on fuel
> standards. They have discussed coordination in individual-level adjudication, such
> as the Department of Justice (DOJ) and the Department of Homeland Security
> (DHS) partnering in cases involving persons without proper documentation. And
> they have analyzed agency collaboration in shaping policy in complex and novel
> areas, such as work by DHS and the National Security Agency (NSA) to combat
> cyber threats.

Daniel A. Farber & Anne Joseph O'Connell, *Agencies As Adversaries*, 105 Cal. L. Rev. 1375,

1384 (2017); *but see Hunter v. F.E.R.C.*, 711 F.3d 155, 157 (D.C. Cir. 2013) ("Stated simply,

Congress crafted CEA section 2(a)(1)(A) to give the CFTC exclusive jurisdiction over

transactions conducted on futures markets.").

C.  Preliminary Injunction Standard

Under Title 7 U.S.C. § 13a-1(a) the CFTC may seek injunctive or other relief when it

concludes that a person or entity is in violation of the CEA.  "The CFTC is entitled to a

preliminary injunction upon a *prima facie* showing that defendants have violated the Act and

'that there is a reasonable likelihood that the wrong will be repeated.'"  *Commodity Futures*

23

*Trading Comm'n, v. Commodity Inv. Grp., Inc.*, No. 05 CIV 5741(HB), 2006 WL 353466, at *1

(S.D.N.Y. Feb. 11, 2006) (quoting *CFTC v. British Am. Commodity Options Corp.,* 560 F.2d

135, 141 (2d Cir.1977)).  When enforcing a statutorily prescribed injunction, the CFTC "need

not prove irreparable injury or the inadequacy of other remedies as required in private injunctive

suits." *British Am.,* 560 F.2d at 141.  Likelihood of future violations may be inferred from a

"defendant's past conduct." *CFTC v. Am. Bd. of Trade, Inc.,* 803 F.2d 1242, 1251 (2d Cir.

1986).

V.  Application of Law

  A.  CFTC Standing

The CFTC has standing pursuant to Title 7 U.S.C. § 13a-1(a) to seek injunctive and other

relief related to misleading advice, and the fraudulent scheme and misappropriation of virtual

currencies by defendants.

1.  Virtual Currencies as Commodities

Virtual currencies can be regulated by CFTC as a commodity.  Virtual currencies are

"goods" exchanged in a market for a uniform quality and value.  Mitchell Prentis, *Digital Metal:*

*Regulating Bitcoin As A Commodity*, 66 Case W. Res. L. Rev. 609, 626 (2015).  They fall well-

within the common definition of "commodity" as well as the CEA's definition of "commodities"

as "all other goods and articles . . . in which contracts for future delivery are presently or in the

future dealt in." Title 7 U.S.C. § 1(a)(9).

The jurisdictional authority of CFTC to regulate virtual currencies as commodities does

not preclude other agencies from exercising their regulatory power when virtual currencies

function differently than derivative commodities.  *See, e.g.,* Jay Clayton [SEC Chair] and

Christopher Giancarlo [CFTC Chair], *Regulators are Looking at Cryptocurrency,* Wall Street

Journal, Jan. 24, 2018 ("The SEC does not have direct oversight of transactions in currencies or commodities. Yet some products that are labeled cryptocurrencies have characteristics that make them securities. The offer, sale and trading of such products must be carried out in compliance with securities law. The SEC will vigorously pursue those who seek to evade the registration, disclosure and antifraud requirements of our securities laws.").

The Chicago Mercantile Exchange Inc. ("CME") has filed an *amicus* brief. *See* ECF No. 27, Mar. 6, 2018. It claims to operate the "world's leading derivatives marketplace." *Id.* at 1. It supports the view that virtual currencies are commodities subject to the CFTC's regulatory protections. It writes:

> CME offers for the Court's consideration an explanation of the possible consequences of a determination that a virtual currency such as bitcoin is not a commodity. Such a determination would put in jeopardy CME's and its market participants' expectation to rely on . . . the CFTC's regulatory protections for commodity derivatives contracts based on virtual currencies. This legal uncertainty would substantially disrupt the settled expectations of CME and numerous market participants who are trading bitcoin futures for purposes of hedging cash market exposures or making a market in bitcoin futures by offering liquidity, in addition to market professionals that clear, broker or manage virtual currency futures trading activity.

*Id.* at 2.

