FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 1 1 2018 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,

     - against -

MAKSIM ZASLAVSKIY,

            Defendant.
-------------------------------------------------------- x

**MEMORANDUM & ORDER**

17 CR 647 (RJD)

DEARIE, District Judge

    Defendant Maksim Zaslavskiy ("Zaslavskiy") is alleged to have made materially false and fraudulent representations and omissions in connection with two purported virtual currency investment schemes and their related Initial Coin Offerings ("ICOs"): REcoin Group Foundation, LLC ("REcoin") and DRC World, Inc., a.k.a. Diamond Reserve Club ("DRC" or "Diamond"). Zaslavskiy is charged in a three-count indictment, ECF No. 7, (the "Indictment") with Conspiracy to Commit Securities Fraud (Count One), in violation of 18 U.S.C. § 371, and Securities Fraud, in connection with REcoin (Count Two) and Diamond (Count Three), in violation of 15 U.S.C. §§ 78j(b) and 78ff.[1]  He now moves to dismiss the Indictment, arguing that REcoin and Diamond did not involve securities and are beyond the reach of the federal securities laws.  See Def. Mot. to Dismiss, ECF No. 22; Def. Reply in Supp. of Def. Mot. to Dismiss, ECF No. 26 ("Def. Reply").  He also argues that the securities laws are unconstitutionality vague as applied.  See id.  The Government, meanwhile, asserts that the

---

[1] On or about September 29, 2017, the SEC filed a complaint against Zaslavskiy, REcoin, and Diamond, containing similar allegations to those contained in the Indictment.  See SEC v. Maksim Zaslavskiy et. al., No. 17-CV-5725 (RDJ) (the "Civil Case").  On January 31, 2018, this Court granted the Government's Motion to Intervene and Stay Proceedings in the Civil Case, pending resolution of this parallel criminal case, United States v. Zaslavskiy, No. 17-CR-647 (RJD).  With the Court's permission, the SEC and Zaslavskiy's civil defense counsel to file briefs in support of the briefs submitted by the U.S. Attorney's Office and Zaslavskiy's criminal defense counsel in this case.  See SEC Mem. in Opp'n to Mot. to Dismiss, ECF No. 25 ("SEC Mem. in Opp'n"); Nagi Mem. in Supp. of Mot. to Dismiss, ECF No. 27 ("Nagi Mem. in Supp.").

investments made in REcoin and Diamond were "investment contracts," see SEC v. W.J. Howey Co., 328 U.S. 293 (1946), and thus "securities," as defined by both Section 3(a)(10) of the Securities Exchange Act of 1933 (the "Exchange Act") and Section 2(a)(1) of the Securities Act of 1933 (the "Securities Act"), and that these laws are not unconstitutionally vague. Gov't Mem. in Opp'n to Mot. to Dismiss, ECF No. 24 ("Gov't Mem. in Opp'n"). For the reasons set forth below, we find that the Indictment is constitutionally sufficient and meets the pleading requirements set forth in the Federal Rules of Criminal Procedure. Furthermore, we conclude that the Exchange Act and SEC Rule 10b-5, under which Zaslavskiy is charged, are not unconstitutionally vague as applied to this case. Zaslavskiy's motion to dismiss is denied.

## BACKGROUND

The following factual background is reflected in the Indictment, "the allegations of which we accept as true for purposes of the present motion[]." See United States v. Rajarantnam, No. 13-CR-211 (NRB), 2014 WL 1554078, at *1 (S.D.N.Y. Apr. 17, 2014) (citations omitted); see also Indictment, ECF No. 7.

In 2017, Zaslavskiy founded REcoin, a limited liability company organized in Nevada and with a purported place of business in Las Vegas, Nevada, and Diamond, incorporated in and with its purported principal place of business in Puerto Rico. Indictment ¶¶ 2-3. Zaslavskiy was the sole owner of both. Id. ¶ 1. REcoin was purportedly engaged in real estate investment and development of real estate-related "smart contracts." Id. ¶ 2. Diamond purportedly invested in diamonds and obtained discounts from diamond retailers for Diamond members. Id. ¶ 3. From approximately January to October 2017, Zaslavskiy fraudulently induced investors to purchase purported cryptocurrency "tokens" or "coins" in connection with the REcoin and Diamond ICOs.

2

Id. ¶ 10.  He did so by offering "investment opportunities" based on material false statements. Id. ¶¶ 10, 11, 16-21, 23-24.

Zaslavskiy and his co-conspirators advertised REcoin as a new blockchain virtual currency.  Id. ¶ 11.  They promised that (1) unlike most cryptocurrency, REcoin was uniquely valuable: it was backed by domestic and international real estate investments; (2) REcoin provided investors an "easily accessible financial platform through which people from all over the world [could] convert their savings into real estate-backed currency for the potential of high returns to protect their earnings from inflation"; and (3) REcoin had "some of the highest potential returns."  Id.  They also launched a promotional website for REcoin, where they posted an informational "white paper" (the "REcoin White Paper").  Id. ¶¶ 12-14.  According to the REcoin White Paper, investors could change their money into a "more stable and secure investment: real estate," which "grows in value."  Id. ¶ 14.  It also touted that REcoin was led by "an experienced team of brokers, lawyers, and developers and [that it] invest[ed] its proceeds into global real estate based on the soundest strategies."  Id. ¶ 14.  REcoin's website provided investors with access to a portal through which they could invest in REcoin using credit cards, virtual currency, and online funds transfers.  Id. ¶¶ 11-12.  According to the REcoin website, REcoin was expected to launch its ICO in August 2017.  Id. ¶ 12.