### 2. CFTC Jurisdiction Over Virtual Currency Fraud

CFTC has jurisdictional authority to bring suit against defendants utilizing a scheme to defraud investors through a "contract [for] sale of [a] commodity in interstate commerce." Title 7 U.S.C. § 9(1). Although the CFTC has traditionally limited its jurisdiction primarily to "future" contracts for commodities, its expansion into spot trade commodity fraud is justified by statutory and regulatory guidelines. *See CFTC v. Gelfman Blueprint, Inc.,* Case No. 17-7181 (S.D.N.Y. Filed Sept. 21, 2017); *see also* Gary DeWaal, *CFTC Files Charges Alleging Bitcoin Ponzi Scheme Not Involving Derivatives*, Sept. 24, 2017 ("This CFTC complaint [*CFTC v.*

*Gelfman Blueprint, Inc.*] has significant ramifications beyond its four corners. It represents a powerful statement by the Commission that it will exercise jurisdiction over cryptocurrencies when there is potential fraud – even if the fraud does not involve derivatives based on cryptocurrencies.").

Language in 7 U.S.C. § 9(1), and 17 C.F.R. § 180.1, establish the CFTC's regulatory authority over the manipulative schemes, fraud, and misleading statements alleged in the complaint. 17 C.F.R. § 180.1 ("It shall be unlawful for any person, directly or indirectly, in connection . . . [with any] contract of sale of any commodity in interstate commerce . . . to [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; [m]ake, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [e]ngage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit . . .").

B.  Prima Facie Showing of Fraud Committed by Defendants

CFTC has made a prima facie showing that the defendants committed fraud by misappropriation of investors' funds and misrepresentation of trading advice and future profits promised to customers. CFTC Brief, at 11 (citing Giglio Decl. ¶ 26) ("[O]nce Defendants had solicited and obtained [] Customer funds for trading by Defendants on behalf of customers, Defendants ceased communicating with the customers and misappropriated the customers' funds."). The intentional nature of the defendants' conduct, as required by 17 C.F.R. § 180.1, is evidenced by the blatant disregard of customers' complaints and their refusal to return investors' funds. *See* Giglio Decl. ¶¶ 29-32; *see also* Hr'g Tr., Mar. 6, 2018.

C.  Preliminary Injunction

26

A preliminary injunction is granted in favor of the CFTC.  The court concludes that without an injunction there is a reasonable likelihood that defendants will continue to violate the CEA.  A separate order outlining the terms of the relief is issued.  *See* App. A, Prelim. Injunction.

### D.  Appropriate Research by Court

In deciding jurisdictional, standing and other issues fundamental to the present litigation, the court has engaged in extensive background research, but not on the specific frauds charged. This is appropriate.

The ABA has issued the following opinion related to individual research by the court:

> Easy access to a vast amount of information available on the Internet exposes judges to potential ethical problems. Judges risk violating the Model Code of Judicial Conduct by searching the *Internet for information related to participants or facts in a proceeding. Independent investigation of adjudicative facts generally is prohibited* unless the information is properly subject to judicial notice. The restriction on independent investigation includes individuals subject to the judge's direction and control.

Committee on Ethics and Responsibility, *Independent Factual Research by Judges Via Internet*, Formal Opinion 478, Dec. 8, 2017 (ABA) (emphasis added).

It is appropriate and necessary for the judge to do research required by a case in order to understand the context and background of the issues involved so long as the judge indicates to the parties the research and conclusions, by opinions and otherwise, so they may contest and clarify.  *See* Abrams, Brewer, Medwed, et al., *Evidence Cases and Materials* (10th Ed. 2017) (Ch. 9 "Judicial Notice").  It would be a misapprehension of the ABA rule to conclude otherwise.

Adjudicative facts involving defendants' alleged activities have not been the subject of investigation by the court, except at an evidentiary hearing.  *See* Hr'g Tr., Mar. 6, 2018.

VI.    Conclusion

CFTC has standing to exercise its enforcement power over fraud related to virtual

currencies sold in interstate commerce.  A preliminary injunction is granted in favor of the

CFTC.  *See* App. A, Prelim. Injunction.

The individual defendant's pro se motion to "Dismiss for Lack of Jurisdiction" is denied.

ECF No. 18, Feb. 15, 2018.  This court has subject matter jurisdiction pursuant to 28 U.S.C. §§

1331 and 1345.  The CFTC has adequately pled and for purpose of a preliminary injunction

proved its claim of fraud in violation of the CEA.

Any person claiming improper application of the injunctive power of the court may seek

relief by motion.

SO ORDERED.


/s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge

Dated: March 6, 2018
       Brooklyn, New York

# DEFENDANT'S EXHIBIT

# B



coinmarketcap.com