Contrary to Zaslavksiy's representations, REcoin never purchased any real estate.  Id. ¶ 16.  REcoin never hired a broker, lawyer, or developer to initiate the real estate investments advertised in its marketing materials.  Id.  Nor did it sell more than 2.8 million tokens, as it falsely advertised on its website.  Id.  In the end, REcoin investors received no "digital asset[s], token[s] or coin[s]" and no REcoin token or coin was ever developed.  Id. ¶ 16.  Still, based on

3

materially false and misleading representations, Zaslavskiy and his co-conspirators induced approximately 1,000 investors to purchase REcoin tokens. Id. ¶ 17.

On September 11, 2017, Zaslavskiy and his co-conspirators declared the end of the REcoin ICO and deemed it a success.[2] Id. ¶ 19. At the same time, they announced the start of a purported Initial Membership Offering ("IMO")[3] for Diamond, id. ¶¶ 3, 19, and offered REcoin investors the option to either obtain a refund on their investments *or* convert their REcoin tokens (at a discounted rate) into tokens in Diamond, id. ¶ 19. They promoted Diamond as a virtual ecosystem that offered "cryptocurrency" tokens hedged with "real world assets"—this time, diamonds. Id. ¶¶ 18-21. Again, investors could access a white paper (the "Diamond White Paper") and purchase Diamond tokens on Diamond's website. Id. ¶ 21. Both the Diamond White Paper and the September 11, 2017 Reddit Release explained that Diamond was "hedged by physical diamonds [] stored in secure locations in the United States and [] fully insured for their value." Id. ¶¶ 19, 21. The Diamond White Paper also advertised that Diamond intended to "indefinitely prolong [its] lifespan and development [] to increase [] liquidity, visibility, [and] enhance its credibility worldwide." Id. ¶ 21. Zaslavskiy offered that Diamond forecast "a minimum growth of 10% to 15% per year." Id. ¶ 22. Contrary to Zaslavskiy's promises, no Diamond tokens or coins were developed. Id. Zaslavskiy purchased no diamonds. Id. Diamond did not take out insurance on diamonds or conduct an ICO. Id. And investors who transferred funds from REcoin to Diamond never received coins or tokens in exchange. Id. ¶ 23.

---

[2] Zaslavskiy issued a press release on Reddit (the "Reddit Release") on September 11, 2017, proclaiming "the supposed success of the REcoin ICO by reiterating the false statement made in prior releases that, after the REcoin ICO began on August 7, 2017, 'over 1.5 million in direct REcoin token purchases [were made].'" Indictment ¶ 19.
[3] As defined in the Indictment, the Diamond "IMO" was "functionally the same as an ICO." Indictment ¶ 3.

<u>DISCUSSION</u>

Fed. R. Crim P. 7(c)(1) requires that an indictment state a "'plain, concise and definite written statement of the essential facts constituting the offense charged.'" See <u>United States v. Pirro</u>, 212 F.3d 86, 91-92 (2d Cir. 2000) (quoting Fed. R. Crim. P. 7(c)). This ensures that three "constitutionally required functions" are met: "[i]t fulfills the Sixth Amendment right to be informed of the nature and cause of the accusation; it prevents a person from being subject to double jeopardy as required by the Fifth Amendment; and it serves the Fifth Amendment protection against prosecution for crimes based on evidence not presented to the grand jury." <u>United States v. Walsh</u>, 194 F.3d 37, 44 (2d Cir. 1999) (internal quotation marks and citations omitted); <u>see also</u> <u>Cochran v. United States</u>, 157 U.S. 286, 290 (1985) (an indictment must contain factual detail sufficient to "apprise[] the defendant of what he must be prepared to meet"). While an indictment must "contain some amount of factual particularly," the Second Circuit has "consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." <u>Walsh</u>, 194 F.3d at 44 (internal quotation marks and citations omitted).

If it is valid on its face, "[a]n indictment returned by a legally constituted and unbiased grand jury…is enough to call for trial of the charge on the merits." See <u>Costello v. United States</u>, 350 U.S. 359, 363 (1956). In evaluating a pre-trial motion to dismiss, we must accept as true the allegations contained in the indictment. <u>See</u> <u>Boyce Motor Lines v. United States</u>, 342 U.S. 337, 343 n. 16 (1952). This is because the validity of an indictment depends on "'its allegations, not [] whether the Government can prove its case.'" <u>United States v. Wey</u>, No. 15-CR-611 (AJN), 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017) (quoting <u>United States v. Coffey</u>, 361 F. Supp. 2d 102, 111 (E.D.N.Y. 2005) (Glasser, J.)). An indictment "is not meant to

5

serve an evidentiary function." United States v. Juwa, 508 F.3d 694, 701 (2d Cir. 2007).  Unless the government has made a "'full proffer of the evidence it intends to present at trial,'" it is improper to weigh the sufficiency of the evidence supporting an indictment on a pretrial motion to dismiss.  United States v. Perez, 575 F.3d 164, 166-67 (2d Cir. 2009) (quoting United States v. Alfonso, 143 F.3d 772, 776-77 (2d Cir. 1998)).  Ultimately, "'dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." United States v. De la Pava, 268 F.3d 157, 165 (2d Cir. 2001) (citations omitted); United States v. Phillips, 120 F. Supp. 3d 263, 268 (E.D.N.Y. 2015) (Dearie, J.).

### A. The Challenged Indictment Is Constitutionally Sound and Satisfies Federal Rule of Criminal Procedure 7(c)

As an initial observation, there can be no serious debate that the Indictment satisfies the demands of due process and gives the defendant clear notice of the charges against him. See Walsh, 194 F.3d at 44.  The label Zaslavskiy chooses to attach to the alleged scheme does not control our analysis.  See SEC v. Edwards, 540 U.S. 389, 393 (2004) ("'Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called.'") (quoting Reves v. Ernst & Young, 494 U.S. 56, 61 (1990)). Nor does it camouflage the core nature of his alleged criminal endeavors.  Stripped of the 21st-century jargon, including the Defendant's own characterization of the offered investment opportunities, the challenged Indictment charges a straightforward scam, replete with the common characteristics of many financial frauds.  See Indictment ¶ 10.  The grand jury alleges, among other things, that the Defendant made repeated false and materially false statements to induce potential investors to part with their resources in the hopes of significant financial gain through the efforts of the touted "experienced team of brokers, lawyers, and developers." Id. ¶¶ 10-11, 13-14, 16-17, 19, 21, 23-24.  It also alleges that investments in the schemes were

"investment contracts, and therefore 'securities' as defined by Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act." Id. ¶ 9. Furthermore, the Indictment tracks the language of the statutes and rules under which Zaslavskiy is charged, 15 U.S.C. § 78j(b)[4] and § 78ff; Rule 10b-5 of the Rules and Regulations of the SEC, codified at 17 C.F.R. § 240.10b-5,[5] and 18 U.S.C. § 371, and it includes the relevant timeframe and occurrence of each offense, at least in part, within the Eastern District of New York. Indictment ¶¶ 26-27, 29, 31. The Indictment goes further, incorporating by reference into each count an eight-page introduction, which outlines the framework and nuances of the crimes charged and recites, in more specific terms, Zaslavskiy's promotional efforts. Indictment ¶¶ 25, 28, 30.

The subsidiary question of whether the conspirators *in fact* offered a security, currency, or another financial instrument altogether, is best left to the finder of fact—unless the Court is able to answer it as a matter of law after the close of evidence at trial. Nevertheless, the parties engage in a spirited debate that is undoubtedly premature. The Court has been treated to a volley of cases decided in the civil arena, which may well be instructive at the appropriate time but do not inform us as to whether the Indictment itself is fatally flawed. The parties also encourage the Court to evaluate documents and evidence outside of the four corners of the Indictment, which we decline to do. See Alfonso, 143 F.3d at 776-77. Despite the parties' attempt to cast this issue

---

[4] 15 U.S.C. § 78j(b) makes it unlawful for any person, "directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange…[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

[5] Rule 10b-5 makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

as one related to the Indictment's facial sufficiency, they have instead asked us to resolve what can only fairly be a question of proof at trial, based on all of the evidence presented to a jury. Zaslavskiy's primary contention—that the investment scheme at issue did not constitute a security, as that term is defined under <u>Howey</u>, is undoubtedly a factual one.  <u>Howey</u>, 328 U.S. at 299-301; <u>Cf</u>. <u>Marine Bank v. Weaver</u>, 455 U.S. 551, 560 n.11 (1982) ("[e]ach transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole"); <u>see also</u> <u>United States v. Gambino</u>, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992), <u>aff'd</u>, 17 F.3d 572 (2d Cir. 1994) (defendant must "await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary sufficiency") (citations omitted).  In any event, we briefly examine the parties' exchange and confirm our conclusion that the Indictment calls for a trial on the merits.

### B. A Reasonable Jury Could Conclude That The Facts Alleged in the Indictment Satisfy the <u>Howey</u> Test

Zaslavskiy argues that the virtual currencies promoted in connection with REcoin and Diamond are not securities (i.e. investment contracts), as alleged in the Indictment, and therefore do not fall within the Government's criminal or civil enforcement power.  Zaslavskiy's reading of the relevant law is overly narrow.  <u>See</u> <u>Howey</u>, 328 U.S. at 299 (the definition of a security, and therefore of an investment contract, "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.").

Section 10(b) of Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security…any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  First

and foremost, to state a valid claim of securities fraud under Section 10(b), the allegedly fraudulent conduct must involve a "security."  It is beyond dispute that both Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), and Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), include "investment contract" within their definitions of security.  Though "investment contract" has not been defined by Congress, the test for whether a "given financial instrument or transaction constitutes an 'investment contract' under the federal securities laws," has long been settled.  See United States v. Leonard, 529 F.3d 83, 85 (2d Cir. 2008) (citing Howey, 328 U.S. 293).  The test set forth in Howey, 328 U.S. 293 (the "Howey Test"), defines an investment contract as a "contract, transaction, or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or third party."  See id. at 298-99; see also Edwards, 540 U.S. at 393; Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994); Indictment ¶ 9.  All three elements of the Howey test must be established for a scheme or transaction to qualify as an investment contract.  Revak, 18 F.3d at 87.

Whether a transaction or instrument qualifies as an investment contract is a highly fact-specific inquiry.  See, generally, Howey, 328 U.S. 293 (investment contract existed where investors bought parcels of land in citrus grove from a company for a relatively uniform purchase price, company had discretion to cultivate and harvest the crops, and investors were to receive allocations of net profits); see also Marine, 455 U.S. at 560 n.11.  This is especially true in the context of "relatively new, hybrid vehicle[s]," which require "case-by-case analysis into the economic realities of the underlying transaction[s]."  See Leonard, 529 F.3d at 88-89 (quoting Reves, 494 U.S. at 62) (internal quotation marks omitted); Tcherepnin v. Knight, 389 U.S. 332, 336 (1967); see also Howey, 328 U.S. at 301 (noting the importance of the "statutory

policy of affording broad protection to investors"); United Hous. Found., Inc. v. Forman, 421 U.S. 837, 847-48 (1975) (Congress "sought to define 'the term security in sufficiently broad and general terms so as to include within that definition the many types of instruments that…fall within the ordinary concept of a security.'") (citations omitted).  The question is whether the "elements of a profit-seeking business venture" are sufficiently alleged in the Indictment, such that, if proven at trial, a reasonable jury could conclude that "investors provide[d] the capital and share[d] in the earnings and profits; [and] the promoters manage[d], control[ed] and operate[d] the enterprise." See Howey, 328 U.S. at 300.

For present purposes, we conclude that they are.  However, the ultimate fact-finder will be required to conduct an independent Howey analysis based on the evidence presented at trial. See United States v. Barry, 09-CR-833 (E.D.N.Y. November 17, 2010) (Dearie, J.) (instructing jury on application of Howey test); United States v. Brooks, 62 F.3d 1425, 1995 WL 451090, at *2 (9th Cir. July 28, 1995) (unpublished) (district court did not err in refusing to dismiss securities fraud counts or in instructing the jury on the definition of "investment contract"); United States v. Carman, 577 F.2d 556, 562-64 (9th Cir. 1978) (upholding jury's verdict, finding that transaction at issue constituted a security, where it was supported by sufficient evidence and jury instructions included the "statutory definition of a security [] supplemented with the definition of an investment contract" under Howey).  Still, the Indictment alleges sufficient facts that, if proven at trial, could lead a reasonable jury to find that REcoin and Diamond constituted "investment contracts."

(1) First, a reasonable jury could conclude that, if proven at trial, the facts alleged in the Indictment demonstrate that individuals invested money (and other forms of payment) in order to participate in Zaslavskiy's schemes. Id. ¶¶ 10, 12-13, 17- 20, 24; see Howey, 328 U.S. at 299-

10

300. They did so in exchange for investments in what they were told were investment-backed virtual tokens or coins. Id. ¶¶ 10-11, 18-19; see also SEC v. SG Ltd., 265 F.3d 42, 48 (1st Cir. 2001) ("[t]he determining factor [for the first Howey prong] is whether an investor 'chose to give up specific consideration in return for a separable financial interest with the characteristics of a security.'") (quoting Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel, 439 U.S. 551, 559 (1979)); SEC v. Brigadoon Scotch Distrib., Ltd., 388 F. Supp. 1288, 1291 (S.D.N.Y. 1975) (finding significant that advertising brochure "consistently described the collection of rare coins as an 'investment'"). Investors in Zaslavskiy's schemes were "able to invest in REcoin [and Diamond] through [their] websites using their credit cards, virtual currency or [] online funds transfer services."[6] Id. ¶¶ 12, 20. Approximately 1,000 individuals invested in the REcoin ICO. Id. ¶ 17. Others invested in the Diamond IMO. Id. ¶ 24. And some REcoin investors "transferred" their investments in REcoin to Diamond. Id. ¶¶ 19, 23.

Zaslavskiy glibly submits that investments in REcoin and Diamond did not involve an investment of money, because they involved the exchange of "one medium of currency for another." Def. Mot. to Dismiss at 12. However, the Indictment alleges that investors gave up money—or other assets—in exchange for "membership" in these two ventures. Indictment ¶¶ 8, 12, 17, 20, 24; see also Howey, 328 U.S. at 299-300; Uselton v. Commercial Lovelace Motor Freight, Inc., 940 F.2d 564, 574 (10th Cir. 1991), cert. denied sub nom. Alcox v. Uselton, 502 U.S. 893 (1991) ("cash is not the only form of contribution or investment that will create an investment contract...the 'investment' may take the form of 'goods and services'...or some other

---

[6] As defined in the Indictment, "'[o]nline funds transfer services' such as PayPal and Stripe permitted users to purchase goods and services from websites and mobile applications using the payment methods stored in that user's account, such as their credit cards or direct debit bank accounts." Indictment ¶ 8.

11

'exchange of value'") (quoting Daniel, 439 U.S. at 560 n. 12; Hocking v. Dubois, 885 F.2d 1449, 1471 (9th Cir. 1989)).

(2) Second, the Indictment alleges facts that, if proven at trial, would allow a reasonable jury to find that both REcoin and Diamond constituted a "common enterprise." See Howey, 328 U.S. at 298-300; see also Daniel, 439 U.S. at 561 ("the 'touchstone' of the Howey test 'is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'") (quoting Forman, 421 U.S. at 852).  To allege a common enterprise, the Indictment must establish that "commonality" existed between the investors in REcoin, and, separately, between the investors in Diamond.  In this Circuit, "horizontal commonality" is sufficient to establish a common enterprise.[7] Revak, 18 F.3d at 87.

Horizontal commonality "is characterized as the tying of each individual investor's fortunes to the fortunes of [] other investors by the pooling of assets, *usually* combined with the pro-rata distribution of profits." In re J.P. Jeanneret, 769 F. Supp. 2d at 359 (internal quotation marks and citations omitted) (emphasis added); Marini v. Adamo, 812 F. Supp. 2d 243, 255 (E.D.N.Y. 2011) (Bianco, J), aff'd on other grounds, 644 Fed. App'x 33 (2d Cir. 2016)

---

[7] A different type of commonality, strict vertical commonality, requires that investors' fortunes be "'tied to the *fortunes* of the promoter." Revak v. SEC Realty Corp., 18 F.3d 81, 87-88 (2d Cir. 1994) (citations omitted); see also In re J.P. Jeanneret Assoc., Inc., 769 F. Supp. 2d 340, 359-60 (S.D.N.Y. 2011) ("Where strict vertical commonality exists, the fortunes of the plaintiff and defendants are so linked that they rise and fall together.") (internal quotation marks and citations omitted).  Some Circuits have held that "strict vertical commonality" can establish a common enterprise. Revak, 18 F.3d at 87-88.  The Second Circuit has not opined. Id. at 88; see also In re J.P. Jeanneret, 769 F. Supp. 2d at 359-60.  However, District Courts in this Circuit have found "strict vertical commonality [] sufficient to establish a common enterprise under Howey." In re J.P. Jeanneret, 769 F. Supp. 2d at 360 (citing cases); see also Marini v. Adamo, 812 F. Supp. 2d 243, 256 n.9, 257-61 (E.D.N.Y. 2011) (Bianco, J), aff'd on other grounds, 644 Fed. App'x 33 (2d Cir. 2016) (summary order); In re Energy Sys. Equip. Leasing Sec. Litig., 642 F. Supp. 718, 735 (E.D.N.Y. 1986) (Wexler, J.).  Separately, in Revak, the Second Circuit explicitly "rejected the broad vertical commonality test, which requires that 'the fortunes of investors…be linked only to the *efforts* of the promoter.'" Marini, 812 F. Supp. 2d at 259, n. 13 (quoting Revak, 18 F.3d at 88)

(summary order); Revak, 18 F.3d at 87.  When a common enterprise is "marked by horizontal commonality, the fortunes of each investor depend upon the profitability of the enterprise as a whole…[with] a sharing or pooling of funds." Revak, 18 F.3d at 87 (internal quotation marks and citations omitted).  If proven at trial, the facts alleged in the Indictment would lead a reasonable jury to conclude that the horizontal commonality requirement is satisfied.[8]  Though the Indictment is not explicit, it can readily be inferred from the facts alleged that the REcoin and Diamond investment strategies depended upon the pooling of investor assets to purchase real estate and diamonds.  See Indictment ¶¶ 11, 14 (the REcoin White Paper advertised that REcoin "invests its proceeds into global real estate based on the soundest strategies"), 18-19, 21 (Diamond was "hedged by physical diamonds," which "were [purportedly] stored in secure locations in the United States and [were] fully insured for their value.").  It can also be inferred that investors' fortunes were necessarily tied together through the pooling of their investments. Cf Revak, 18 F.3d at 87-88; see also Indictment ¶¶ 11, 14, 21.

In this Court's view, the Indictment makes clear that REcoin and Diamond profits would be distributed to investors pro-rata—given that investors were promised "tokens" or "coins" in exchange for, and proportionate to, their investment interests in the schemes.  See Indictment ¶¶ 11-12, 14, 18-19 (REcoin investors received certificates memorializing their "individual ownership in REcoin tokens."); see also Howey, 328 U.S. at 301 (investors "respective shares in th[e] enterprise" served as a "convenient method of determining [their] allocable shares of the profits"); SG Ltd, 265 F.3d at 51 (horizontal commonality established where investors received

---

[8] As a result, we need not address whether strict vertical commonality is also sufficiently alleged.  In any event, the parties' arguments about whether or not the fortunes of REcoin and Diamond investors were tied to the fortunes of Zaslavskiy and his co-conspirators depend upon facts not contained in the Indictment, and thus are not within the scope of our analysis at this stage.

13

"capital units…directly proportional to the size of [their] investment[s]" and "expected profits were a function of the number of 'capital units' held") (citing <u>SEC v. Infinity Grp. Co.</u>, 212 F.3d 180, 184-85, 188-89 (2d Cir. 2000)).  That Zaslavskiy promised investors tokens in exchange for their investments does not undercut our conclusion that the Indictment sufficiently alleges a pooling of assets in a common enterprise.  <u>But see</u> Def. Mot. to Dismiss at 13.

(3) Third, and finally, the facts alleged, if proven, would enable a jury to conclude that investors were led to expect profits in REcoin and Diamond to be derived solely from the managerial efforts of Zaslavaskiy and his co-conspirators, not any efforts of the investors themselves.  <u>See</u> <u>Howey</u>, 328 U.S. at 300 ("[a] common enterprise managed by respondents or third parties with adequate personnel and equipment is [] essential if [] investors are to achieve their paramount aim of a return on their investments."); <u>see also</u> <u>Edwards</u>, 540 U.S. at 396 (a "touchstone" of an investment contract is "the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."); <u>see also</u> <u>Leonard</u>, 529 F.3d at 88 (the Second Circuit does not interpret "solely" literally, "rather, we 'consider whether, under the all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money, and the promoter's contribution in a meaningful way.'") (quoting <u>SEC v. Aqua-Sonic Prods. Corp.</u>, 687 F.2d 577, 582 (2d Cir. 1982)).

REcoin and Diamond investors undoubtedly expected to receive profits on their investments.  <u>See</u> Indictment ¶¶ 11, 14, 21-22; <u>see also</u> <u>Howey</u>, 328 U.S. at 298-300; <u>Edwards</u>, 540 U.S. at 390, 396 (profits refer to "simpl[e] financial returns on…investments" and may "include, for example, dividends, other periodic payments, or the increased value of the investment.") (internal quotation marks and citations omitted); <u>Forman</u>, 421 U.S. at 852 (profits

include "capital appreciation resulting from the development of the initial investment" or "a

participation in earnings resulting from the use of the investors' funds."). The REcoin "token"

was described to investors as "an attractive investment opportunity" which "grows in value,"

Indictment ¶ 14, and as having "some of the highest potential returns," id. ¶ 11; see also SEC

Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The

DAO, SEC Release No. 81207, 2017 WL 7184670, at *9 (July 25, 2017) (reasonable expectation

of profits existed where promotional materials "informed investors that [enterprise] was a for-

profit entity whose objective was to fund projects in exchange for a return on investment...[and

investors] stood to share in potential profits"). The same was true for Diamond investors, who

were told that Diamond was expected to grow by 10 to 15 percent per year. See Indictment ¶ 22.

The Indictment also makes clear that the investors could have reasonably expected their

profits to be derived primarily from the managerial efforts of Zaslavksiy and his team. See

Howey, 328 U.S. at 299-301; Leonard, 529 F.3d at 88. Zaslvskiy's marketing materials and

communications advertised that he (and other skilled professionals) would use their expertise to

develop the ventures, invest proceeds in real estate and diamonds, and generate profits.

Indictment ¶¶ 14, 19, 22; see also Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027,

1035 (2d Cir. 1974) (investors depended on promoters' "expertise in selecting the type of

[product] to be purchased...to make the tangible investment pay off."). Though Zaslavskiy

suggested that Diamond investors could "trade Diamond coins on an external exchange and

make more profit," id. ¶ 22, there is no indication that investors were to have any control over

the management of REcoin or Diamond, see Leonard, 529 F.3d at 88 (citations omitted); see also

SEC v. Glenn W. Turner Enter., Inc., 474 F.2d 476, 482 (9th Cir. 1973), cert. denied, 414 U.S.

821 (1973) (focusing on whether efforts of promoter or third parties are "undeniably significant

15

ones, those essential managerial efforts which affect the failure or success of the enterprise."). Nor is there any indication that investors would have been capable of participating in or directing their investments. See Howey, 328 U.S. at 299-300; see also In re Energy Sys. Equip. Leasing Sec. Litig., 642 F. Supp. 718, 738 (E.D.N.Y. 1986) (Wexler, J.); In re J.P. Jeanneret, 769 F. Supp. 2d at 361. Finally, that market forces might contribute to the value of the schemes' underlying assets does not change the fact that, according to the Indictment, Zaslavskiy and his co-conspirators induced investors to participate based on promises of "the soundest" investment strategies. Indictment ¶ 14; but see Def. Mot. to Dismiss at 17.

For these reasons, we find that the allegations in the Indictment, if proven, would permit a reasonable jury to conclude that Zaslavskiy promoted investment contracts (i.e. securities), through the REcoin and Diamond schemes. See Glen-Arden, 493 F.2d at 1035 ("There have been many other schemes…where the public was led into buying what purported to be tangible items when in fact what was being sold was an investment entrusting the promoters with both the work and the expertise to make the tangible investment pay off."). This is enough to warrant a trial on the merits.

Zaslavsiy separately argues that the virtual currencies promoted in the REcoin and Diamond ICOs are "currencies," and therefore, by definition, *not* securities.[9] See 15 U.S.C § 78c(a)(10) (security does not include "currency or any note, draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited"). In doing so,

---

[9] The Exchange Act (and the Securities Act) exclude "currency" from the list of instruments included in their definitions of "security." See 15 U.S.C § 78c(a)(10); 15 U.S.C. § 77b(a)(1); see also Landreth Timber Co. v. Landreth, 471 U.S. 681, 686 n.1 (1985) (despite their minor differences, these statutes are construed identically in "decisions dealing with the scope of the term" security) (citing cases).

he ignores the fact that, per the Indictment, no diamonds or real estate, or any coins, tokens, or currency of any imaginable sort, ever existed—despite promises made to investors to the contrary. Indictment ¶¶ 16, 23. He also overlooks the fact that simply labeling an investment opportunity as "virtual currency" or "cryptocurrency" does not transform an investment contract—a security—into a currency. See Edwards, 540 U.S. at 393; Forman, 421 U.S. at 848 ("[I]n searching for the meaning and scope of the word 'security' in the Act(s), form should be disregarded for substance and the emphasis should be on economic reality.") (internal quotation marks and citations omitted). As explained, supra, the allegations contained in the Indictment could allow a reasonable jury to find that the investment opportunities described satisfy the Howey test, and therefore meet the definition of "security." See Howey, 328 U.S. 293; see also 15 U.S.C § 78c(a)(10). In any event, because the Indictment is facially sufficient, and because the ultimate characterization of the investment scheme at issue depends on facts that must be developed at trial, we need not resolve this issue at this time.

## C. The Exchange Act and Rule 10b-5 Are Not Unconstitutionally Vague As Applied

As a separate basis for dismissal of the Indictment, Zaslavskiy contends that the United States securities laws are unconstitutionally vague ("void for vagueness") as applied to cryptocurrencies. See Def. Mot. to Dismiss at 18-19. He later suggests that these laws are void for vagueness *as applied* to REcoin and Diamond, although he continues to focus his analysis on cryptocurrency more generally. See Def. Reply at 14-15. Whether or not the investments promoted in the REcoin and Diamond are cryptocurrencies is beside the point at this stage. The question is whether the law under which Zaslavskiy is charged is unconstitutionally vague as applied to his conduct, as it is described in the Indictment. It is not. See United States v. Coonan, 938 F.2d 1553, 1562 (2d Cir. 1991) ("In the absence of first amendment considerations,

vagueness challenges must be evaluated based on the particular application of the statute and not 'on the ground that [the statute] may conceivably be applied unconstitutionally to others in situations not before the Court.'") (quoting <u>New York v. Ferber</u>, 458 U.S. 747, 767 (1982)); <u>see also</u> <u>Mannix v. Phillips</u>, 619 F.3d 187, 197 (2d Cir. 2010); <u>United States v. Motz</u>, 652 F. Supp. 2d 284, 294 (E.D.N.Y. 2009) (Spatt, J.).

   "The Government violates the Due Process Clause when it takes away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." <u>Johnson v. United States</u>, 135 S. Ct. 2551, 2556 (2015) (citing <u>Kolender v. Lawson</u>, 461 U.S. 352, 357-58 (1983)); <u>see also</u> <u>Copeland v. Vance</u>, 893 F.3d 101, 110, 114 (2d Cir. 2018).  When evaluating an "as-applied" challenge to a statute for vagueness, we employ a "two-part test: [we] must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." <u>Farrell v. Burke</u>, 449 F.3d 470, 486, 495 (2d Cir. 2006) (internal quotation marks and citations omitted) (Sotomayor, J.) (adding that, with respect to the second prong, a court may determine "either (1) that a statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement or (2) that, even in the absence of such standards, the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute"); <u>United States v. Farhane</u>, 634 F.3d 127, 139-40 (2d Cir. 2011) (internal quotation marks omitted); <u>see also</u> <u>Kolender</u>, 461 U.S. at 358 ("[T]he more important aspect of the vagueness doctrine is...the requirement that a legislature establish minimal guidelines to govern law enforcement.")

(internal quotation marks and citations omitted).  The challenged Indictment satisfies both

prongs.

First, Zaslavskiy fails to demonstrate that a person of ordinary intelligence would not

have sufficient notice that the charged conduct was proscribed.  Cf Johnson, 135 S. Ct. at 2556-

57; Farrell, 449 F.3d at 486-92; see also Copeland, 893 F.3d at 114 ("[w]hether a statute is

unconstitutionally vague is an 'objective' inquiry"); Dickerson, 604 F.3d at 745-46 (the question

is not "whether [Zaslavskiy] actually received a warning that alerted him [] to the danger of

being held to account for the behavior in question").  Combined, the Exchange Act, 15 U.S.C. §

§ 78c(a)(10) (which identifies an "investment contract" as a type of security), Rule 10b-5, and

the definition of "investment contract" set forth in Howey, "'made it reasonably clear at the

relevant time that [the charged] conduct was criminal.'"  See Mannix, 619 F.3d at 194 (quoting

United States v. Lanier, 520 U.S. 259, 267 (1997)).  Furthermore, "it is not only the language of

a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can

do so as well."  See United States v. Smith, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014), aff'd sub

nom United States v. Halloran, 664 Fed. App'x 23 (2d Cir. 2016), cert. denied, 138 S. Ct. 56

(2017) (citations omitted).  This is the case even when "the facts at issue in [prior] decisions [are]

not 'fundamentally similar' or 'materially similar' to the facts of the defendant's case...so long

as the prior decisions gave reasonable warning."  Id. at 589 (citations omitted).

First, courts are clear that the securities laws are meant to be interpreted "flexibly to

effectuate [their] remedial purpose."  See SEC v. Zandford, 535 U.S. 813, 819 (2002) (internal

quotation marks and citations omitted) (explaining that "[a]mong Congress' objectives in passing

the [Exchange] Act was to insure honest securities markets and thereby promote investor

confidence after the market crash of 1929") (internal quotation marks and citations omitted).

Furthermore, the test expounded in <u>Howey</u> has—for over 70 years—provided clear guidance to courts and litigants as to the definition of "investment contract" under the securities laws.  <u>See</u> <u>SG Ltd.</u>, 265 F.3d at 47 ("[o]ver time, courts have classified as investment contracts a kaleidoscopic assortment of pecuniary arrangements that defy categorization in conventional financial terms").  Moreover, the abundance of caselaw interpreting and applying <u>Howey</u> at all levels of the judiciary, as well as related guidance issued by the SEC as to the scope of its regulatory authority and enforcement power, provide all the notice that is constitutionally required.  <u>See</u> <u>SEC v. Brigadoon Scotch Distrib. Co.</u>, 480 F.2d 1047, 1052 n. 6 (2d Cir. 1973), <u>cert denied</u>, 415 U.S. 914 (1974) (argument that "investment contract" in the Securities Act was void for vagueness was "untenable," "in light of the many Supreme Court decisions defining and applying the term"); <u>see also, e.g.</u>, <u>SEC Report of Investigation Pursuant to Section 21(a) of the</u> <u>Securities Exchange Act of 1934: The DAO</u>, SEC Release No. 81207, 2017 WL 7184670, at *9 ("automation of certain functions through [distributed ledger, blockchain, smart contracts, or computer code] technology...does not remove conduct from the purview of the U.S. federal securities laws"); Jay Clayton and J. Christopher Giancarlo, <u>Regulators are Looking at</u> <u>Cryptocurrency</u>, Wall St. J., Jan. 24, 2018, <u>available at</u> https://www.wsj.com/articles/regulators-are-looking-at-cryptocurrency-1516836363 ("some products that are labeled virtual currencies have characteristics that make them securities"); <u>Public Statement of SEC Chairman Jay Clayton</u> <u>on Cryptocurrencies and Initial Coin Offerings</u>, Dec. 11, 2017, <u>available at</u> http://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 ("simply calling something a 'currency' or a currency-based product does not mean that it is not a security.").

Zaslavskiy's suggestion that the Exchange Act and Rule 10b-5 lack such clear standards that they authorize or encourage arbitrary enforcement fails for the same reasons as his notice

argument. Cf Johnson, 135 S. Ct. at 2556-57; see also Farrell, 449 F.3d at 486-92. The Exchange Act and Rule 10b-5 set forth the types of behavior that constitute securities fraud, and Howey and its progeny set forth the standards needed to cabin their enforcement relative to investment contracts. Furthermore, the conduct charged "falls within the core of the statute's prohibition," and its enforcement in this case is "not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." See Farrell, 449 F.3d at 492-95. The Indictment describes REcoin and Diamond as schemes devised by Zaslavskiy and his co-conspirators to "use [] the money of others on the promise of profits." See Howey, 328 U.S. at 299. The Exchange Act (and Rule 10b-5) are intended to prevent just that: their aim is to "protect the American public from speculative or fraudulent schemes of promoters" like Zaslavskiy and ensure "full and fair disclosure" with respect to securities. See Glenn W. Turner, 474 F.2d at 481 (citations omitted). The relevant statutes and rule, and judicial interpretations thereof, as well as regulatory guidance, provide "sufficiently clear standards to eliminate" any risk of "arbitrary enforcement" of the securities laws in this case. See Farhane, 634 F.3d at 139 (internal quotation marks and citations omitted).[10] The Indictment plainly alleges that REcoin and Diamond were two of the "countless and variable schemes" that in the ever-evolving commercial market, "fall within the ordinary concept of a security." See Howey, 328 U.S. at 299 (internal quotation marks and citations omitted). At this juncture, Zaslavskiy's contrary characterizations are plainly insufficient to by-pass regulatory and criminal enforcement of the securities laws.

---

[10] Whether and when the SEC chooses to engage in formal rulemaking regarding the regulation of digital assets is of no moment here. But see Nagi Mem. in Supp. at 5 (citing Petition for Rulemaking Regarding Digital Assets and Blockchain Technology by Ouisa Capital (March 13, 2017), available at http://www.sec.gov/rules/petitions/2017/petn4-710.pdf)).

## CONCLUSION

Because the Indictment is sufficient under the Constitution and the Federal Rules of Criminal Procedure, and because the law under which Zaslavskiy is charged is not unconstitutionally vague as applied, Zasvlavskiy's motion is denied.  The case will proceed to trial.

SO ORDERED:

Dated: September 11, 2018
Brooklyn, New York

s/ RJD

Raymond J. Dearie
United States District Judge

22